**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
David M. Bass, Esq.
Felice R. Yudkin, Esq.
Proposed Attorneys for Bamboo Abbott, Inc.
t/a Prestige Window Fashions,
Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 09-28689 (MBK)

Chapter 11

| | |
|---|---|
| In re:<br><br>BAMBOO ABBOTT, INC., t/a PRESTIGE WINDOW FASHIONS,<br><br>Debtor-in-Possession. | **REPLY OF THE DEBTOR-IN-POSSESSION TO OBJECTION OF WELLS FARGO BANK, NATIONAL ASSOCIATION TO DEBTOR'S MOTION FOR INTERIM AND FINAL USE OF CASH COLLATERAL PURSUANT TO §§ 361 AND 363 AND GRANTING ADEQUATE PROTECTION** |

**FINAL HEARING DATE:**
August 12, 2009, at 1:00 p.m.

Bamboo Abbott, Inc. t/a Prestige Window Fashions, the within debtor and debtor-in-possession (the "Debtor") by and through its counsel, Cole, Schotz, Meisel, Forman & Leonard, P.A., in reply to the Objection of Wells Fargo Bank, National Association to Debtor's Motion for Interim and Final Use of Cash Collateral Pursuant to §§ 361 and 363 and Granting Adequate Protection (the "Objection") and in further support of the Debtor's Motion for an Order (A) Authorizing the Debtor's Interim and Final Use of Cash Collateral Pursuant to 11 U.S.C. § 361

46758/0001-5912453v1

and 363 and Granting Adequate Protection and (B) Scheduling Final Hearing Pursuant To 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001 (the "Motion"), respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      Despite (a) being adequately protected by (i) an equity cushion of more than 160%, (ii) the granting of replacement liens, and (iii) its statutory entitlements under Section 507(b) of the Bankruptcy Code, (b) a budget showing that the Debtor's cash flow can sustain its continuing operations and (c) a build up in its collateral base over the budget period, Wells Fargo Bank, National Association ("Wells Fargo" or the "Bank") seeks to prohibit the Debtor's use of cash collateral, for the purpose of causing the liquidation of the Debtor's assets to ensure the Bank can force the premature repayment of its loan.

2.      In its overzealous effort to terminate the Debtor's operations by prohibiting the use of cash collateral during the infancy of this case, the Bank relies primarily on liquidation value appraisals of the Debtor's inventory and machinery and equipment to support its contention that it is not adequately protected by an equity cushion (and, presumably, the replacement lien the Debtor has agreed to grant to the Bank). In its analysis, the Bank conveniently disregards the guarantees of the Debtor's principals, which have a value of $1.25 million, and other collateral on which it holds a lien. The Bank also attempts to malign the Debtor's credibility before this Court by making unfavorable insinuations about the Debtor's "failure" to put into place a perpetual inventory system which bears no relevance to the issue at hand (despite the fact that the Bank continually extended credit on the Debtor's stated inventory since the loan's inception in January 2008).

3.      The Bank presents no legal authority to support its contention that the Court should adopt liquidation values (or indeed lower than liquidation values) for the Debtor's assets to determine whether the Bank is adequately protected in the context of a cash collateral hearing

2

when the Debtor has a reasonable prospect of reorganization. Because no such authority exists, the Bank's objection to the Debtor's request to use the Bank's cash collateral should be overruled.

4. The Debtor submits that the Bank is adequately protected and, as a result, cannot defeat the Debtor's efforts to use its cash collateral to operate and pursue reorganization to avoid the potentially catastrophic effect the cessation of its business will have on the Debtor's vendors and the more than 500 families that directly rely on the Debtor for a paycheck. Sustaining the Bank's objection in the face of the Debtor's evidence that the Bank is adequately protected will effectively put the Debtor, a manufacturer in New Jersey where the unemployment rate has climbed to its highest level in 32 years, out of business and those 500 or so people in the Debtor's employ on the unemployment line during one of the worst economic recessions in this country's history.

5. The Bank's request is particularly egregious in light of its receipt of funds from the Troubled Assets Relief Program ("TARP"), a program designed to encourage U.S. financial institutions to build capital to increase the flow of financing to U.S. businesses and consumers and to support the U.S. economy. Under one part of TARP, the U.S. government has already invested $180 billion in more than 250 banks, including Wells Fargo, in efforts to increase consumer credit and lending to businesses. (Wells Fargo is reported to have received $25 billon of TARP funds). Despite Secretary of the Treasury Henry Paulson's October mandate for banks accepting TARP funds to "deploy, not hoard" monies, it has been reported that numerous TARP recipients, including Wells Fargo, have flouted the program's manifest aim.

6. Worse, prior to the Debtor's filing, Wells Fargo placed a stranglehold on the Debtor and ultimately threatened to cease funding, the repercussions of which have forced a

3

company that has thrived for many years into bankruptcy. This Court should put a stop to Wells Fargo's egregious conduct and give the Debtor an opportunity to reorganize. Accordingly, the Debtor requests that the Court overrule Wells Fargo's Objection and permit the Debtor's use of cash collateral pursuant to the terms of a final cash collateral order, the form of which is attached hereto as **Exhibit A**.

## **RELEVANT FACTS[1]**

7.     On July 20, 2009, the first business day after the Filing Date, the Court scheduled and heard the Debtor's request for certain emergent relief as set forth in the Debtor's various "First Day" motions, including the Debtor's request to use Wells Fargo's cash collateral.

8.     At that hearing, the Debtor and Wells Fargo advised the Court that Wells Fargo had consented to the Debtor's limited use of cash collateral for the period through and including July 27, 2009, in accordance with the budget (the "Initial Cash Collateral Budget") attached as Exhibit "A" to the Motion. Accordingly, on July 20, 2009, the Court entered an *Interim Order Authorizing the Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001 and Scheduling Final Hearing Date* [Docket No. 25] (the "First Interim Cash Collateral Order"). In accordance with the First Interim Cash Collateral Order, the Court scheduled an interim hearing on the Debtor's continued interim use of cash collateral for July 27, 2009 (the "Interim Hearing").

---

[1] On July 19, 2009, the Debtor filed, among other documents and pleadings, (i) the Affidavit of Joel S. Botwick in Support of the Debtor's Various "First Day Motions" and Entry of an Emergency Interim Order Authorizing Payment of Certain Pre-Petition Payroll and Related Obligations Pending Hearing on "First Day" Motions (the "Botwick Affidavit") and (ii) the Motion, which was also verified by Mr. Botwick. The Debtor will not repeat the detailed facts set forth in each of the Botwick Affidavit and the Motion but instead incorporates them by reference and will only recite those facts germane to the Motion and not otherwise set forth therein. Terms not otherwise defined herein shall be given the meanings ascribed to them in the Botwick Affidavit and/or the Motion.

9. On July 27, 2009, the Court conducted the Interim Hearing, at which hearing Wells Fargo objected to the Debtor's continued use of cash collateral. Despite that objection and other material misrepresentations by its counsel at that hearing,[2] at the conclusion of the Interim Hearing, the Court authorized the Debtor's continued use of Wells Fargo's cash collateral on an interim basis (through and including August 12, 2009), pursuant to the terms of the *Second Interim Order Authorizing the Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. § 363(c)(2) and Fed. R. Bankr. P. 4001 and Scheduling Final Hearing Date* entered July 29, 2009 [Docket No. 49] (the "Second Interim Cash Collateral Order"), overruling Wells Fargo's objection to the Debtor's interim use of cash collateral pending the Final Hearing, and deferring consideration of the Objection until the Final Hearing.

10. As reflected on the "Budget to Actual Performance" attached hereto as **Exhibit B**, the Debtor has met (actually bettered in most cases) its budgeted expectations. For instance, over the three-week period, the Debtor has exceeded budgeted sales by $59,750, exceeded budgeted collections by $116,300, and disbursed $98,840 less than budgeted. For the first three-week period of the Chapter 11 case, the Debtor has generated positive net cash flow totaling $363,200 (and has bettered the budgeted net cash flow by $215,140).

11. The Debtor continues to maintain that Wells Fargo is adequately protected by a substantial equity cushion and the replacement lien granted Wells Fargo on the Debtor's post-petition assets.

---

[2] For instance, counsel for Wells Fargo stated at the hearing on July 27, 2009, that the Debtor had materially missed its projected cash receipts for the first week of the case – something that was materially wrong (as the Debtor had actually exceeded cash receipts by $87,000 for that period). Moreover, counsel for Wells Fargo misstated at the hearing that the Debtor's budget failed to provide a line item for the Committee's professional fees, when the sum of $75,000 was clearly budgeted in the week ending September 27, 2009 (immediately below the line item for the Debtor's professional fees payable during that same week).

**LEGAL ARGUMENT**

**I.**

**WELLS FARGO HAS FAILED TO PROVIDE THE COURT WITH ANY FACTUAL OR LEGAL SUPPORT FOR ITS OBJECTION AND, THUS, THE DEBTOR SHOULD BE AUTHORIZED TO CONTINUE USING WELLS FARGO'S CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c)(2)(B) AND FED. R. BANKR. P. 4001(b)**

12.   As set forth in the Motion, and based on the uncontroverted evidence set forth in the Debtor's Verified Application submitted in support of the Motion, the Debtor should be authorized to continue to use Wells Fargo's cash collateral as Wells Fargo is adequately protected by the replacement lien on the Debtor's assets offered by the Debtor and by virtue of a substantial equity cushion of at least $12 million (or 145%) – without regard to the $1.25 million personal guarantees that Wells Fargo has commenced suit on in the United States District Court.

**A.   Going Concern Value is the Proper Method for Valuing Collateral**

13.   Without a single case citation, in a footnote on page 6 of the Objection, Wells Fargo "submits" that liquidation values should be used to value the Debtor's assets. (Wells Fargo actually goes one step further and inexplicably, and again without a single case to support its views, applies its lending formulas to the collateral, resulting in a reduction on the eligible inventory alone – which is already "marked down" to the "lower of cost or market" – by $6,309,809).

14.   Wells Fargo's "submission" (a) fails to address the case law set forth in the Motion, i.e., that in reviewing an application to use cash collateral at the outset of a Chapter 11 case "going concern" value is the appropriate method for determining whether an equity cushion exists. See, e.g., Motion at ¶ 35 (citing, inter alia, In re Dynaco Corp., 162 B.R. 389 (Bankr. D.N.H. 1993)) and (b) ignores Congressional direction that valuation of a secured creditor's interest in the collateral "shall be determined in light of the purpose of the valuation and of the

6

proposed disposition or use of such property." Even were liquidation value the proper valuation method – and it is not – further depressing the value of the assets by the advance rates against which Wells Fargo is willing to lend has no basis whatsoever (and Wells Fargo does not supply a single case citation that so provides).

15. Section 506(a) governs the determination of a secured creditor's claim and provides, in relevant part, as follows:

> (a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property … **Such value shall be determined in light of the <u>purpose</u> of the valuation and of the proposed <u>disposition</u> or use of such property**, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. § 506(a) (emphasis added).

16. It has been observed that Section 506(a) provides for flexibility in valuing collateral to ensure the Court has wide discretion to choose the proper standard of valuation in each case – *i.e.*, liquidation value, replacement value, going concern value – and to account for appreciation or depreciation in the value of the property as well as any changes in the amount of the secured creditor's claim. <u>In re Vacuum Cleaner Corp. of Am.</u>, 33 BR. 701, 703 (Bank. E.D. Pa. 1983); <u>In re Winthrop Old Farm Nurseries, Inc.</u>, 50 F.3d 72, 73 (1st Cir. 1995). The Bankruptcy Code's legislative history supports this conclusion:

> Subsection (a) of [§ 506] separates an undersecured creditor's claim into two parts – he has a secured claim to the extent of the value of his collateral; he has an undersecured claim for the balance of his claim. "Value" does not necessarily contemplate forced sale or liquidation value of the collateral; nor does it imply a full going concern value. Courts will have to determine value on a case-by-case basis, taking into account the facts of each case and the competing interests in the cases.

Winthrop, 50 F.3d at 73-74 (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6312).

17. The Senate Report's commentary on Section 361 further evidence's congressional intent that courts use a flexible approach in valuing collateral:

> Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes although forced sale liquidation value will be a minimum.
>
> In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case.

Winthrop, 50 F.3d at 74 (quoting S.R. Rep. No. 989, 95th Cong., 2d Sess. 54 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5840).

18. The United States Supreme Court's decision in Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 956, 117 S.Ct. 1879, 1884-85, 138 L.Ed.2d 148 (1997) underscores that the Section 506(a) analysis is two fold and flexible: the Court must first determine the purpose of the valuation and then the proposed disposition of the collateral.[3]

19. In Rash, the debtors proposed in their Chapter 13 plan to retain possession and use of a truck subject to a lien, over the secured creditor's objection, and to provide the creditor with payments over the life of the plan that would total the present value of the collateral under the so-called "cram down" provision of the Bankruptcy Code. 11 U.S.C. § 1325(a)(5). The debtors argued the truck should be valued at the lower "foreclosure sale" standard while the

---

[3] "Although Rash arose in the context of a chapter 13 case, its application in chapter 11 cases is not in question." In re Preventive Maint. Servs., Inc., 359 B.R. 607 (Bankr. W.D. La. 2007) (citing Matter of T-H New Orleans Ltd. P'ship, 116 F.3d 790, 799 (5th Cir. 1997)).

secured creditor advanced the replacement value approach, which would allow it to realize a higher total recovery.

20. The Supreme Court first noted that the "proposed disposition or use" of the collateral language in Section 506(a) is "of paramount importance to the valuation question." Rash, 520 U.S. at 956. See also In re Sandy Ridge Dev. Corp., 881 F.2d 1346 (5th Cir. 1989). The Court then found that if a secured creditor rejects a Chapter 13 plan, the debtor has two choices – surrender the collateral or retain the collateral and cram down the secured creditor. Rash, 520 U.S. at 956. The Court concluded that applying the foreclosure value standard when the debtor invokes the cram down choice assigns no import to the different results of the debtor's choice to surrender or retain the property. Id. To the contrary, a replacement value standard "distinguishes retention from surrender and renders meaningful the key works 'disposition or use.'" Id. Thus, the Court found that because the disposition was the debtors' continued retention and use of the truck in order to generate an income stream, the replacement-value standard was appropriate in determining the value of the collateral.

21. Adopting this flexible approach to valuation, courts have used going concern/fair market valuations in the context of cash collateral hearings. See, e.g., Dynaco, 162 B.R. at 398. See also In re Sharon Steel Corp., 159 B.R. 165 (Bankr. W.D. Pa. 1993) (liquidation in place valuation, which contemplates bulk sale of all of debtor's assets, was not appropriate in determining whether lenders would be adequately protected upon use of cash collateral in steel companies' Chapter 11 proceeding). Courts have also held that a secured party is adequately protected when proceeds of accounts receivable are being used by the debtor to generate new inventory and accounts. Fed. Nat'l. Mort. v. Dacon Bolingbrook Assocs. P'ship, 153 B.R. 204, 214 (N.D. Ill. 1993) (security interest is adequately protected to the extent the debtor reinvested

9

rents in the operation and maintenance of the property); In re Stein, 19 B.R. 458, 460 (Bank. E.D. Pa. 1982) (use of cash collateral allowed where it was necessary to meet operation costs and secured creditor's position could only be enhanced by the continued business operations).

22. Application of Rash and the mandate of §506(a) to the facts of this case clearly establishes that the Court should reject Wells Fargo's liquidation value approach to value Wells Fargo's secured claim. Instead, the Debtor believes it has more than a reasonable likelihood of reorganizing its financial affairs. As such, the Court should adopt the Debtor's valuation for its assets, which include both fair market values and "cost" or replacement values, and authorize the Debtor's use of cash collateral based on the significant equity cushion (and replacement lien).

23. Indeed, the use of cash collateral will not diminish, but will actually preserve and enhance Wells Fargo's secured position. Attached hereto as **Exhibit C** is an adequate protection analysis prepared by the Debtor which anticipates that the Debtor will actually increase the Bank's collateral base by $1,520,000 over the 13-week budget period (or an 8.63% increase). (In fact, over the 3-week period since the Chapter 11 case has been filed, the Debtor has increased the Bank's collateral base by $372,000 (or in excess of 2.1%)).

24. The alternative proposed by Wells Fargo – which is on a mission to destroy the Debtor without regard for the interests of the Debtor, its employees and creditors – is to force the Debtor to close down its operations less than 30 days into the case and thus destroy any chance to reorganize the Debtor's affairs for the benefit of all parties-in-interest – a result not contemplated by the Bankruptcy Code given the facts and circumstances of this case. Wells Fargo's requests and demands on the Debtor are designed to make the Debtor fail. If, as Wells Fargo desires, the Debtor's business is shut down, then Wells Fargo's stilted views of the value of the Debtor's assets will become a self-fulfilling prophecy.

10

**B.  The Bank's "Benefit of the Bargain" Argument Misconstrues the Measure of Adequate Protection Required under the Law**

25. Throughout its papers, Wells Fargo asserts that it is entitled to the "benefit of its bargain", i.e., that Wells Fargo is required to receive the equivalent of what it would have received had there been no bankruptcy filed. Wells Fargo's so-called entitlement to "benefit of its bargain" (e.g., to limit the Debtor to only 85% of its accounts receivable, for payment of default rate interest, and to impose borrowing formulas to value the Debtor's assets) is misplaced, intentionally misleading and, of course, is not the law.[4]

26. Adequate protection focuses on the value of the collateral itself, not the whole economic bargain of the credit agreement. Facing a similar argument, the 8th Circuit held:

> Contrary to GMAC and Lend Lease's contention, creditors have no right to be placed in the same economic position as if there had been no bankruptcy filing." Congress has observed "[t]here may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the policy of the bankruptcy laws." S.Rep. No. 989 at 53, 1978 U.S.Code Cong. & Ad.News at 5839. Bankruptcy involves a balancing of interests between the debtor and creditors. The effect of the bankruptcy laws is to alter or eliminate a debtor's obligations to its creditors upon the advent of the debtor's inability to meet those obligations. These changes are imposed as a matter of law and leave creditors in a very different economic position

---

[4] Presumably Wells Fargo has seized upon language from the Congressional record discussing the concept of adequate protection, which notes that "[s]ecured creditors should not be deprived the benefit of their bargain." Of course, absent from Wells Fargo's Objection is reference to the next portions of the record, which provides as follows:

> There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the policy of the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest …

H.R. Rep. No. 595, 95th Cong., 1st Sess. 356 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6295.

11

>than before the debtor filed for bankruptcy. A creditor's interest in the collateral is tied to possible default by the debtor and, like any contractual agreement, is always subject to existing federal law, including the automatic stay provisions under section 362(a).

Lendlease v. Briggs Transp. Co. (In re Briggs Transp. Co.), 780 F.2d 1339, 1346-47 (8th Cir. 1985).

27. The primary case relied upon by Wells Fargo is the Third Circuit's decision in In re Swedeland Dev. Group, Inc., 16 F.3d 552 (3d Cir. 1994). Wells Fargo ignores (or deliberately omits reference to the fact) that Swedeland addressed the concept of adequate protection in a much different context, i.e., in the context of a "priming lien" rather than in the context of cash collateral. As the bankruptcy judge in Dynaco aptly observed:

>In my view it makes a big difference whether we are talking about a § 364 priming lien situation, in which the total encumbrances against the property of the estate are being *increased* compared to a § 363 proposal for the use of cash collateral in which the pertinent inquiry is whether the level of the fluctuating collateral involved will be *maintained.*

Dynaco, 162 B.R. at 397 (emphasis in original). Concepts of adequate protection in the context before this Court is much different than in those presented to the court in Swedeland.

28. The other cases cited by Wells Fargo for this proposition also are of no help to Wells Fargo. For instance, Wells Fargo relies on In re Republic Tech. Intern., L.L.C., 267 B.R. 548, 554-55 (Bankr. N.D. Ohio 2001), which Wells Fargo cites for its "holding that a creditor is entitled to that amount of adequate protection which would enable it to receive the benefit its bargain." See Objection at ¶18. Wells Fargo misstates the "holding" of that decision, which actually denied the creditor's request for adequate protection in that case. (In Republic Tech, a lessor (not a secured creditor) requested adequate protection in the form of lease payments. The court denied that request because lessor's lease (structured by the lessor with up front payments) only required payments for the period preceding the bankruptcy. Thus, in enforcing the lease as

12

written the Court held the lessor was not entitled to adequate protection but only entitled to its benefit of the bargain – and not more.)

29.    Next, Wells Fargo relies on In re Hart Ski Mfg. Co., Inc., 9 B.R. 397, 400 (Bankr. D. Minn. 1981), quoting that case for the proposition that "[t]he secured creditor is entitled to the indubitable equivalent or full benefit of its bargain." However, Hart Ski simply held that an oversecured lender that is entitled to attorneys' fees under its loan documents, would be entitled to them under **Section 506(b)**, i.e., maintaining the benefit of its bargain. The Debtor does not dispute that an oversecured creditor is entitled to attorneys' fees and interest under **Section 506(b)**, but the holding in Hart Ski hardly supports Wells Fargo's position that this Court must adequately protect its interest by enforcing each term of the pre-petition credit agreement as written.

30.    As long as the Debtor's proposed adequate protection will preserve the Bank's interest in the collateral securing the debt pending the outcome of the bankruptcy proceeding, Wells Fargo will have received the "benefit of its bargain" within the meaning of Section 361 of the Bankruptcy Code.

**C.    Wells Fargo is Not Entitled to the Current Payment of Interest – Whether at the Default Rate or Otherwise**

31.    Wells Fargo either misunderstands that Sections 506(b) and 361(1) of the Bankruptcy Code are not one in the same, or seeks to impermissibly bootstrap the two Sections to suggest the Debtor is "required" to pay interest (at the *default* rate no less) simply because Wells Fargo is oversecured. Wells Fargo is wrong.

32.    First, there is nothing in the Bankruptcy Code that requires the ongoing payment of interest to an oversecured creditor during the pendency of a bankruptcy case. Rather, Section 506(b) merely permits a secured creditor to accrue interest during the pendency of a case.

13

Indeed, not a single case cited by Wells Fargo in its Objection holds otherwise. As the Supreme Court's decision in Timbers dictates, accrued interest under § 506(b) is not paid to an oversecured creditor until the plan's confirmation or its effective date, whichever is later. United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assoc., Ltd.), 793 F.2d 1380, 1381, 1407 (5th Cir.1986), on reh'g, 808 F.2d 363 (5th Cir. 1987 (*en banc* court reinstating panel opinion)), aff'd, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

33. While the Debtor certainly does not dispute that periodic payments in accordance with Section 361(1) are, when necessary, made in the context of adequate protection to ensure that the secured creditor is compensated for the decline in its collateral (often at the contract rate set forth in a pre-petition credit agreement), they are prescribed as a measure of adequate protection – not as a matter of course because the creditor is oversecured. What Wells Fargo fails to grasp is that periodic payments are but one form of adequate protection. Where a secured creditor is otherwise provided with adequate protection without the necessity of periodic payments – as is the case here – there is no need to place the debtor in financial jeopardy and provide periodic payments as adequate protection. Even if there was such a basis – and there is not, there is certainly no need to pay it at the *default* rate.[5] Not surprisingly, Wells Fargo fails to cite a single case supporting its so-called "entitlement."

---

[5] Wells Fargo has been charging the Debtor interest at the default rate since November 2008. Under the pre-petition credit agreement, and provided there is no default, the Debtor has the option of converting the principal indebtedness under the Revolving Credit Facility to a rate of LIBOR plus 2% (which today would be a rate of 2.5%). Otherwise the non-default contract rate of interest on the Revolving Credit Facility and the Equipment Term loan is equal to prime rate (today 3.25%) and the non-default contract rate of interest on Structural Overadvance is prime plus 1% (4.25%). Default rates are currently prime plus 3% (6.25%) on the Revolving Loan and the Equipment Term Loan and prime plus 4% (7.25%) on the Structural Overadvance (continued…)

14

34.     Quite simply, as set forth in the Motion, Wells Fargo is adequately protected by its equity cushion and by the replacement lien that the Debtor has offered.[6]  The Debtor should be able to utilize <u>all</u> of its cash during the pendency of this case.  The more money that is available to the Debtor, the more raw material purchases it can make, which in turn will lead to more sales.  Wells Fargo "choked" the Debtor for months prior to the filing with respect availability, thereby depriving the Debtor of access to its cash and risking the Debtor's viability.  It should not be permitted to continue its "grab" post-petition.  Wells Fargo simply is not "entitled" to interest payment – whether at the default rate or otherwise.[7]  This is particularly true under the facts of this case, <u>i.e.</u>, where the Bank is adequately protected by a significant equity cushion and the granting of replacement liens and in fact the Bank's collateral base is actually being built up as a result of the Debtor's use of cash collateral.  Accordingly, the Debtor requests that the Court deny Wells Fargo's request for its so-called "entitlement" to default rate interest,

---

(…continued)
Term Loan.  The Debtor estimates that the difference in default and non-default interest is approximately $20,000 per month.

[6] There are other forms of "adequate protection" that the Debtor has provided Wells Fargo.  For instance, Wells Fargo also has its statutory entitlements under Section 507(b) of the Bankruptcy Code.  Moreover, since at least July 27, 2009, the Debtor has been providing to Wells Fargo on a <u>daily</u> <u>basis</u> financial reporting, including submissions of borrowing base certificates and inventory certifications, as it had done historically, and has provided complete access and information to Wells Fargo and its auditors.  In fact, there are days when Wells Fargo has several auditors on-site at the Debtor's premises.  Although there are obviously many administrative tasks the Debtor's financial staff has been confronted with in connection with this Chapter 11 case (including preparation of the schedules and statement of financial affairs and other reporting for the Office of the United States Trustee), it has gone to extraordinarily lengths to provide Wells Fargo the access and information it has requested.  <u>The Debtor has not refused any request made of its staff by Wells Fargo or its auditors</u>.

[7] Denying the payment of such "interest" as adequate protection does not impact Wells Fargo's rights under Section 506(b).

15

and find that it is adequately protected by the adequate protection package offered in the Motion (*i.e.*, an equity cushion and replacement liens).

D. **The Debtor's Operations Provide Sufficient Basis for the Continuation of the Use of Cash Collateral**

35. The Objection is short on substance and long on conclusory statements not supported by the record or any "facts". For instance, without any actual supporting "facts", Wells Fargo puts into question the Debtor's ability to survive on cash collateral and ultimately reorganize. To "support" its bald statements, Wells Fargo relies on a "budget" that it prepared – a copy of which it attached as Exhibit A to its Objection. The Debtor is fortunate that it does not need to rely on Wells Fargo to prepare its budget. For instance, Wells Fargo predicted in *its* budget – attached as Exhibit "A" to its Objection – that the Debtor "Over-projected" its sales in the first three weeks of this case by nearly $500,000 (i.e., by $489,723). As set forth on Exhibit "B" hereto, the Debtor actually exceeded its budgeted sales by $59,750, or $549,472 better than Wells Fargo predicted. Similarly, in its budget, Wells Fargo projected that the Debtor would have operating expenses of $2,849,674. The Debtor projected operating expenses of $2,721,940 during the same period. The Debtor actually spent $2,623,100 during that period, or $226,574 less than what Wells Fargo insisted the Debtor would be required to spend. All told, the Debtor did not operate at the modest $20,326 net cash that Wells Fargo predicted – but much better, i.e., with net cash flow of $363,200.

36. Wells Fargo's contentions that its collateral is depreciating (or not adequately replaced) and that the Debtor is incapable of reorganization are simply based on false assumptions and conjecture. Actual performance since the filing dispels Wells Fargo's contentions. For instance, as set forth in the "Budget to Actual", the Debtor's actual post-petition operations have been more profitable than even projected by the Debtor. Wells Fargo

16

fails to provide the Court with any substantiated "facts" for disallowing the Debtor's use of cash collateral. In fact, the Objection contains one unsubstantiated assumption after another, all of which are contrary to facts, as set forth in the Motion (which was verified by Mr. Botwick) and otherwise dispelled here.

37.    As set forth in the Motion, a court's inquiry with respect to a debtor's motion to use cash collateral should focus on whether the creditor is adequately protected by the debtor's use of its cash collateral. As set forth in the Motion, Wells Fargo, if its lien is valid, is secured by, among other assets, accounts and notes receivable of approximately $6 million and $329,000[8] respectively, inventory in excess of $11.5 million,[9] and machinery and equipment value of $2.34 million (which is at cost less depreciation instead of at a higher replacement value) for a total collateral base of no less than $20.2 million against debt of approximately $8.2 million. Of course, when a creditor intentionally omits additional collateral and other security protecting its loans (as it has done with, among other collateral, the notes receivable and the

---

[8] With respect to the Notes Receivable, Wells Fargo ignores that the parties obligated on those notes have continually performed in accordance with those written instruments, claiming without any support that "in all likelihood uncollectable and totally worthless." Simply, there is no basis for such a statement.

[9] In an attempt to divert the Court's attention, Wells Fargo devotes a substantial portion of the Objection to the fact that the Debtor does not maintain a perpetual inventory system. Putting aside (a) whether such a system would even have any benefit (in light of the type of inventory the Debtor maintains), and (b) the Bank's misleading comments about the last physical inventory (omitting reference to a physical inspection of the inventory in which the Bank was present in the month preceding the bankruptcy filing which disclosed no material deviations from the stated inventory levels), Wells Fargo's cries that the inventory levels are "anybody's best guess", "unreliable" and a "complete mystery" and that it has "little confidence" therein defy credibility. Indeed, if the inventory were so "unreliable" and a "complete mystery" and if Wells Fargo truly had "little confidence that the Debtor's stated inventory levels are accurate," how does Wells Fargo explain that it never ceased lending against the Debtor's stated inventory all the way through the Filing Date? Wells Fargo's attempts to belittle the inventory notwithstanding, the fact is that the inventory is sufficiently stated to provide Wells Fargo with an equity cushion.

17

personal guarantees of Messrs. Botwick and Goldweitz), it is not difficult to artificially lower the collateral base for equity cushion analysis. This Court should not be fooled by Wells Fargo's chicanery.[10] The fact is Wells Fargo is protected by an equity cushion in excess of $12 million without reference to the personal guarantees. When properly including the personal guarantees and notes receivable into the equation, which are both indisputably part of the Bank's security for the repayment of its loans, Wells Fargo's equity cushion is at least $13.3 million, or 161%.

38.    Thus, when viewed in the context of the fact that the Debtor is operating profitably, that a substantial equity cushion exists, and that there is no diminution in the value of Wells Fargo's collateral, the Debtor submits that the Court must find that the Debtor is a viable entity capable of reorganization, that Wells Fargo is adequately protected and that the Debtor should be permitted to continue to use Wells Fargo's cash collateral.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[10] If the personal guarantees were worthless – as the Wells Fargo equity cushion analysis suggests – then why has Wells Fargo filed a complaint in the United States District Court for the collection of the $1.25 million due from Messrs. Botwick and Goldweitz?

WHEREFORE, the Debtor respectfully requests that the Court authorize the Debtors' continued use of cash collateral, overrule the Objection filed by Wells Fargo, and grant such other relief as the Court deems just and appropriate under the circumstances.

    Respectfully submitted,

    COLE, SCHOTZ, MEISEL,
    FORMAN & LEONARD, P.A.
    Proposed Attorneys for Bamboo Abbott, Inc.
    t/a Prestige Window Fashions, Debtor-in-Possession

    By: */s/ Michael D. Sirota*
        Michael D. Sirota
        David M. Bass
        Felice R. Yudkin

DATED:  August 10, 2009