**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
David M. Bass, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Bamboo Abbott, Inc.
t/a Prestige Window Fashions, Debtor-in-Possession

|  |  |
|---|---|
| In re:<br><br>BAMBOO ABBOTT, INC. t/a Prestige<br>Window Fashions,<br><br>              Debtor-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE MICHAEL B. KAPLAN<br>CASE NO. 09-28689 (MBK)<br><br>Chapter 11<br><br>**(Proposed) Bid Procedures Hearing: January 12, 2010 at 2:00 p.m.**<br>**(Proposed) Approval Hearing: January 21, 2010 at 2:00 p.m.**<br>**(Proposed) Sale Objection Deadline: January 20, 2010 at 4:00 p.m.** |

**ORAL ARGUMENT REQUESTED**

**VERIFIED APPLICATION IN SUPPORT OF THE DEBTOR'S MOTION FOR AN
ORDER PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365 AND 1113 AND FED. R.
BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET
PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTOR'S ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM,
MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION
SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND
BEST OFFER; (4) AUTHORIZING THE DEBTOR TO SELL SUBSTANTIALLY
ALL OF ITS ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS AND TO ASSUME AND ASSIGN CERTAIN RELATED
EXECUTORY CONTRACTS, UNEXPIRED LEASES AND ITS COLLECTIVE
BARGAINING AGREEMENT; AND (5) GRANTING OTHER RELATED RELIEF**

TO:    HONORABLE MICHAEL B. KAPLAN
         United States Bankruptcy Judge

The Verified Application of Bamboo Abbott, Inc. t/a Prestige Window Fashions, the

within debtor and debtor-in-possession (the "Debtor"), by and through its counsel, Cole, Schotz,

Meisel, Forman & Leonard, P.A., respectfully represents:

## I.    PRELIMINARY STATEMENT

1.    Over the last several months, the Debtor and its Court retained investment banker,

SSG Capital Advisors, LLC ("SSG"), have aggressively pursued a potential sale of substantially

all of the Debtor's assets as a going concern.  During the last two months, discussions intensified

with several parties.  However, one of those parties, Ventanas Acquisition Corporation (the

"Stalking Horse Bidder"), a subsidiary of a private equity fund managed by merger, acquisition

and operation specialist Platinum Equity Advisors, LLC (collectively, with its affiliates,

"Platinum Equity"), has stepped to the forefront and is prepared to enter into a "stalking horse"

agreement that, subject to the terms thereof and entry of the Bidding Procedures Order as

requested herein, including, inter alia, approval of the Expense Reimbursement, will enable a

competitive bidding process to take place that will maximize the going concern value of the

Debtor's assets.  This Motion is the logical last step in wrapping up SSG's extensive,

comprehensive marketing process.  Potential bidders will now have a target against which they

can assess a transaction while the Debtor can be assured of a sale of its assets at going concern

prices.  Upon a closing, the Debtor's business will in short order receive a well-needed cash

infusion and sufficient liquidity necessary to more effectively meet the demands of the Debtor's

business.  The sale transaction proposed herein maximizes the value of the Debtor's assets and

enables its business operation to be sold as a going concern for the benefit of vendors, customers

and employees.  Accordingly, the Debtor believes approval of the proposed Bidding Procedures

and related transactions within the timeframe set out below avoids the potential cessation of

operations, financial deterioration of the Debtor's business, and will result in the highest and best

46758/0001-6180090v1

price for the Debtor's assets. In sum, the Debtor believes the sale process as proposed herein is in the best interest of all of the Debtor's stakeholders.

## II.    INTRODUCTION AND JURISDICTION

2.    This Verified Application is submitted in support of the Debtor's motion (the "Motion") for an Order pursuant to 11 U.S.C. §§ 105(a), 363, 365 and 1113 and Fed. R. Bankr. P. 2002, 6004 and 6006: (1) Approving a "Stalking Horse" Asset Purchase Agreement for the Sale of Substantially All of the Debtor's Assets; (2) Approving Bidding Procedures and Form, Manner and Sufficiency of Notice Thereof; (3) Scheduling (a) an Auction Sale and (b) a Hearing to Consider Approving the Highest and Best Offer; (4) Authorizing the Debtor to Sell Substantially All of its Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Related Executory Contracts, Unexpired Leases and its Collective Bargaining Agreement; and (5) Granting Other Related Relief (the relief requested in subparts (1) through (3) is referred to as "Part I of the Motion" and the proposed Order granting Part I of the Motion, submitted herewith, is referred to as the "Bidding Procedures Order"; the relief requested in subparts (4) and (5) is referred to as "Part II of the Motion" and the proposed Order granting Part II of the Motion is referred to as the "Approval Order").

3.    This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

4.    The statutory predicates for the relief requested herein are Bankruptcy Code Sections 105(a), 363, 365 and 1113 and Bankruptcy Rules 2002, 6004, and 6006.

5.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

46758/0001-6180090v1

### III.    FACTUAL BACKGROUND

**A.    The Debtor's Bankruptcy Filing and Business**

6.      On July 19, 2009 (the "Filing Date"), the Debtor filed a voluntary petition for
relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").
Since the Filing Date, the Debtor has remained in possession of its assets and continued
management of its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the
Bankruptcy Code.

7.      On or about August 3, 2009, the Office of the United States Trustee appointed an
Official Committee of Unsecured Creditors (the "Committee").

8.      A detailed description of the Debtor's businesses and the facts precipitating the
filing of the Debtor's Chapter 11 proceeding are set forth in the Affidavit of Joel S. Botwick (the
"Botwick Affidavit") in support of the Debtor's various "First Day Motions."  Those facts are
incorporated herein by reference.

9.      As set forth in more detail in the Botwick Affidavit, the Debtor manufactures and
distributes custom made window coverings.  The Debtor's Chapter 11 proceeding was
precipitated by limited cash availability resulting from restricted borrowing conditions and a
general downturn in the economy leaving the Debtor unable to timely deliver products to its
customers and without adequate cash to meet its day-to-day operating needs.  The Debtor
evaluated several options to resolve its financial difficulties and maximize value for the benefit
of all stakeholders.  Despite its best efforts, the Debtor was unable to effectuate the necessary
restructuring goals without resorting to the protections afforded by Chapter 11.

**B.    Background and Current Business Operations**

10.      As set forth in more detail in the Botwick Affidavit, as of the Filing Date, the
Debtor was a party to a pre-Filing Date senior secured financing facility (the "Prepetition Credit

4

Facility") with Wells Fargo Bank, National Association ("Wells Fargo") dated as of January 25, 2008, consisting of (a) a revolving credit facility in an amount up to $13 million (the "Revolving Credit Facility"), and (b) the following term loans: (i) an Equipment Term loan in the original principal amount of $892,000; and (ii) a Structural Overadvance Term loan in the original principal amount of $600,000.

11.     The Prepetition Credit Facility is governed by that certain Credit and Security Agreement dated as of January 25, 2008, and evidenced by various notes (collectively, the "Notes"), each dated as of January 25, 2008, including (a) that certain Revolving Note; (b) that certain Equipment Term Note in the original principal amount of $892,000; and (c) that certain Structural Overadvance Term Note in the original principal amount of $600,000.

12.     In accordance with the Credit and Security Agreement, the Prepetition Credit Facility is secured by substantially all of the Debtor's personal property, including, without limitation, inventory and accounts receivable (collectively, the "Collateral").

13.     As of the Filing Date, borrowings under the Revolving Credit Facility were subject to a borrowing base tied to the Company's eligible inventory and accounts receivable. As of the Filing Date, outstanding obligations under the Prepetition Credit Facility totaled approximately $8.42 million.  Wells Fargo has asserted that its current indebtedness approximates $9.0 million.

14.     The Debtor did not obtain debtor-in-possession financing upon the commencement of this case.  Instead, the Debtor has financed its operations throughout this case through the use of Wells Fargo's cash collateral.  In the first few months after the Filing Date, the Debtor exceeded budgeted targets and operated on a cash flow positive basis.  Nevertheless, facing forecasted declining sales during its slow season (in the latter part of the calendar year)

and unable to secure debt financing necessary to implement a feasible exit from Chapter 11, the

Debtor determined in or about mid-August 2009 to find a suitable financial or strategic partner to

provide the impetus for the Debtor's emergence from Chapter 11.

**C.    Marketing Efforts and Sale Process**

15.    Indeed, since the Filing Date, the Debtor has devoted substantial time to critically

examining its business operations and funding requirements to identify the most efficient and

comprehensive options for emerging from Chapter 11 and maximizing value for stakeholders.

The Debtor has explored and evaluated various strategic alternatives including attempts to attract

third party financing/investment as well as a possible sale of the Debtor's assets.

16.    To assist the Debtor in this regard, the Debtor sought to retain SSG as its

exclusive investment banker.

17.    On November 4, 2009, the Court entered an Order, *nunc pro tunc* to October 16,

2009, approving the Debtor's retention of SSG as the Debtor's exclusive investment banker in

this proceeding to assist the Debtor in connection with the sale of its business.

18.    Commencing immediately with its engagement in mid-October 2009, SSG

initiated an extensive and aggressive marketing of the Debtor's assets for sale as a going concern

and began soliciting suitable potential buyers (including those potentially interested parties with

whom the Debtor had been in discussions).

19.    Since SSG's retention, SSG and the Debtor identified and contacted

approximately fifty potential financial and strategic counterparties.  Approximately nineteen of

these parties received a confidential information memorandum detailing the operations and

finances of the Debtor.  Of these, seven parties submitted initial indications of interest to acquire

substantially all of the assets of the Debtor.  To date, SSG has forwarded twenty-five

confidentiality agreements to interested parties of which nineteen have been executed.  All

6

parties that have signed a confidentiality agreement have been granted access to detailed

financial, operational, legal and other documents necessary to facilitate a comprehensive due

diligence review by prospective buyers, and eight parties were given the opportunity to speak

with the Debtor and its advisors and to conduct site visits with respect to the assets to be

acquired.  Seven of these parties (five private equity firms and two strategic investors) submitted

preliminary offers and/or term sheets for various types of proposed transactions.

20.    These original six preliminary proposals have been the basis for extensive

discussions and negotiations with the Debtor, ongoing diligence and discussions with

management, and visits to the Debtor's facilities.  The Debtor has pursued, and continues to

pursue, potential transactions with at least two of the six parties.  However, ultimately, based

upon various factors, including the increase in consideration offered by the Stalking Horse

Bidder through active negotiations regarding the terms and conditions of the Asset Purchase

Agreement (the "Asset Purchase Agreement"), the Debtor is close to reaching agreement on the

terms of an Asset Purchase Agreement with the Stalking Horse Bidder[1] for the purchase of the

Purchased Assets (as defined in the Asset Purchase Agreement) for the aggregate price of cash of

$8.2 million, subject to certain adjustments, plus the assumption of certain liabilities, including

---

[1] The Debtor and the Stalking Horse Bidder remain in discussions finalizing the Asset
Purchase Agreement and the Debtor and the Stalking Horse Bidder expect to enter into the
definitive Asset Purchase Agreement imminently.  The expected salient provisions of the Asset
Purchase Agreement are set forth in Section IV below.  Once the Debtor and the Stalking Horse
Bidder execute the Asset Purchase Agreement, that copy will be filed with the Court and
available on the Court's CM/ECF website and available from the Debtor's counsel upon written
request.  Because the terms of the Asset Purchase Agreement may change, parties are
encouraged to review the executed Asset Purchase Agreement once it is filed for its terms and
should not rely on the summary below.

46758/0001-6180090v1

certain cure costs and postpetition administrative expenses, which liabilities the Debtor estimates to be no less than $9,450,000.[2]

21.     The Stalking Horse Bidder is a subsidiary of a private equity fund managed by Platinum Equity, a firm that specializes in the merger, acquisition and operation of companies that provide services and solutions to customers in a broad range of business markets, including information technology, telecommunications, logistics, metals services, manufacturing and distribution.  Since its founding in 1995, Platinum Equity has completed nearly 100 acquisitions with more than $27.5 billion in aggregate annual revenue at the time of acquisition.

22.     At this juncture, the Stalking Horse Bidder's bid is the most well-developed of the bids.  The other parties are still completing diligence efforts and performing other analyses with respect to their proposals, and while the Debtor is committed to continuing to work with these bidders to bring their bids to fruition, if possible, the estate can no longer bear the risk and uncertainty of further protracted marketing efforts.  At this point, the Stalking Horse Bidder represents the proverbial "bird in the hand," is a fair and reasonable bid for substantially all of the assets of the Debtor, and provides the best platform from which a successful and value-maximizing auction and ultimate disposition of the Debtor's assets on a going concern basis may take place.

---

[2] As noted below, Wells Fargo has consented to the proposed sale to the Stalking Horse Bidder on the terms set forth in the Asset Purchase Agreement.  In this regard (and currently with respect to this contemplated sale transaction only), it has agreed to accept less than the full amount of its claimed indebtedness and has agreed to fund a carve-out to estate professionals pursuant to a stipulation and consent order that will be filed with the Court shortly.  Additionally, it is the Debtor's understanding that the Stalking Horse Bidder is finalizing the terms of the assumption of the Debtor's obligations to Turnils North America (which are believed to be in excess of $1.6 million).  It is the Debtor's understanding that if such a deal were reached, that the Stalking Horse Bidder will assume a $1.2 million obligation to Turnils, with Turnils waiving the remaining $400,000 of claims against the Debtor's estate.  Thus, the Debtor submits that the actual "value" of the sale to the estate under the stalking horse bid exceeds $10.2 million.

23.    To that end, now that the Debtor has essentially concluded negotiations with the Stalking Horse Bidder as a potential stalking horse bidder (subject to approval by this Court), and after approval of the Bidding Procedures Order, the Debtor will seek to bring to fruition other Qualified Bids through ongoing negotiations with other bidders that have already expressed significant interest in the Debtor's assets in order to maximize the value thereof at an Auction on the terms as requested herein.

24.    Because of various factors, including the seasonality of the Debtor's business operations, liquidity restraints, and the Stalking Horse Bidder's desire not to unnecessarily tie up capital or risk of losing other business opportunities, the Debtor believes it is essential to move forward with the sale process on an expedited basis and within a specified time frame. Consequently, the Debtor has determined that it is in the best interest of its estate, creditors, and other parties in interest to move forward with the sale process set forth herein.

25.    Accordingly, the Debtor has proposed the following timeline for the sale of the Purchased Assets (as defined in the Asset Purchase Agreement):[3]

- January 12, 2010 – Bidding Procedures Hearing
- January 18, 2010, at 1:00 p.m. – Submission Deadline for Qualified Bids (defined below)
- January 20, 2010, at 4:00 p.m. –Deadline for Objection to Sale and to Proposed Assumption and Assignment of Executory Contracts or Leases to Stalking Horse Bidder
- January 19, 2010, at 10:00 a.m. – Auction
- January 21, 2010 – Proposed Approval Hearing

---

[3] The Debtor, in the exercise of its business judgment after consultation with the Committee and Wells Fargo, and subject to its agreement with the Stalking Horse Bidder, reserves its right to change these sale-related dates in order to achieve the maximum value for the Purchased Assets.

46758/0001-6180090v1

### IV.    SUMMARY OF THE MATERIAL TERMS OF THE ASSET PURCHASE AGREEMENT[4]

26.    Pursuant to the terms and subject to the conditions of the Asset Purchase

Agreement, the Debtor, subject to a Court-approved auction and sale process and any higher and

better offers in accordance with the proposed bidding procedures outlined below (the "Bidding

Procedures"), will sell to the Purchaser its right, title and interest in and to the Purchased Assets

and, in connection therewith, and subject to its agreement with the Stalking Horse Bidder, assign

to the Purchaser the Assumed Contracts (including the Collective Bargaining Agreement

between the Bamboo Abbott, Inc. t/a Prestige Window Fashions and Amalgamated Industrial

Union Local 76B and its divisions affiliated with the IUE-CWA, AFL-CIO (the "Union"), dated

as of June 5, 2008 (the "CBA")).  The Purchaser will purchase the Purchased Assets free and

clear of Claims pursuant to Sections 105(a), 363, 365 and 1113 of the Bankruptcy Code.

27.    The terms of the Purchaser's offer to purchase the Purchased Assets are set forth

in the Asset Purchase Agreement, and are summarized herein:

(a)    **Purchaser**.  Ventanas Acquisition Corporation, a subsidiary of a private

equity fund managed by Platinum Equity that was formed for the purpose of acquiring the

Purchased Assets.

(b)    **Purchased Assets**.  Pursuant to Section 2.2 of the Asset Purchase

Agreement, at the Closing, and on the terms and conditions set forth in the Asset Purchase

Agreement, the Debtor shall sell, transfer, assign, convey and deliver to Purchaser, and

Purchaser, shall accept all the Debtor's right, title and interest in and to the Purchased Assets,

---

[4] The foregoing is only a summary of the Asset Purchase Agreement.  The reader is urged to consult the Asset Purchase Agreement, when filed, for a complete and accurate description of its terms.  Any capitalized terms used but not otherwise defined in Section IV hereof shall have the meanings ascribed to them in the Asset Purchase Agreement.

including, but not limited to: (i) Inventory; (ii) Accounts Receivable; (iii) any cash and cash equivalents of the Debtor; (iv) all books and records related to or used in the Business or otherwise related to the Purchased Assets, including (A) a customer list inclusive of all of the customers of the Business, and all customer records with respect to such customers, and (B) all financial, project-related and other records relating to the Business (including equipment records, project plans, marketing materials, catalogs and operating manuals); (v) to the extent legally transferable (including pursuant to Section 365 of the Bankruptcy Code), all of the Debtor's interest in the Assumed Contracts; (vi) all Tangible Personal Property owned or leased by the Debtor; (vii) all Intellectual Property owned or held by the Debtor, including the Intellectual Property listed on Schedule 5.2(n); (viii) all deposits, rebates, prepaid insurance and other prepaid expenses of any kind related to the Business (collectively, the "Prepaid Items"); and (ix) all goodwill appurtenant to the Business.  See Asset Purchase Agreement, § 2.2.

(c)    **Excluded Assets**.  Section 2.3 of the Asset Purchase Agreement sets forth the Excluded Assets, which include, but are not limited to: (i) any contract of the Debtor (including any Business Contract) other than the Assumed Contracts; (ii) all causes of action belonging to the Debtor or its bankruptcy estate arising under Sections 544 through 550 and 553 of the Bankruptcy Code; provided, that no such causes of action shall be asserted, brought or otherwise prosecuted by the Debtor or by any Person on the Debtor's behalf against any customer of the Business or against the counterparty to any Assumed Contract; (iii) any Tangible Personal Property subject to any Business Contract that is not an Assumed Contract; (iv) and the rights of the Debtor under the Asset Purchase Agreement and all cash and non-cash consideration payable or deliverable to the Debtor under the Asset Purchase Agreement.  See Asset Purchase Agreement, § 2.3.

11

46758/0001-6180090v1

(d)    **Assumed Liabilities**.  Subject to the terms and conditions of the Asset

Purchase Agreement, at the Closing the Debtor shall assign and transfer to Purchaser, to the

extent legally permissible, all of its rights and benefits under the Assumed Contracts, and

Purchaser shall (i) assume and agree to discharge or perform the obligations of the Debtor arising

under the Assumed Contracts after the Closing, (ii) discharge or pay any amounts necessary to

cure defaults or that are otherwise payable in order to effectuate, pursuant to the Bankruptcy

Code, the assumption by Purchaser of the Assumed Contracts which shall be paid or otherwise

discharged by Purchaser on or before the Closing, in each case in the amounts set forth in the

Asset Purchase Agreement, (iii) discharge or pay certain administrative accounts payable of the

Company (in the amounts set forth in the Asset Purchase Agreement), and (iv) assume and be

responsible for transfer taxes.  See Asset Purchase Agreement, § 3.1.

(e)    **Excluded Liabilities**.  Except for the Assumed Liabilities, Purchaser shall

not assume and shall not be deemed to have assumed any debt, Claim, obligation, tax or other

liability of the Debtor whatsoever (the "Excluded Liabilities"), all of which shall remain the sole

responsibility and obligation of the Debtor.  The Excluded Liabilities shall include the following:

(i) all liabilities associated with any Excluded Assets; (ii) all liabilities under the WARN Act, if

any, arising out of or resulting from layoffs or termination of employees by the Debtor prior to

the Closing Date; (iii) all customer service and warranty claims arising after the Closing Date

with respect to merchandise and finished goods sold by the Debtor prior to the Closing Date, and

all obligations to perform warranty repair or replacement arising after the Closing Date with

respect to merchandise or finished goods sold by the Debtor prior to the Closing Date; (iv) all

liabilities under and with respect to the Seller Plans; and (v) all liabilities arising out of or in

connection with claims, litigation and proceedings (whether instituted or related to prior to or

46758/0001-6180090v1

after the Closing) for acts or omissions that occurred, or arise from events that occurred or

circumstances existing, prior to the Closing Date.  See Asset Purchase Agreement, § 3.2.

(f)    **Purchase Price**.  The aggregate consideration for the Purchased Assets

(the "Purchase Price") shall be (a) a cash purchase price in an amount equal to (i) $8,200,000,

minus (ii) the Adjustment Amount[5] (the "Closing Date Payment"), which Closing Date Payment

will be paid directly to Wells Fargo at the Closing, (b) the assumption by Purchaser of the

Assumed Liabilities and (iii) the undertaking by Purchaser of the obligations with respect to the

payment of up to $1,200,000 (such amount representing the amount currently owed by the

Debtor in favor of Turnils), as set forth in the agreements between the Debtor and Turnils

contemplated by Section 7.2(l).  See Asset Purchase Agreement, § 4.1.  The Purchaser agrees to

pay the Closing Date Payment in the manner described in Article IV of the Asset Purchase

Agreement.

(g)    **Closing Date**.  The closing of the transactions contemplated by the Asset

Purchase Agreement shall take place at 10:00 a.m., Eastern Standard Time, at the offices of Cole,

Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New

Jersey, (i) on the date that is one (1) Business Day after all of the conditions set forth in Article

IV of the Asset Purchase Agreement have been satisfied or waived (or such longer period after

such conditions have been satisfied as may be required by the Approval Order under the

provisions of Bankruptcy Code Rules 6004(g) or 6006(d)), or (ii) on such other date as the

parties mutually agree upon (the "Closing").  The date on which the Closing occurs in

---

[5] "Adjustment Amount" means an amount equal to (a) $14,300,000, minus (b) the sum of
(i) the Accounts Receivable Amount, (ii) the Cash Amount and (iii) the Inventory Value
Amount; provided, that the Adjustment Amount shall not be less than zero or greater than
$500,000.

accordance with the foregoing is referred to in the Asset Purchase Agreement as the "Closing

Date.". See Asset Purchase Agreement, § 4.1.

      (h)    **Deliveries at Closing**. The following deliverables shall be executed and

delivered or delivered, as applicable, by the Debtor and the Purchaser, at or prior to the Closing

(See Asset Purchase Agreement, § 4.5):

      (i)    the Debtor shall execute and deliver to Purchaser a bill of sale substantially in the form attached as Exhibit C to the Asset Purchase Agreement, and such other bills of sale, endorsements, assignments and such other instruments of transfer and conveyance, in form and substance reasonably satisfactory to Purchaser, as shall be effective, together with the Approval Order, to vest in Purchaser as of the Closing Date good title to all of the Purchased Assets, free and clear, in accordance with the terms of the Approval Order, of all Claims;

      (ii)    the Debtor shall execute and deliver to Purchaser, and Purchaser shall execute and deliver to the Debtor, an assignment and assumption agreement substantially in the form attached as Exhibit D to the Asset Purchase Agreement conveying the Debtor's interests in the Assumed Contracts; and

      (iii)    in addition to the foregoing, there shall be executed and delivered at the Closing the following:

      A.    by the Debtor to Purchaser, a certificate, dated the Closing Date and signed by the Debtor's President and Chief Executive Officer, certifying that the representations and warranties of the Debtor contained in Section 5.2 of the Asset Purchase Agreement were true and correct in all material respects when made and are true and correct in all material respects as if originally made on and as of the Closing Date (except for the representations and warranties that are qualified by materiality or material adverse effect, which were and are true and correct in all respects) and that all covenants required by the terms hereof to be performed by the Debtor on or before the Closing Date, to the extent not waived by Purchaser in writing, have been duly performed in all material respects;

      B.    by the Debtor to Purchaser, a certificate, dated the Closing Date and signed by the Debtor's President and Chief Executive Officer attaching (1) a certified copy of the resolutions of the board of directors of the Debtor authorizing the execution, delivery and performance of the Asset Purchase Agreement and all documents associated herewith, (2) a certified copy of the resolutions or written consent of the stockholders of the Debtor authorizing the execution,

delivery and performance of the Asset Purchase Agreement and all documents associated herewith and (3) a certified copy of the articles of incorporation and bylaws of the Debtor and all amendments thereto;

C.    by the Debtor to Purchaser, a certificate of non-foreign status, in a form satisfactory to Purchaser, in the form provided in Treasury Regulation Section 1.1445-2(b), from the Debtor certifying that it is not a foreign person within the meaning of Treasury Regulation Section 1.1445-2(b); and

D.    by Purchaser to the Debtor, a certificate, dated the Closing Date and signed by a Person duly authorized by Purchaser, certifying that the representations and warranties of Purchaser contained in Section 5.1 were true and correct in all material respects when made and are true and correct in all material respects as if originally made on and as of the Closing Date (except for the representations and warranties that are qualified by materiality or material adverse effect, which were and are true and correct in all respects) and that all covenants required by the terms hereof to be performed by Purchaser on or before the Closing Date, to the extent not waived by the Debtor in writing, have been duly performed in all material respects.

(i)    **Representations and Warranties**.  The Asset Purchase Agreement contains representations and warranties of the Purchaser in Section 5.1, and of the Debtor in Section 5.2.

(j)    **Covenants**.  The Asset Purchase Agreement in Article VI contains covenants and agreements with respect to conduct prior to the Closing.

(k)    **Conditions to Closing**.  The Asset Purchase Agreement contains conditions to Closing in Article VII.

(l)    **Termination**.  The Asset Purchase Agreement contains termination provisions in Article IX.

(m)    **Expense Reimbursement**.  Upon the occurrence of certain termination events under the Asset Purchase Agreement, the Debtor will be required to pay to the Purchaser the amount of $350,000 (the "Expense Reimbursement"), which the Debtor agrees represents only a portion of Purchaser's actual, reasonable out-of-pocket fees and expenses, including

15

reasonable attorneys' fees, expenses of its financial advisors and expenses of other consultants, incurred in connection with the transactions contemplated by the Asset Purchase Agreement, upon the consummation of an Alternative Transaction.  See Asset Purchase Agreement, § 9.4.

28.    The Debtor seeks authority to sell the Purchased Assets to the Purchaser on the terms and conditions set forth in the Asset Purchase Agreement or to a higher and better bidder to be determined in accordance with the Bidding Procedures.  The Debtor believes that the sale of the Purchased Assets as a going concern will result in a higher price for those assets than a piecemeal liquidation, will result in the assumption of certain obligations of the Debtor and its estate, including, but not limited to, certain administrative claims and claims under the Assumed Contracts, and will provide a continuing business operation for the benefit of vendors, customers and employees.  The Debtor further believes that its securing the Stalking Horse Bidder as a "stalking horse" bidder after nearly four months of extensive marketing efforts, coupled with the further marketing of the Purchased Assets with the assistance of SSG over the remaining time period contemplated by the Bidding Procedures and the holding of the Auction will result in the highest and best price for the Purchased Assets.

## V.    RELIEF REQUESTED

29.    The Debtor has determined that given its liquidity, current market conditions, and the condition of the home furnishings industry, a prompt sale of the Purchased Assets is the best way to maximize the value of the Purchased Assets for its estate and creditors.

30.    Accordingly, by this Motion, the Debtor seeks approval for the sale of the Purchased Assets to the Stalking Horse Bidder, subject to additional competitive bidding pursuant to the proposed Bidding Procedures.  To effect the Sale, the Debtor seeks two types of relief.  First, at a hearing to be held on or about January 12, 2010, the Debtor will seek entry of the Bidding Procedures Order in the form attached hereto as **Exhibit A** approving the Bidding

16

Procedures, Notice Procedures, and the Expense Reimbursement to be provided to the Stalking

Horse Bidder pursuant to the Asset Purchase Agreement, and as described more fully herein.

Second, subject to the terms of the Bidding Procedures Order, at a proposed hearing to be held

on or about January 21, 2010, the Debtor will seek entry of the Approval Order authorizing and

approving the Sale to the Stalking Horse Bidder or the Successful Bidder, as the case may be,

including, without limitation, the assumption and assignment of the Assumed Contracts to the

Stalking Horse Bidder, and the assumption by the Stalking Horse Bidder of the Assumed

Liabilities.[6]

## VI.    BASIS FOR RELIEF

31.    The events leading to this Chapter 11 case have been documented to this Court

and are well known to the Debtor's suppliers, creditors, and other parties in interest.  In

furtherance of the Debtor's duty to maximize the value of its estate, the Debtor has filed this

Motion seeking approval of a sale process, including the Bidding Procedures.

**A.    Necessity for Sale**

32.    The Debtor faces severe liquidity constraints and has exhausted its options for

addressing this issue, including attempts to raise cash through various strategic transactions.  To

date, none of these options has been successful.  Given current economic market conditions,

including unfavorable conditions in the home furnishings industry, the Debtor's liquidity

situation has not improved.

33.    While the Debtor believes it has sufficient liquidity to conduct the sale process

proposed herein, it has serious concerns that it can operate beyond the timeframes set out herein

---

[6] A form of the Approval Order will be filed by the Debtor in advance of the Approval
Hearing (as defined below).

and in the Bidding Procedures.  Thus, to avoid any further financial deterioration of the Debtor's

business and its assets and the possible cessation of the Debtor's business, resulting in the loss of

several hundred jobs, the Debtor, in consultation with Wells Fargo and after numerous

discussions with the Committee, has decided to pursue a sale of all of the Purchased Assets and

believes that it must be permitted to conduct the process in the manner and on the timetable set

forth herein and in the Bidding Procedures.

**B.    The Bidding Procedures**[7]

34.    In order to maximize the value of the Purchased Assets for the benefit of the

Debtor's estate and its creditors, the Debtor seeks to implement a competitive bidding process.

The Debtor proposes and respectfully requests approval of the Bidding Procedures, which are

attached to the Bidding Procedures Order, will govern the Auction and proposed sale of the

Purchased Assets.

35.    The following summarizes the proposed Bidding Procedures:[8]

- Any person who wishes to participate in the bidding process must (a) become
  a "Qualified Bidder" and (b) submit a "Qualified Bid."

- To become a Qualified Bidder, a person must submit to the Notice Parties
  (which includes counsel for the Debtor, the Committee and Wells Fargo) (a)
  an executed confidentiality agreement, (b) certain financial statements and
  other financial information, and (c) a preliminary non-binding proposal.  In
  addition, the Debtor must determine that such person will be able to
  consummate the transactions contemplated by the Asset Purchase Agreement.

- A bid submitted by a Qualified Bidder will be a Qualified Bid only if, among
  other things, it (a) includes the required bid documents (which include, among

---

[7] Terms used but not otherwise defined in this section of this Motion shall have the
meanings ascribed to them in the Bidding Procedures attached to the Bidding Procedures Order.

[8] The following description of the Bidding Procedures is a summary only.  To the extent
that this summary differs in any way from terms set forth in the Bidding Procedures, the terms of
the Bidding Procedures shall control.

other things, a good faith deposit), (b) is not conditioned on the outcome of unperformed due diligence by the bidder, (c) proposes a transaction on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that the Debtor determines, in its reasonable business judgment, are similar to, and are not materially more burdensome or conditional than, the terms of the Asset Purchase Agreement, (d) includes certain acknowledgements and commitments, and (e) is received by the Bid Deadline.

- A Qualified Bid must have a value, in the Debtor's reasonable business judgment after consultation with its financial advisors, Wells Fargo and the Committee, that is greater than or equal to the sum of (a) the Purchase Price (as defined in the Asset Purchase Agreement), plus (b) the amount of the Expense Reimbursement, plus (c) $250,000;

- The Bid Deadline is 1:00 p.m. (prevailing Eastern time) on January 18, 2010. The Debtor may extend the Bid Deadline once or successively, up to two calendar days or with consent of the Purchaser, which consent shall not be unreasonably withheld.

- If the Debtor receives one or more Qualified Bids, in addition to the Asset Purchase Agreement, the Debtor may conduct an auction (the "Auction"), commencing at 10:00 a.m. (prevailing Eastern time) on January 19, 2010, at the offices of Cole, Schotz, Meisel, Forman & Leonard, P.A., 25 Main Street, Hackensack, New Jersey 07601 or such later time or other place as the Debtor notifies all Qualified Bidders who have submitted Qualified Bids.

- Bidding at the Auction will begin with the highest or otherwise best Qualified Bid and continue with bids that have an incremental value to the estate of at least $100,000. At the conclusion of the Auction, the Debtor, in consultation with the Committee and Wells Fargo, will identify the highest or otherwise best offer for the Acquired Assets received at the Auction.

- The Debtor will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon approval of such Successful Bid by the Bankruptcy Court at the Approval Hearing.

36.    In addition, the Debtor respectfully requests that the Court schedule a hearing to confirm the results of the Auction, if any, and to approve the sale (the "Approval Hearing") on the first business day after the date scheduled for the Auction. As detailed above, the Purchased Assets have been widely marketed for sale for almost four (4) months. The Debtor firmly believes, based on its testing of the market, that the efforts to sell the Purchased Assets have been

46758/0001-6180090v1

maximized and, therefore, any delay in the date of the Auction or the Approval Hearing will serve no meaningful purpose.  To the contrary, such delay will only cause the further decline in value of the Purchased Assets to the detriment of the Debtor, its creditors and estate.

**C.**    **Notice of Bidding Procedures and Sale**

37.    Within one (1) calendar day after the entry of the Bidding Procedures Order (the "Mailing Date") or as soon thereafter as practicable, the Debtor's counsel shall serve the notice substantially in the form attached to the Bidding Procedures Order as Exhibit "2" (the "Sale Notice") along with the Motion, the Asset Purchase Agreement, the proposed Sale Approval Order, the Bidding Procedures, and a copy of the Bidding Procedures Order by overnight mail upon (i) all parties to the Assumed Contracts, (ii) the Office of the United States Trustee (iii) the Pension Benefit Guaranty Corporation; (iv) counsel for the Union; (v) counsel for the Committee; (vi) counsel for Wells Fargo; (vii) counsel for the Purchaser; (viii) all entities known to have expressed an interest in a transaction with respect to any of the Acquired Assets during the past year from the Effective Date of the Agreement; (ix) those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in this Chapter 11 case; (x) all Governmental Entities and taxing authorities having or asserting jurisdiction over the Debtor or any of the Acquired Assets (including the Internal Revenue Service, the United States Department of Justice and the United States Attorney Office for the District of New Jersey); (xi) the counterparties to any Rejected Contract; and (xii) all known parties asserting Claims on any of the Acquired Assets (the "Sale Notice Parties").  In addition, by the Mailing Date, the Debtor's counsel shall serve, by first-class mail, postage prepaid, the Sale Notice only upon all parties identified as creditors as set forth on Schedules D through H of the Debtor's Schedules of Statements and Liabilities.

46758/0001-6180090v1

**D.    Notice Procedures with Respect to Business Contracts and Real Estate
Leases**

38.    The Debtor proposes the following procedures for notifying counterparties to

executory contracts and unexpired leases of potential cure amounts in the event the Debtor

decides to assume such contracts or leases.

39.    <u>Cure Notice</u>.  On or before January 12, 2010, the Debtor will file with the Court

and serve on each non-Debtor party to an Assumed Contract a cure notice substantially in the

form attached to the Bidding Procedures Order as Exhibit "3" (the "Cure Notice").  The Cure

Notice shall state the cure amount that the Debtor believes is necessary to assume such contract

or lease pursuant to section 365 of the Bankruptcy Code (the "Cure Amount") and notify each

party that such party's contract or lease will be assumed and assigned to the Purchaser or a

Successful Bidder to be identified at the conclusion of the Auction.  Each non-Debtor party to an

Assumed Contract shall have until January 20, 2010 to object to the Cure Amount and must state

in its objection with specificity what Cure Amount is required (with appropriate documentation

in support thereof).  If no objection is timely received, the Cure Amount set forth in the Cure

Notice shall be controlling, notwithstanding anything to the contrary in any Assumed Contract,

or any other document, and the non-Debtor party to the Assumed Contract shall be deemed to

have consented to the Cure Amount and shall be forever barred from asserting any other claims

as to such Assumed Contract against the Debtor, the Purchaser, or the Successful Bidder, or the

property of any of them.  If an objection to the Cure Amount is timely filed and received and the

parties are unable to consensually resolve the dispute, the amount to be paid under Section 365

of the Bankruptcy Code, if any, with respect to such objection will be determined at a hearing to

be requested by the Debtor or by the objecting counterparty.  At the Purchaser's or the

Successful Bidder's discretion, and provided the Purchaser or the Successful Bidder escrow the

disputed portion of the Cure Amount, the hearing regarding the Cure Amount may be continued until after the Closing Date and the Assumed Contract(s) subjected to such Cure Amount shall be assumed and assigned to the Purchaser or the Successful Bidder at Closing.

40.    <u>Assumption/Assignment Notice For Purchaser</u>.  Within one (1) calendar day of the Court's entry of the Bidding Procedures Order, the Debtor shall file with the Court and serve on all non-Debtor parties to the Assumed Contracts a notice (the "Purchasers Assumption/Assignment Notice"), substantially in the form of the notice attached to the Bidding Procedures Order as Exhibit "4", identifying the Purchaser as the party which will be assigned all of the Debtor's right, title, and interest in the Assumed Contracts, subject to completion of the bidding process provided under the Bidding Procedures.  The non-Debtor party to an Assumed Contract shall have until January 20, 2010 to object to the proposed assumption and assignment to the Purchaser and shall state in its objection, with specificity, the legal and factual basis of its objection.  If no objection is timely received, the Debtor proposes that the non-Debtor party to the Assumed Contract be deemed to have consented to the assumption and assignment of the Assumed Contract to the Purchaser and be forever barred from asserting any objection with regard to the assumption and assignment.

41.    <u>Assumption/Assignment Notice For Qualified Bidders</u>.  On the next calendar day following the Bid Deadline, the Debtor shall cause a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form of the notice attached to the Bidding Procedures Order as Exhibit "5", to be sent to each non-Debtor party to an Assigned Contract identifying all Qualified Bidders (except the Purchaser, which notice shall be governed by the Purchasers Assumption/Assignment Notice set forth above).  The Debtor proposes that the non-Debtor party to an Assumed Contract be permitted to present at the Approval Hearing an

22

objection to the proposed assumption and assignment to any Qualified Bidder and shall state in

its objection, with specificity, the legal and factual basis of its objection.  The Debtor further

submits that, if no objection is timely received, the non-Debtor party to the Assumed Contract be

deemed to have consented to the assumption and assignment of the Assumed Contract to any

Qualified Bidder and be forever barred from asserting any objection with regard to the

assumption and assignment.

42.    At the Approval Hearing, the Debtor shall (i) present evidence necessary to

demonstrate adequate assurance of future performance by any Successful Bidder and (ii) request

entry of an order requesting approval of the assumption and assignment of any Assumed

Contracts to any Successful Bidder.

43.    Termination or Rejection of Rejected Contracts.  In the event the Debtor deems it

appropriate at the conclusion of the Auction, the Debtor reserves the right to request authority at

the Approval Hearing to reject any Business Contracts or Real Property Leases that are not

Assumed Contracts (collectively, the "Rejected Contracts") pursuant to Section 365 of the

Bankruptcy Code.

## VII.    APPLICABLE AUTHORITY

44.    "[T]he business judgment rule operates as a presumption 'that directors making a

business decision, not involving self-interest, act on an informed basis, in good faith and in the

honest belief that its actions are in the corporation's best interest.'"  Continuing Creditors'

Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F.Supp.2d 449, 462 (D. Del. 2004) (quoting

Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Comm. of Equity Holders of

Tectonic Network, Inc. v. Wolford, 554 F.Supp.2d 538, 555 n.111 (D. Del. 2008).  Thus, this

Court should grant the relief requested in this Motion if the Debtor demonstrates a sound

23

business justification therefore.  <u>See</u> <u>In re Delaware Hudson Ry. Co.</u>, 124 B.R. 169 , 179 (D. Del.

1991).

45.     The Debtor has sound business justifications for selling the Acquired Assets at

this time.  While the Debtor currently has limited access to capital, it is endowed with a strong

customer base, well-respected brands, and solid operations.  Accordingly, the Debtor has

determined that the best option for maximizing the value of its estate for the benefit of its

creditors is through a sale of substantially all of the Acquired Assets.

**A.**     **The Bidding Procedures are Fair and are Designed to Maximize the Value**
           **Received for the Acquired Assets**

46.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate."  11 U.S.C. § 363(b)(1).  The Debtor believes that the Bidding Procedures are

appropriate under Sections 105 and 363 of the Bankruptcy Code to ensure that the bidding

process is fair and reasonable and will yield the maximum value for its estate and creditors under

the circumstances.  The Bidding Procedures proposed herein are designed to maximize the value

received for the Acquired Assets by facilitating a competitive bidding process in which all

potential bidders are encouraged to participate and submit competing bids.  The Bidding

Procedures provide potential bidders with sufficient notice and an opportunity to acquire

information necessary to submit a timely and informed bid.  At the same time, the Bidding

Procedures provide the Debtor with the opportunity to consider all competing offers and to select

the highest and best offer for the Acquired Assets, in consultation with the Committee and Wells

Fargo.

47.     The Debtor requests this Court's approval of the Bidding Procedures, including

the dates established thereby for an Auction and an Approval Hearing.  Accordingly, the Debtor

and all parties in interest can be assured that the consideration for the Acquired Assets will be

fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

**B.**       **The Expense Reimbursement is Necessary to Preserve the Value of the
             Debtor's Estate**

48.       Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary

course of business may be by private sale or by public auction.  The Debtor believes that having

the ability to offer the Expense Reimbursement to the Purchaser and thereby facilitating an

Auction will maximize the realizable value of the Acquired Assets for the benefit of the Debtor's

estate, creditors and other parties-in-interest.

49.       In order to provide an incentive and to compensate the Stalking Horse Bidder for

entering into the Asset Purchase Agreement and the extensive fees and costs incurred as serving

as the stalking horse purchaser, the Debtor has agreed to reimburse the Stalking Horse Bidder in

the amount of $350,000 for expenses incurred in connection with the Stalking Horse Bidder's

attempted purchase of the Purchased Assets and service as stalking horse bidder.

50.       The Debtor believes that offering the Expense Reimbursement will benefit the

Debtor's estate by establishing a floor and promoting more competitive bidding.  Without

approval of the Bidding Procedures Order and Expense Reimbursement as requested herein, the

Stalking Horse Bidder would not have agreed to enter into the Asset Purchase Agreement.

Without the presence of the Stalking Horse Bidder, bidding on the Debtor's Purchased Assets

would likely be reduced.  The availability of the Expense Reimbursement, therefore, is necessary

in order to provide the Stalking Horse Bidder with some assurance that it will be compensated

for the time and expense it has spent in putting together its offer for the Purchased Assets and the

risk that arises from participating in the Sale and subsequent bidding process as the Stalking

Horse Bidder.

46758/0001-6180090v1

51.     Break-up and other termination fees are a normal, and in many cases necessary,
component of sales outside the ordinary course of business under section 363 of the Bankruptcy
Code.  See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.,
147 B.R. 650 (S.D.N.Y.1992) (noting that break-up fees may be legitimately necessary to
convince a single "white knight" to enter the bidding by providing some form of compensation
for the risk it is undertaking); In re Fin. News Network, Inc., 126 B.R. 152 (S.D.N.Y. 1991),
appeal dismissed, 931 F.2d 217 (2d Cir. 1991); In re Crowthers McCall Pattern, Inc., 114 B.R.
877, 879 (Bankr. S.D.N.Y. 1990) (break-up fees in merger agreement approved); In re 995 Fifth
Ave. Assoc., L.P., 96 B.R. 24, 28-29 (Bankr. S.D.N.Y. 1989) (payment of $500,000 break-up fee
to outbid contract vendee following sale of debtor's property was not unreasonable absent
evidence that fee chilled bidding).  Bankruptcy Courts regularly authorize expense
reimbursement under the "business judgment rule" which, essentially, prohibits judicial second-
guessing of the actions of a corporation's board of directors taken in good faith and in the
exercise of sound business judgment.  See id.

52.     The United States Court of Appeals for the Third Circuit established standards for
determining the appropriateness of expense reimbursement and other financial protections in the
bankruptcy context in Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl. Energy,
Inc.), 181 F.3d 527 (3d Cir. 1999).  In O'Brien, the Third Circuit identified at least two instances
in which an award of a break-up fee or expense reimbursement may benefit the estate.  First, a
break-up fee or expense reimbursement may be necessary to preserve the value of the estate if
assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that
otherwise would not have been made and without which bidding would have been limited."
O'Brien, 181 F.3d at 537.  Second, if the availability of break-up fees and expenses were to

26

induce a bidder to research the value of the debtor and convert the value to a dollar figure on

which other bidders can rely, the bidder may have provided a benefit to the estate by increasing

the likelihood that the price at which the debtor is sold will reflect its true worth.  Id.  The Third

Circuit held that although payment of expenses and break-up fees are measured against a

business judgment standard in non-bankruptcy transactions, the administrative expense

provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context.

Therefore, to be approved, the debtor must demonstrate that the expenses to be reimbursed

provide a benefit to its estate.  Id. at 533.

     53.    In O'Brien, the court reviewed the nine factors set forth by the lower court as

relevant in deciding whether to award a break-up fee.  Such factors are:

    (a)    the presence of self-dealing or manipulation in negotiating the break-up fee;

    (b)    whether the fee harms, rather than encourages, bidding;

    (c)    the reasonableness of the break-up fee relative to the purchase price;

    (d)    whether the unsuccessful bidder placed the estate property in a "sales
configuration, mode" to attract other bidders to the auction;

    (e)    the ability of the request for a break-up fee to serve to attract or retain a
potentially successful bid, establish a bid standard or minimum for other
bidders, or attract additional bidders;

    (f)    the correlation of the fee to a maximum of value of the debtor's estate;

    (g)    the support of the principal secured creditors and creditors committees of the
break-up fee;

    (h)    the benefits of the safeguards to the debtor's estate; and

    (i)    the substantial adverse impact of the break-up on unsecured creditors, where
such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

     54.    The Expense Reimbursement will enable the Debtor to secure an adequate floor

for the Purchased Assets and, thus, insist that competing bids be materially higher or otherwise

better than the Asset Purchase Agreement – a clear benefit to the Debtor's estate.  Moreover, the

Stalking Horse Bidder would not agree to act as a stalking horse without the Expense

Reimbursement.  Without the Expense Reimbursement, the Debtor might lose the opportunity to

obtain the highest or best offer for the Purchased Assets and would certainly lose the downside

protection that will be afforded by the existence of the Stalking Horse Bidder.  Furthermore,

without the benefit of the Stalking Horse Bidder, the bids received at Auction for the Property

could be substantially lower than that offered by the Stalking Horse Bidder.

55.    In the present case, the Expense Reimbursement approximates 3.5% of the value

of the Stalking Horse Bidder's bid.  This percentage is of the same order of magnitude as break-

up fees approved in other cases.  See, e.g., Consumer News & Business Channel P'ship v. Fin.

News Network, Inc. (In re Fin. News Network, Inc.), 980 F.2d 165, 167 (2d Cir. 1992) (noting

without discussion $8.2 million Break-up fee on $149.3 million transaction, or 5.5% of

consideration offered, is fair); Cottle v. Stores Comm'ns, 849 F.2d 570, 578-79 (11th Cir. 1988)

(approving $29 million fee on $2.5 billion transaction, or 1.16%); see also LTV Aerospace &

Defense Co. v. Thomson-CSF, S.A. (In re Chateugay Corp.), 1998 B.R. 848, 861 (S.D.N.Y.

1996) (enforcing $20 million "reverse Break-up fee" payable to debtor on $450 million offer, or

4.4% of the consideration).  The ability to offer an Expense Reimbursement to induce the

Stalking Horse Bidder's substantial and valued bid in advance of the Auction establishes a

committed baseline, or floor, upon which all other bids can be compared and evaluated, and

therefore, is beneficial to the Debtor's estate and its stakeholders.

56.    The Debtor respectfully submits that the proposed Expense Reimbursement will

not chill bidding and is fair and reasonable under the circumstances and, therefore, meets the

requirements of the business judgment rule, as well as the Third Circuit's standards as set out in

O'Brien.

**C.    The Debtor Should be Authorized to Sell the Purchased Assets Pursuant to
Sections 105(a) and 363(b)(1) of the Bankruptcy Code.**

57.    Section 363(b)(1) of the Bankruptcy Code governs sales of assets outside the

ordinary course of business and provides as follows:

> The trustee [or debtor-in-possession], after notice and a hearing,
> may use, sell, or lease, other than in the ordinary course of
> business, property of the estate.

11 U.S.C. § 363(b)(l).[9] Section 105(a) provides, in relevant part, that "[t]he court may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title." 11 U.S.C. § 105(a).

58.    Although the Bankruptcy Code does not articulate the standard for approving a

sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for

the Third Circuit in the seminal case of In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 149-50

(3d Cir. 1986) interpreted Section 363(b)(i) to require a finding by the Bankruptcy Court that the

acquirer of a debtor's assets be a good faith purchaser.  The Third Circuit construed the "good

faith purchaser" standard to mean one who purchases "in good faith" and for "value."  Abbotts

Dairies, 788 F.2d at 147.

59.    The Third Circuit in Abbotts Dairies then analogized the bona fides of a Section

363(b)(1) purchaser to a buyer at a judicial sale:

> The requirement that a purchaser act in good faith … speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good

---

[9] Federal Rule of Bankruptcy Procedure 6004 authorizes sales outside of the ordinary
course of business to be conducted privately or by public auction.  Fed. R. Bankr. P. 6004(f)(1).

46758/0001-6180090v1

faith status at a judicial sale involves fraud, collusion between the
purchaser and other bidders or the trustee, or an attempt to take
grossly unfair advantage of other bidders.

Abbotts Dairies, 788 F.2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198

(7th Cir. 1978)).  Finally, the Court noted that '[t]raditionally, courts have held that "[f]air and

valuable consideration is given in a bankruptcy sale when the purchaser pays 75% percent of the

appraised value of the assets."  Abbotts Dairies, 788 F.2d at 149; In re Karpe, 84 B.R. 926, 933

(Bankr. M.D. Pa. 1988).

60.     Respectfully, the sale of the Purchased Assets in accordance with the Asset

Purchase Agreement and Bidding Procedures satisfies the Abbotts Dairies test.  First, the Debtor

has fully disclosed and requested the Court's approval of the Bidding Procedures and all the

terms and conditions of the sale and proposed Auction, and intends to provide comprehensive

notice of the sale.[10]  See In re Colony Hill Assoc., 111 F.3d 269 (2d Cir. 1997) (determination of

"good faith" is based on traditional equitable principles, including whether there has been full

disclosure to the Bankruptcy Court).  In addition, the Debtor, on its own initially and then

through SSG, extensively marketed the sale of the Purchased Assets for nearly four (4) months.

The potential sale of the Debtor's business has been well known to investors and strategic

purchasers in the industry.  After these widespread and comprehensive marketing efforts, the

---

[10] For disclosure purposes, and although there is no definitive arrangement in place, the
Purchaser has discussed with certain members of the Debtor's current management team,
including, without limitation, the Debtor's sole shareholders, Joel S. Botwick and Phil S.
Goldweitz, the possibility of those individuals having some role in the Purchaser's business.
However, the sale to the Stalking Horse Bidder is not conditioned upon such arrangements being
reached.  As a matter of additional disclosure, the Debtor has been told that the Stalking Horse
Bidder intends to finance a portion of the Purchase Price and/or obtain post-Closing Date asset-
based lending financing from Wells Fargo.  The Debtor is further advised that the Stalking Horse
Bidder is in the process of finalizing a term sheet for the commitment of such financing from
Wells Fargo.

Asset Purchase Agreement was ardently negotiated by the Debtor and SSG (with input from

Wells Fargo) for nearly two months, and the Debtor believes that the Purchase Price and other

consideration being provided under the Asset Purchase Agreement such as, for example, the

assumption of the Assumed Liabilities, represent reasonably equivalent value and fair

consideration for the Purchased Assets.  Lastly, the Debtor is hopeful that as a result of its

intended notice of the Sale to all bidders who previously expressed to SSG an interest in the

Purchased Assets, interested purchasers will be encouraged to submit bids, attend the Auction

and generate a spirited bidding process.

61.    In addition to the <u>Abbotts Dairies</u> requirements which the Debtor clearly satisfy,

courts typically require a sound business purpose to sell assets outside of a plan of

reorganization.  <u>In re Lionel Corp.</u>, 722 F.2d 1063 (2d Cir. 1983); <u>In re Del. & Hudson Ry. Co.</u>,

124 B.R. 169, 175-76 (D. Del. 1991); <u>In re Titusville Country Club</u>, 128 B.R. 396, 399 (Bankr.

W.D. Pa. 1991); <u>In re Sovereign Estates, Ltd.</u>, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); <u>In re

Conroe Forge & Mfg. Corp.</u>, 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988); <u>In re Indus. Valley

Refrigeration & Air Conditioning Supplies, Inc.</u>, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).  Courts

consider the following non-exhaustive list of factors in determining whether a sound business

purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c)

proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of

elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and

confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the

amount of proceeds to be obtained from the sale versus the appraised value of the property sold;

and (h) whether the asset is decreasing or increasing in value.  <u>Lionel</u>, 722 F.2d at 1071;

<u>Delaware & Hudson Ry.</u>, 124 B.R. at 176; <u>In re Weatherly Frozen Food Group, Inc.</u>, 149 B.R.

480, 483 (Bankr. N.D. Ohio 1992).  A debtor's showing of sound business justification need not

be unduly exhaustive.  Rather, a debtor is "simply required to justify the proposed disposition

with sound business reason."  In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio

1984).

62.     Consideration of the above factors here unequivocally establishes that the sale

should be approved.  As discussed above, the Debtor, commenced marketing the Purchased

Assets in mid-August 2009 (and has had the assistance of SSG since mid-October 2009).  The

Debtor, with the assistance of SSG, will further solicit proposals for the purchase of the

Purchased Assets before the proposed bid deadline and, based on the Debtor's extensive

marketing efforts, the Debtor will have amply marketed the Purchased Assets before the

proposed date of the Approval Hearing.  The Debtor has proposed Bidding Procedures that are

designed to maximize the purchase price for the Purchased Assets under the circumstances.

Those Bidding Procedures and the form and manner of notice of the sale have been submitted for

approval to the Court and will ensure that any and all interested parties will receive adequate

notice of the Auction to allow for a competitive sale process.

63.     Absent the sale, whether to the Stalking Horse Bidder or another Successful

Bidder, it is likely that the Debtor might be forced to cease operations.  In such event, hundreds

of employees will lose their jobs, hundreds of businesses will not have Prestige Window

Fashions as a customer from which to generate revenue and Wells Fargo might incur

significantly greater losses if it had to liquidate its Collateral in a disorderly, piecemeal fashion.

To the contrary, the sale affords Prestige Window Fashions the opportunity to stay in business,

for significant liabilities to be assumed by the Stalking Horse Bidder or otherwise paid at or

about the Closing, maximizes value to Wells Fargo and preserves hundreds of jobs.

64.    In view of the declining revenues recently suffered by the Debtor, as well as the entire home furnishings industry, the Debtor believes that the Stalking Horse Bidder's offer for the Purchased Assets is fair and reasonable.  Moreover, the reasonableness of such offer will be tested in accordance with the Bidding Procedures and marketing efforts to be undertaken by SSG.

65.    For all these reasons, the Debtor respectfully submits that the sale of the Purchased Assets is supported by sound business reasons and is in the best interests of the Debtor and its estate.  Accordingly, the Debtor requests approval of the sale to the Stalking Horse Bidder, or the Successful Bidder, pursuant to Section 363(b) of the Bankruptcy Code.

**The Sale Will Not Require the Appointment of a Consumer Privacy Ombudsman**

66.    The Sale of the Purchased Assets will not necessitate the appointment of a consumer privacy ombudsman in accordance with Section 332 of the Bankruptcy Code.  Section 363(b)(l) of the Bankruptcy Code provides that:

> if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless … such sale or such lease is consistent with such policy.

11 U.S.C. § 363(b)(l).

67.    Section 101(41A) defines "personally identifiable information" as an individual's name, residence address, email address, telephone number, social security number or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual."  11 U.S.C. § 10l(41A).

33

68.     The Debtor is not transferring "personally identifiable information" to the

Stalking Horse Bidder (or any Successful Bidder for that matter).

69.     Even to the extent that the information collected from the Debtor's customers

includes "personally identifiable information" as that term is defined in Section 101(41A), the

buyer of the Purchased Assets will serve as a successor-in-interest to the Debtor's privacy policy

and utilize the "personally identifiable information" in exactly the same fashion as the Debtor.

Accordingly, this Court may authorize the proposed Sale without appointing a privacy

ombudsman because the transfer of the "personally identifiable information" is consistent with

the Debtor's privacy policy as provided in 11 U.S.C. § 363(b)(l).

**D.     The Debtor Should Be Authorized to Sell the Purchased Assets Free and
       Clear of Liens, Claims, Encumbrances, and Interests Pursuant to Section
       363(f) of the Bankruptcy Code**

70.     The Bankruptcy Code authorizes a debtor-in-possession to sell property of the

estate under Section 363(b) free and clear of any interest or lien in such property if one of the

following five criteria is met:

1.     applicable non-bankruptcy law permits sale of such
       property free and clear of such interest;

2.     such entity consents;

3.     such interest is a lien and the price at which such property
       is to be sold is greater than the aggregate value of all liens
       on such property;

4.     such interest is in bona fide dispute; <u>or</u>

5.     such entity could be compelled, in a legal or equitable
       proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

71.     This statute authorizes the sale of assets "free and clear of any interest."  The term

"any interest," as used in Section 363(f), is not defined in the Bankruptcy Code.  The Third

Circuit Court of Appeals specifically addressed the scope of the term "any interest" in <u>Folger</u>

<u>Adam Security v. DeMatteis/MacGregor, JV</u>, 209 F.3d 252, 258 (3d Cir. 2000).  The Third

Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in*

*rem* interests in property," the trend in modern cases is towards a "broader interpretation which

includes other obligations that may flow from ownership of the property."  <u>Id.</u> at 258.  In turn,

the <u>Folger Adam</u> Court cited with approval the Fourth Circuit's ruling in <u>In re Leckie Smokeless</u>

<u>Coal Co.</u>, 99 F.3d 573, 58 1-82 (4th Cir. 1996) for the proposition that debtors "could sell their

assets under § 363(f) free and clear of successor liability that otherwise would have arisen under

federal statute."  <u>Folger Adam</u>, 209 F.3d at 258.

72.     The language of Section 363(f) is in the disjunctive, so that a sale free and clear of

interests can be approved if any one of the enumerated conditions is satisfied.  <u>In re Heine</u>, 141

B.R. 185, 189 (Bankr. D.S.D. 1992); <u>In re Elliot</u>, 94 B.R. 343, 345 (E.D. Pa. 1988).  Here, the

sale of the Purchased Assets free and clear of liens, claims, encumbrances, and interests, except

with respect to any Claims that constitute Assumed Liabilities under the Asset Purchase

Agreement or otherwise are expressly assumed by the Stalking Horse Purchaser in the Asset

Purchase Agreement, should be approved under Section 363(f)(2) of the Bankruptcy Code by

virtue of Wells Fargo's consent to the Sale.  Additionally, the Debtor submits that authorizing

the Debtor to sell the Purchased Assets free and clear of "successor liability" type claims also is

justified under <u>Folger Adam</u> and <u>Leckie</u>.

**E.      Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In**
        **Violation of Section 363(n) of the Bankruptcy Code**

73.     Section 363(m) of the Bankruptcy Code provides:

The reversal or modification on appeal of an authorization under
subsection (b) or (c) of this section of a sale or lease of property
does not affect the validity of a sale or lease under such
authorization to an entity that purchased or leased such property in

35

> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides that a

trustee may avoid a sale under such section if the sale price was controlled by an agreement

among potential bidders at the sale.  As discussed above, the Third Circuit in Abbotts Dairies

noted the kind of misconduct that would destroy a Buyer's good faith.  Abbotts Dairies, 788 F.2d

at 147.

74.     Here, the Asset Purchase Agreement represents a zealously negotiated, arms'-

length transaction, in which the Stalking Horse Bidder has acted in good faith, without collusion

or fraud of any kind.  In addition, substantially all aspects of the negotiations, including the

outstanding issues that the parties were trying to resolve at various stages of their negotiations,

also were discussed with Wells Fargo and the Committee.  Therefore, the Debtor respectfully

requests that the Court find that the Stalking Horse Bidder has purchased the Purchased Assets in

good faith within the meaning of Section 363(m) of the Bankruptcy Code, and is entitled to the

protections of Sections 363(m) and 363(n) of the Bankruptcy Code.  If a party other than the

Stalking Horse Bidder emerges as the Successful Bidder, the Debtor intends to make the

appropriate showing at the Approval Hearing that such Successful Bidder satisfies the

requirements of "good faith" and similarly is entitled to relief under Sections 363(m) and 363(n).

**F.      The Debtor Should Be Authorized to Assume and Assign the Assumed
         Contracts and the CBA**

75.     The Asset Purchase Agreement requires the Debtor to assume and assign the

Assumed Contracts and the CBA to the Stalking Horse Bidder upon the Closing.

76.     Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume

any executory contract or unexpired lease, subject to Court approval.  11 U.S.C. § 365(a).

36

Section 1113 of the Bankruptcy Code authorizes assumption of collective bargaining

agreements.  11 U.S.C. § 1113(a).  The requirements for assumption of executory contracts and

unexpired leases, if there has been a default thereunder, are set forth in Section 365(b)(1):

> (b)(1) If there has been a default in an executory contract or
> unexpired lease of the debtor, the trustee [debtor-in-possession]
> may not assume such contract or lease unless, at the time of
> assumption of such contract or leases, the trustee -
>
> (A)    cures, or provides adequate assurance that the
> trustee will promptly cure, such default …;
>
> (B)    compensates, or provides adequate assurance that
> the trustee will promptly compensate, a party other than the debtor
> to such contract or lease, for any actual pecuniary loss to such
> party resulting from such default; and
>
> (C)    provides adequate assurance of future performance
> under such contract or lease.

11 U.S.C. § 365(b).

77.    In turn, a debtor-in-possession may assign an executory contract or unexpired

lease if: (i) it assumes the contract in accordance with the provisions of Section 365(b) of the

Bankruptcy Code; and (ii) adequate assurance of future performance by the assignee is provided.

11 U.S.C. § 365(f)(2).  The Bankruptcy Code does not define the meaning of "adequate

assurance of future performance."  Courts have held that adequate assurance of future

performance depends on the facts and circumstances of each case, but should be given "practical,

pragmatic construction."  See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103

B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr.

S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance

that debtor will thrive and pay rent).

78.    In addition, Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign

executory contracts and unexpired leases free from anti-assignment restrictions.  Section

365(f)(1) renders unenforceable provisions that prohibit, restrict or condition an assignment of an executory contract or unexpired lease.  Section 365(f)(3) prohibits the termination or modification of an executory contract or unexpired lease because of the assumption or assignment of such contract or lease.

79.     Here, the assumption and assignment of the Assumed Contracts and the CBA is a necessary part of the Asset Purchase Agreement, and the Debtor satisfies all of the relevant requirements of Section 365 of the Bankruptcy Code.  First, pursuant to Section 3.1 of the Asset Purchase Agreement, cure amounts required to be paid to the counterparties to the Assumed Contracts and the CBA will be assumed and paid by the Stalking Horse Bidder. As reflected in the Bidding Procedures Order, the counterparties to the Assumed Contracts and the CBA will have an opportunity to review and object to the Debtor's cure statement (the "Cure Statement"), which reflects the amounts the Debtor believes are due and owing to the non-Debtor parties as of the Filing Date and will be filed with the Court and served on the counter-parties upon entry of the Bidding Procedures Order.  In the event any potential disputes to the Cure Statement cannot be resolved consensually, the Court will adjudicate the dispute and the Stalking Horse Bidder will escrow sufficient funds to pay those amounts pending Court Order.

80.     Second, the Stalking Horse Bidder or Successful Bidder will demonstrate at the Approval Hearing that adequate assurance of future performance under the Assumed Contracts and the CBA.  Accordingly, given the requirements of Section 365 of the Bankruptcy Code are satisfied, the Debtor should be authorized to assume and assign the Assumed Contracts and the CBA to the Stalking Horse Bidder or Successful Bidder.

81.     The Debtor also requests approval of the proposed respective Assumption/Assignment Notices.  The Assumption/Assignment Notices are intended to provide

counterparties to the Assumed Contracts and the CBA with the Cure Statement for their

applicable Assumed Contract and the CBA and simplified instructions of how they need to

proceed with respect to the proposed assumption and assignment of their respective Assumed

Contract and the CBA to the Stalking Horse Bidder or the Successful Bidder.

**G.**    **The Debtor Should Be Authorized to Reject the Rejected Contracts**

82.    In the event the Debtor deems it appropriate at the conclusion of the Auction, the

Debtor reserves the right to request authority at the Approval Hearing to reject the Rejected

Contracts pursuant to Section 365 of the Bankruptcy Code.

83.    Section 365(a) of the Bankruptcy Code allows the Debtor to reject any executory

contract or unexpired lease if such rejection represents a reasonable exercise of its business

judgment.  See In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir. 1993); In re Bullet Jet

Charter, Inc., 177 B.R. 593, 601 (Bankr. N.D. Ill. 1995); In re Del Grosso, 115 B.R. 136, 138

(Bankr. N.D. Ill. 1990); Johnson v. Fairco Corp., 61 B.R. 317, 319-20 (N.D. Ill. 1986).

84.    After conducting the Auction, any unsold Business Contracts or Real Property

Leases are likely valueless to the Debtor and might only create a potential administrative expense

burden on the Debtor's estate.

85.    Therefore, the Debtor requests authority, upon notice to counterparties to the

Rejected Contracts, to reject, as of the date of the Approval Hearing, some or all of its unsold

Business Contracts or Real Property Leases that the Debtor believes will have no value to the

estate.

**H.**    **Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

86.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property … is stayed until the expiration of 10 days after entry of the order, unless the

court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order

46758/0001-6180090v1

authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the

expiration of 10 days after the entry of the order, unless the court orders otherwise." The Debtor

requests that any Approval Order be effective immediately by providing that the 10-day stays

under Bankruptcy Rules 6004(h) and 6006(d) are waived.

WHEREFORE, the Debtor respectfully requests that this Court enter the Bidding

Procedures Order substantially in the form attached hereto (i) approving the Bidding Procedures;

(ii) approving the Expense Reimbursement; (iii) scheduling an Auction and an Approval Hearing

to approve such sale, and approving the form and manner of notice thereof; and (iv) granting

such other and further relief as may be just and proper. Additionally, the Debtor requests that at

the Approval Hearing, the Court enter an Approval Orders subject to the result of the Auction

and to the Bidding Procedures (i) approving and authorizing the sale; (ii) authorizing the

assumption and assignment of certain executory contracts and unexpired leases; (iii) authorizing

the termination or rejection of the Rejected Contracts; and (iv) granting such other and further

relief as may be just and proper.

<div style="margin-left:40%">

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Attorneys for Bamboo Abbott, Inc.
t/a Prestige Window Fashions, Debtor-in-
Possession


By:___*/s/ Michael D. Sirota*_____
       Michael D. Sirota
       David M. Bass

</div>

DATED: January 10, 2010

46758/0001-6180090v1

## **VERIFICATION**

JOEL S. BOTWICK, of full age, certifies as follows:

1. I am the President of Bamboo Abbott, Inc. t/a Prestige Window Fashions, the within Debtor and Debtor-in-possession (the "Debtor").  As such, I have full knowledge of the facts set forth in, and am duly authorized to make this Verified Application on the Debtor's behalf.

2. I have read the foregoing Verified Application and certify that the statements contained therein are true based upon my personal knowledge, information and belief.

3. I am aware that if any of the factual statements contained in the Verified Application are willfully false, I am subject to punishment.


DATED: January 10, 2010      */s/ Joel S. Botwick*
               JOEL S. BOTWICK

41