**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
David M. Bass, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Bamboo Abbott, Inc.
t/a Prestige Window Fashions, Debtor-in-Possession

|  |  |
|---|---|
| In re:<br><br>BAMBOO ABBOTT, INC. t/a Prestige Window Fashions,<br><br>Debtor-in-Possession. | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE MICHAEL B. KAPLAN<br>CASE NO. 09-28689 (MBK)<br><br>Chapter 11<br><br>**Approval Hearing: January 21, 2010 at 3:00 p.m.** |

**DECLARATION OF J. SCOTT VICTOR ON BEHALF OF SSG CAPITAL ADVISORS, LLC IN CONNECTION WITH DEBTOR'S MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105(A), 363, 365 AND 1113 AND FED. R. BANKR. P. 2002, 6004 AND 6006: (1) APPROVING "STALKING HORSE" ASSET PURCHASE AGREEMENT FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (2) APPROVING BIDDING PROCEDURES AND FORM, MANNER AND SUFFICIENCY OF NOTICE; (3) SCHEDULING (A) AN AUCTION SALE AND (B) A HEARING TO CONSIDER APPROVING THE HIGHEST AND BEST OFFER; (4) AUTHORIZING THE DEBTOR TO SELL SUBSTANTIALLY ALL OF ITS ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND TO ASSUME AND ASSIGN CERTAIN RELATED EXECUTORY CONTRACTS, UNEXPIRED LEASES AND ITS COLLECTIVE BARGAINING AGREEMENT; AND (5) GRANTING OTHER RELATED RELIEF**

I, J. Scott Victor, hereby declare under penalty of perjury:

1.      I am a member and managing director of SSG Capital Advisors, LLC ("SSG"),

investment bankers for Bamboo Abbott, Inc. t/a Prestige Window Fashions (the "Debtor"). I

have personal knowledge of the facts set forth herein, except as otherwise noted, and submit this

Declaration in support of the Debtor's motion for an Order: (a) approving the sale of substantially all the Debtor's assets (the "Assets") free and clear of interests, claims, encumbrances and liens; (b) approving assumption and assignment of certain related executory contracts and unexpired leases; and (c) granting related relief [Docket No. 258] (the "Sale Motion").[1]  The hearing on the Part II of Sale Motion, *i.e.*, the Sale Approval Hearing, has been scheduled for January 21, 2010, at 3:00 p.m.  If called to testify at the Sale Approval Hearing, I would state that:

## RELEVANT BACKGROUND

2. On or about October 16, 2009, the Debtor and SSG entered into an engagement letter dated October 16, 2009 (the "Engagement Letter").  Shortly thereafter, on October 26, 2009, the Debtor filed an Application for authority to retain SSG as investment banker pursuant to 11 U.S.C. § 328(a) in accordance with the terms of the Engagement Letter [Docket No. 178] (the "Retention Application").  On November 4, 2009, the Court entered an Order, *nunc pro tunc* to October 16, 2009, approving the Debtor's retention of SSG as the Debtor's exclusive investment banker.

3. As set forth in more detail in the Engagement Letter and the Retention Application, SSG was retained to, among other things: (a) prepare an information memorandum describing the Debtor, its historical performance and prospects, including existing contracts, marketing and sales, labor force, management and anticipated financial results of the Debtor; (b) assist the Debtor in developing a list of suitable potential buyers who will be contacted on a discreet and confidential basis after approval by the Debtor; (c) coordinate the execution of confidentiality agreements for potential buyers wishing to review the information memorandum;

---

[1] All capitalized terms shall have the meanings ascribed to them in the Sale Motion.

(d) coordinate the data room and the due diligence investigations of potential buyers; (e) assist the Debtor in coordinating site visits for interested buyers and work with the management team to develop appropriate presentations for such visits; (f) solicit competitive offers from potential buyers; (g) evaluate proposals received from potential buyers;(h) advise and assist the Debtor in structuring the transaction and negotiating the transaction agreements; (i) provide testimony on behalf of the Debtor related to the sale process or any other matters related to SSG's investment banking assignment for the Debtor; and (j) otherwise assist the Debtor, its attorneys and accountants, as necessary, through closing on a best efforts basis.

4. On January 11, 2010, the Court entered an Order Shortening Time for notice of hearing on bidding procedures relating to the Debtor's Sale Motion, inter alia, to (a) approve the Debtor's entry into a "stalking horse" asset purchase agreement (the "Purchase Agreement") with Ventanas Acquisition Corporation (the "Proposed Purchaser"), as purchaser for the sale of the Assets free and clear of interests, claims, encumbrances and liens, (b) approve bidding procedures, (c) schedule an auction sale and a hearing to consider approving the highest and best offer, and (d) grant related relief (the "Bidding Procedures Motion").  Pursuant to the Order Shortening Time, the Court conducted a hearing on the Bidding Procedures Motion on January 13, 2010 (the "Bidding Procedures Hearing").  The Court entered an order on January 14, 2010 granting the Bidding Procedures Motion [Docket No. 268].  The Bidding Procedures Order fixed January 20, 2010, at 1:00 p.m. as the deadline for the submission of higher or better bids for the Assets and January 21, 2010 at 9:00 a.m. for an auction to the extent higher or better bids are submitted.

## THE SALE PROCESS

5. Commencing immediately with its engagement in mid-October 2009, SSG initiated an extensive and aggressive marketing of the Debtor's assets for sale as a going concern

and began soliciting suitable potential buyers (including those potentially interested parties with whom the Debtor had been in discussions). Its efforts generally can be summarized in the following categories:

      (a)    *Due Diligence of the Debtor's Operations.* SSG initially spent a considerable amount of time with the Debtor and its management to analyze its business and operations. SSG analyzed business plans, internal financial statements, operating reports (including detail on revenue components, expense categories and profitability), liquidity and working capital reports and forecasts, liquidation analyses, descriptions and contracts for the Debtor's owned and leased assets, financing agreements and other information concerning pre- and post-petition liabilities as well as other information concerning the Debtor's operations.

      (b)    *Potential Purchaser List.* Shortly after its retention, SSG completed extensive research to develop a comprehensive list of those strategic or financial entities most likely to purchase the Assets. SSG researched public and privately-held companies in the same and similar industries as the Debtor and reviewed proprietary and licensed databases of potential financial purchasers interested in investing in companies in similar industries and/or situations as the Debtor. SSG reviewed the data with the Debtor and focused the list to target a subset of those companies with the financial wherewithal and/or most compelling strategic rationales to pursue a transaction with the Debtor.

      (c)    *Due Diligence Material.* Concurrently with contacting potential purchasers, SSG worked with the Debtor to prepare a thorough source of information containing important financial and operating data on the Debtor's business. SSG coordinated with the Debtor to maintain and update that information so that potential purchasers would have access to relevant financial and operational information while evaluating the opportunity. SSG worked

with the Debtor and its advisors to create various materials that also were used during in–person diligence meetings with potential purchasers. These materials included descriptive information, financial data and other financial and operating detail that enabled the potential purchasers to evaluate the Debtor's operating business.

(d) *Contacted Potential Purchasers.* SSG contacted numerous strategic and financial purchasers, reviewed the qualifications and merits of those purchasers with the Debtor's management and, where appropriate, facilitated initial meetings, plant visits and management presentations SSG contacted approximately fifty (50) potential purchasers and had initial discussions with approximately twenty-five (25) of them. Nineteen (19) of those potential purchasers executed confidentiality agreements, all of which then engaged in discussions with SSG and/or the Debtor regarding the general parameters of the potential purchase of the Assets. SSG followed up with all interested buyers, provided due diligence information as requested, answered questions about the Debtor and the sale process and encouraged all parties to move quickly and efficiently to the extent they wished to proceed. In all cases, SSG representatives encouraged qualified buyers to meet with the Debtor's management to obtain a better understanding of the business, assets and going forward opportunity.

(e) *Potential Purchaser Discussions and Follow-Up Meetings.* SSG spent a significant amount of time with potential purchasers discussing the Debtor's operations, historical performance and prospects, as well as responding to specific follow-up questions and due diligence requests from potential purchasers. SSG had extensive discussions and conference calls with a number of purchasers. Several potential purchasers expressed an initial indication to acquire substantially all of the Debtor's assets. The Debtor made presentations to eight (8) of those parties. The presentations were of sufficient detail to give each prospect the opportunity to

assess the opportunity and make a preliminary decision as to whether or not to proceed with further due diligence. In most instances, the prospects had ample opportunity to review the Debtor's operations and business in detail prior to the actual presentation. This was due to the fact that qualified buyers who had signed confidentiality agreements were given the offering memorandum and various due diligence materials prior to the management presentation. SSG attended all management presentations.

        (f)    *Negotiations with Purchasers.* In the end, seven (7) potential purchasers made purchase offers to the Debtor, including five (5) private equity/hedge funds and two (2) strategic purchasers. Following the due diligence process, the Debtor and SSG engaged in extensive negotiations with the at least two (2) offerors.

6.    After careful consideration, the Debtor, in consultation with SSG, opted to pursue a transaction with the Proposed Purchaser, a subsidiary of a private equity fund managed by merger, acquisition and operation specialist Platinum Equity Advisors, LLC (collectively, with its affiliates, "Platinum Equity") because the Proposed Purchaser offer, when compared to the other alternatives, maximized the benefit to the Debtor's estate. SSG also understood that Platinum had a familiarity with the bankruptcy process and the ability to proceed expeditiously to complete a complex transaction, which was critical in light of the liquidity constraints facing the Debtor in the latter part of 2009.[2]

---

[2] Indeed, the Proposed Purchaser moved with the alacrity urged by the Debtor, having conducted extensive due diligence prior to issuance and finalization of its letter of intent; investing, as I understand, in excess of $350,000 on third party accounting, legal and operational due diligence.

## THE PURCHASE AGREEMENT

7.  After receipt of the Proposed Purchaser's letter of intent, the Debtor, its legal advisors and SSG engaged in substantial negotiations with the Proposed Purchaser over the terms of a proposed purchase agreement. Concurrently with the filing of the Sale Motion, the Debtor entered into the Purchase Agreement.

8.  The Purchase Agreement and related transactions provide the framework for (a) the continuation of the Debtor's operation, (b) continued opportunity for employment of approximately 400 people, (c) payment or assumption of certain post-petition obligations of the Debtor's estate, and (d) a minimum bid and comprehensive asset purchase agreement against which other parties were permitted to bid.

9.  Under the sale process identified in the Sale Motion, the Proposed Purchaser served as the "stalking horse" bidder pursuant to the terms of Purchase Agreement, with Wells Fargo being authorized to credit bid in accordance with Section 363(k) of the Bankruptcy Code in the event that the Proposed Purchaser determined not to pursue the transaction.

10. In sum, the Assets of the business have been marketed and solicited by SSG to all potential parties that expressed an interest in doing a transaction with the Debtor and all potential parties that SSG believed would be reasonably interested in purchasing the Assets. Additionally, the sale of the Assets has been subject to an auction process in which the value of the Assets has been maximized. The Debtor, however, did not receive higher and better offers.

11. Unfortunately, buyers expressed concern over the Debtor's operating performance and magnitude of the required turnaround. Those buyers which proceeded with due diligence and additional inquiry did so on their belief that they could operate the business in a manner so as to generate significant operating results. Prospective buyers struggled with any valuation

predicated on future prospects. The valuation metrics were further impacted by the Debtor's business performing well below budget for the last few months.

12. Thus, no other buyer was willing to pay more than $7.1 million purchase price offered by the Proposed Purchaser. The sale process has been conducted in good faith and all interested parties have been given the opportunity to participate in the process. Accordingly, in my opinion the purchase price in the Purchase Agreement, which is the best offer received for the Assets, represents a fair and reasonable value for the Assets and is higher than what could be recovered on a liquidation of the Assets.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: January 20, 2010

J. Scott Victor
Managing Director
SSG Capital Advisors, LLC