Order Filed on
**1/22/2010**
by Clerk U.S. Bankruptcy
Court District of New Jersey

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-2(c)**
COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Attorneys for Bamboo Abbott, Inc. t/a Prestige
Window Fashions, Debtor-in-Possession

In re:

BAMBOO ABBOTT, INC. t/a PRESTIGE
WINDOW FASHIONS,

                   Debtor-in-Possession.

Case No.  09-28689

Judge:  Michael B. Kaplan

Chapter 11

**ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS
105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY
OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)**

The relief set forth on the following pages, numbered two (2) through twenty-three (23),

is hereby **ORDERED**.

**DATED: 1/22/2010**

_Michael B. Kaplan_
Honorable Michael B. Kaplan
United States Bankruptcy Judge

(Page 2)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

Upon the motion (the "Motion"),[1] of Bamboo Abbott, Inc. t/a Prestige Window Fashions, the within debtor and debtor-in-possession (the "Debtor") for an order authorizing the Debtor, pursuant to Sections 105(a), 363, 365 and 1113 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 to sell certain asset and for such other relief as more particularly set forth therein; and the Court having entered an order dated January 14, 2010 approving, among other things, the Bidding Procedures (the "Bid Procedures Order") based upon the evidence and statements of counsel presented at the hearing held on January 14, 2010 (the "Bid Procedures Hearing"); no Qualified Bids having been received by the Bid Deadline and, as a result, the Auction having been cancelled, Ventanas Acquisition Corporation, a Delaware corporation (the "Purchaser"), is the Successful Bidder (as defined in the Bid Procedures Order); and the Court having conducted a final hearing to approve the Motion on January 21, 2010 (the "Approval Hearing"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Asset Purchase Agreement made as of January 14, 2010, and amended pursuant to that Amendment No. 1 To Asset Purchase Agreement dated and entered into as of January 21, 2010 (as so amended, the "Purchase Agreement") (attached hereto as **Exhibit A**) and the transactions contemplated thereby (the "Transactions"); and the Court having reviewed and considered the Motion, and the statements of counsel made, and the evidence adduced at the Bid Procedures Hearing and the Approval Hearing; and upon the record of the Bid Procedures Hearing and the

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order (as defined herein), or if not defined therein, then such capitalized terms shall have the meanings as ascribed to them in the Purchase Agreement (as defined herein).

*Approved by Judge Michael Kaplan January 22, 2010*

(Page 3)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

---

Approval Hearing and this chapter 11 case, and after due deliberation thereon, and good cause appearing therefore, it is hereby

**FOUND AND DETERMINED THAT:**[2]

      A.     This Court has jurisdiction over the Motion and the Transactions under 28 U.S.C. §§ 157(b)(1) and 1334(b).  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this chapter 11 case and the Motion in the District of New Jersey is proper under 28 U.S.C. §§ 1408 and 1409.

      B.     The statutory predicates for the relief sought in the Motion are Sections 105(a), 107(b)(1), 363, 365 and 1113 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9014 and 9018 and Local Rules 6004-1 and 9018-1.

      C.     Notice of the Motion and the Approval Hearing has been provided to: (i) the Office of the United States Trustee; (ii) all parties to the Assumed Contracts; (iii) the Pension Benefit Guaranty Corporation; (iv) counsel for the Union; (v) counsel for the Committee; (vi) counsel for Wells Fargo; (vii) counsel for the Purchaser; (viii) all entities known to have expressed an interest in a transaction with respect to any of the Purchased Assets during the past year from the Effective Date of the Purchase Agreement; (ix) those persons filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in this chapter 11 case; (x) all Governmental Entities and taxing authorities having or asserting jurisdiction

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law.  See Fed. R. Bankr. P. 7052.

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 4)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

---

over the Debtor or any of the Purchased Assets (including the Internal Revenue Service, the United States Department of Justice and the United States Attorney Office for the District of New Jersey); (xi) counterparties to the Rejected Contracts; (xii) all known parties asserting Claims on any of the Purchased Assets; and (xiii) all parties identified as creditors in Schedules D through H of the Debtor's Schedules of Statements and Liabilities.  Based upon the notices and affidavits of service filed with the Court: (a) notice of the Motion and the Approval Hearing was adequate and sufficient under the circumstances of this chapter 11 case and these proceedings complied with the various applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Bid Procedures Order; and (b) a reasonable opportunity to object and be heard with respect to the Motion was afforded to all interested persons and entities.

D.     The Purchased Assets sought to be transferred and/or assigned by the Debtor to the Purchaser pursuant to the Purchase Agreement are property of the Debtor's estate and title thereto is vested in the Debtor's estate.

E.     The Debtor has demonstrated both (i) good, sufficient and sound business purposes and justifications for, and (ii) compelling circumstances to consummate the sale of the Purchased Assets and other Transactions as contemplated by the Purchase Agreement other than in the ordinary course of business under Section 363(b) of the Bankruptcy Code and before and outside of a plan of reorganization, and such action is an appropriate exercise of the Debtor's business judgment and in the best interests of the Debtor, its estate and the creditors. Such business reasons include, but are not limited to, the facts that: (i) there is substantial risk

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 5)
Debtor:              BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.             09-28689 (MBK)
Caption of Order:    ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                     PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                     BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                     REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

_____

of depreciation of the value of Purchased Assets if the sale is not consummated quickly; and (ii)

the offer made by the Purchaser as reflected in the Purchase Agreement constitutes the highest

or best offer for Purchased Assets.

    F.  The Debtor and its professionals widely marketed the Purchased Assets to

potential purchasers as set forth in the Motion and in accordance with the Bid Procedures

Order.  The bidding process set forth in the Bid Procedures Order afforded a full and fair

opportunity for any entity to make a higher or otherwise better offer to acquire the Purchased

Assets.  Based upon the record of these proceedings, all creditors and other parties in interest

and all prospective purchasers have been afforded a reasonable and fair opportunity to bid for

Purchased Assets.  The Bidding Procedures were substantively and procedurally fair to all

parties.  The Debtor conducted the sale process in accordance with the Bidding Procedures and

the Bid Procedures Order.

    G.  No other person or entity or group of persons or entities has offered to

purchase the Purchased Assets for an amount that would give equal or greater value to the

Debtor than the value being provided by the Purchaser.  Approval of the Motion and the sale of

the Purchased Assets to Purchaser on the terms of the Purchase Agreement and this Sale Order

are in the best interests of the Debtor, its creditors and all other parties in interest.  No

alternative to this sale of the Purchased Assets exists that would provide a greater value to the

Debtor, its creditors, or other parties in interest.

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 6)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

H.     The total consideration provided by the Purchaser for the Purchased Assets is the highest and best offer received by the Debtor, and the Purchase Price (as defined in the Purchase Agreement) constitutes reasonably equivalent value and fair consideration for the Purchased Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the laws of the United States, any state, territory, possession thereof or the District of Columbia.  The Purchase Agreement was not entered into, and the sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtor under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law. Neither the Debtor nor the Purchaser has entered into the Purchase Agreement with any fraudulent or otherwise improper purpose.

I.     Subject to entry of this Sale Order, the Debtor: (i) has full power and authority to execute the Purchase Agreement and any ancillary agreement or other document contemplated thereby; (ii) has all of the power and authority necessary to consummate the Transactions contemplated by the Purchase Agreement; and (iii) has taken all company action necessary to authorize and approve the Purchase Agreement, including the sale of the Purchased Assets to Purchaser and the consummation of the Transactions relating thereto (the "Sale").  No consents or approvals, other than those expressly provided for in the Purchase Agreement or this Sale Order, are required for the Debtor to close on the Sale and consummate the Transactions.

46758/0001-6257465v5

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 7)
Debtor:               BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.           09-28689 (MBK)
Caption of Order:   ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

---

J.      The Purchase Agreement and the Transactions were negotiated, proposed and entered into by the Debtor and the Purchaser without collusion or fraud, from arm's-length bargaining positions and in good faith within the meaning of Section 363(m) of the Bankruptcy Code.  Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale.  No stay pending appeal of this Sale Order has been requested, and the stay contained in Bankruptcy Rule 6004(h) and 6006(d) has been and hereby is expressly and irrevocably waived as set forth below.

K.      Neither the Debtor nor the Purchaser nor any of their respective affiliates, partners, principals, or shareholders or their representatives has engaged in any conduct that would cause or permit the Purchase Agreement or other documents and instruments related to or connected with the Sale and the consummation thereof or any of the Transactions relating thereto to be avoided, or costs or damages to be imposed under Section 363(n) of the Bankruptcy Code.  The terms and conditions of the Purchase Agreement, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and the Sale shall not be avoided under Section 363(n) of the Bankruptcy Code.

L.      The Purchaser would not have entered into the Purchase Agreement and would not consummate the Transactions if the Sale of the Purchased Assets to the Purchaser was not free and clear of all liens, claims and interests pursuant to Section 363(f) of the Bankruptcy Code, or if the Purchaser would, or in the future could, be liable for any of such liens, claims and interests.  A sale of the Purchased Assets other than one free and clear of all

(Page 8)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

Claims and Interests (each as defined below) would yield substantially less value for the Debtor's estate, with less certainty, than the Sale. Therefore, the Sale contemplated by the Purchase Agreement is in the best interests of the Debtor, its estate and all other parties in interests.

M.    The Debtor may sell the Purchased Assets free and clear of all Claims and Interests because, with respect to each creditor asserting a Claim or Interest in any of the Purchased Assets, one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Claims or Interests who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented to the Amended Motion and the Sale pursuant to Section 363(f)(2) of the Bankruptcy Code. Those holders of the Claims or Interests who did object fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code.

N.    The Purchaser is not an "insider" or "affiliate" of the Debtor as those terms are defined in the Bankruptcy Code, and no common identity of incorporators, directors, officers or equity-holders exist between the Purchaser and the Debtor. Pursuant to the Purchase Agreement, the Purchaser is not purchasing all of the Debtor's assets in that Purchaser is not purchasing any of the Excluded Assets (as defined in the Purchase Agreement) and is not holding itself out to the public as a continuation of the Debtor. The Sale of the Purchased Assets and consummation of the Transactions does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtor and/or the Debtor's estate, there is not substantial

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 9)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

---

continuity between the Purchaser and the Debtor, there is no continuity of enterprise between the Debtor and the Purchaser, the Purchaser is not a mere continuation of the Debtor or the Debtor's estate, and the Purchaser does not constitute a successor to the Debtor or the Debtor's estates.  Upon the Closing (as defined in the Purchase Agreement), the Purchaser shall be deemed to have assumed only the Assumed Liabilities (as defined in the Purchase Agreement). Except for the Assumed Liabilities, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.  The Court finds that the Purchaser would not have entered into the Purchase Agreement but for the foregoing protections against potential claims based upon "successor liability" theories.

O.      The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Assumed Contracts and any Additional Assumed Contracts to the Purchaser in connection with consummation of the Sale, and the assumption, assignment and sale of the Assumed Contracts and any Additional Assumed Contracts to Purchaser is in the best interests of the Debtor, its estate, creditors and all parties in interest.  The Assumed Contracts and Additional Assumed Contracts being assigned to the Purchaser are an integral part of the Purchased Assets being purchased by the Purchaser, and accordingly, such assumption, assignment and sale of the Assumed Contracts and Additional Assumed Contracts are reasonable and enhance the value of the Debtor's estate.  The Cure Amounts  required to be paid by the Purchaser pursuant to Section 365(b) of the Bankruptcy Code as set forth in the

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 10)

Debtor:                    BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.                  09-28689 (MBK)
Caption of Order:     ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                                PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                                BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                                REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

_____

Cure Notice that Debtor has provided to each non-Debtor party to an Assumed Contract or

Additional Assumed Contract or, if an objection the Cure Amount is timely filed and received

as required by the terms of the Bid Procedures Order and the parties are unable to consensually

resolve such dispute then as otherwise ordered to be paid by this Court pursuant to a final order

are deemed to be and shall constitute for all purposes the entire cure obligation due and owing

under the Assumed Contracts or Additional Assumed Contract pursuant to Section 365 of the

Bankruptcy Code.  Upon payment of the Cure Amount, there are no outstanding defaults of the

Debtor and its estate under the Assumed Contracts.

P.      The Purchaser has demonstrated adequate assurance of future performance

of all Assumed Contracts and Additional Assumed Contracts within the meaning of Section 365

of the Bankruptcy Code and the Bid Procedures Order.

Q.      Each and every provision of the Assumed Contracts or Additional

Assumed Contracts that purport to prohibit, restrict or condition or could be construed as

prohibiting, restricting, or conditioning assignment of any of the Assumed Contracts or

Additional Assumed Contracts have been satisfied or are otherwise unenforceable under

Section 365 of the Bankruptcy Code.

R.      Upon the consummation of the Sale at Closing, the Assumed Contracts

and any Additional Assumed Contract shall be deemed valid and binding, in full force and

effect in accordance with their terms and subject to the provisions of this Approval Order.

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 11)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

---

S.      Good and sufficient reasons for approval of the Purchase Agreement have been articulated to the Court in the Motion and on the record at the Approval Hearing, and the relief requested in the Motion and set forth in this Approval Order is in the best interests of the Debtor, its estate, creditors and other parties in interest.

T.      The transfer of the Purchased Assets to the Purchaser at Closing will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Purchaser with all of the Debtor's right, title and interest of, in and to the Purchased Assets, free and clear of (i) all Claims and Interests (as defined below) of any kind or nature whatsoever (other than Assumed Liabilities), and (ii) all Excluded Liabilities, "claims" as defined in Section 101(5) of the Bankruptcy Code, rights or causes of action (whether in law or in equity), obligations, demands, restrictions, interests and matters of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of this chapter 11 case, and whether imposed by agreement, understanding, law, equity or otherwise, including any "Claims" as defined in the Purchase Agreement (collectively, the "Claims"), other than Assumed Liabilities.

U.      The Sale does not constitute a *sub rosa* chapter 11 plan.

V.      Time is of the essence in consummating the Sale.  In order to maximize the value of the Debtor's assets, it is essential that the Closing of the Sale of the Purchased Assets occur within the time constraints set forth in the Purchase Agreement.  Accordingly, there is cause to lift the stay as contemplated by Bankruptcy Rule 6004(h) and 6006(d).

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 12)
Debtor:              BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.             09-28689 (MBK)
Caption of Order:    ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                     PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                     BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                     REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

---

### IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.    All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled or otherwise dealt with as expressly provided herein, are hereby overruled on the merits.

2.    Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchase Agreement, Sale of the Purchased Assets and consummation of the Transactions are hereby approved and authorized.

3.    The Debtor has demonstrated sound business judgment and is authorized and empowered pursuant to Section 363 of the Bankruptcy Code to sell the Purchased Assets to the Purchaser on the terms and conditions as set forth in the Purchase Agreement.

4.    The Debtor is authorized to execute and deliver such assignments, conveyances, and other documents and instruments of transfer and to take such other actions as may be reasonably necessary to consummate the Sale of the Purchased Assets to Purchaser.

5.    Pursuant to Section 365 of the Bankruptcy Code, notwithstanding any provision of any Assumed Contract or Additional Assumed Contract or applicable non-bankruptcy law that prohibits, restricts or conditions the assignment of the Assumed Contracts or Additional Assumed Contract to Purchaser, the Debtor is authorized to assume and assign the Assumed Contracts and any Additional Assumed Contract to the Purchaser, which shall take place on and be effective as of the Closing provided that the Cure Amount due and owing to the respective counterparty to each such Assumed Contract or Additional Assumed Contract shall

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 13)
Debtor:            BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.           09-28689 (MBK)
Caption of Order:  ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                   PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                   BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                   REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

---

have been paid in full by Purchaser as provided in the Purchase Agreement and herein prior to or at Closing.

6.      As of the Closing, subject to the provisions of this Approval Order, the Purchaser shall succeed to the entirety of the Debtor's rights and obligations in the Assumed Contracts and Additional Assumed Contracts first arising and attributable to the time period occurring on or after the Closing Date and shall have all rights thereunder.  Upon assumption of the Assumed Contracts and any Additional Assumed Contracts and assignment to Purchaser at Closing, the Assumed Contracts and Additional Assumed Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Approval Order.

7.      Upon the entry of this Approval Order: (a) all defaults (monetary and non-monetary) under the Assumed Contracts through Closing shall be deemed cured through the payment of the Cure Amounts; (b) no other amounts will be owed by the Debtor, its estate or the Purchaser with respect to amounts first arising or accruing during, or attributable or related to the period before the Closing Date with respect to the Assumed Contracts and any Additional Assumed Contracts; (c) any and all counterparties to such Assumed Contracts and Additional Assumed Contracts shall be forever barred and estopped from asserting a Claim against the Debtor, its estate or the Purchaser that any additional amounts are due or defaults exist under the Assumed Contracts or Additional Assumed Contracts that arose or accrued, or relate to or are attributable to the period before the Closing.

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 14)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

8.     The Debtor shall be deemed to have rejected, pursuant to Section 365 of the Bankruptcy Code, those executory contracts and unexpired leases that are not Assumed Contracts or Additional Assumed Contracts, which rejection shall be effective on the Closing Date.

9.     Upon the Closing: (a) the Debtor is hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of the Purchased Assets to the Purchaser free and clear of any and all interests pursuant to Section 363 of the Bankruptcy Code, including (without limitation) all liens, including any lien (statutory or otherwise), mortgage, pledge, security interest, charge, right of first refusal, hypothecation, encumbrance on real property, easement, encroachment, right of way, restrictive covenant on real property, real property license, lease or conditional sale arrangement (collectively, the "Liens") and debts, liabilities and obligations, whether accrued or fixed, direct or indirect, liquidated or un-liquidated, absolute or contingent, matured or un-matured, determined or undeterminable, known or unknown, including those arising under any law or action and those arising under any contract or otherwise, including any tax liability (other than Assumed Liabilities) (collectively, the "Liabilities" and together with the Liens, the "Interests"), with such Interests to attach to the proceeds of the Sale in the same validity, extent and priority as existed immediately prior to the consummation of the Sale at Closing, subject to any rights, claims and defenses of the Debtor and other parties in interest; and (b) except as otherwise expressly provided in the Purchase Agreement, all such Interests (other than Assumed

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 15)
Debtor:              BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.             09-28689 (MBK)
Caption of Order:    ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                     PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                     BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                     REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

---

Liabilities) shall be and hereby are released, terminated and discharged as to the Purchaser and the Purchased Assets.

10.     The transfer of the Purchased Assets to Purchaser pursuant to the Purchase Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Purchased Assets, and vests with or will vest in the Purchaser all right, title and interest of the Debtor in the Purchased Assets, free and clear of all Claims and Interests of any kind or nature whatsoever (other than Assumed Liabilities), with any Interests attaching to the sale proceeds in the same validity, extent and priority as existed immediately prior to the Closing, subject to the rights, claims and defenses of the Debtor and other parties in interest.

11.     At Closing, all Sale proceeds of the Purchased Assets shall be paid directly to Wells Fargo Bank, National Association.

12.     Upon the Closing, and except as otherwise expressly provided in the Purchase Agreement, the Purchaser shall not be liable for any Claims against, and Liabilities of, the Debtor or any of the Debtor's predecessors or affiliates.  Without limiting the generality of the foregoing, and except as otherwise expressly provided in the Purchase Agreement: (a) the Purchaser shall have no liability or obligation to pay wages, bonuses, severance pay, benefits, including, without limitation, contributions or payments constituting a Claim as of the Closing on account of any under-funding with respect to any Employee Benefit Plan (as defined in the Purchase Agreement) or any other pension or benefit plan of the Debtor or make any other payment to employees of the Debtor; (b) the Purchaser shall have no liability or obligation in

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 16)
Debtor:             BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.            09-28689 (MBK)
Caption of Order:   ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                    PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                    BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                    REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

_____

respect of any Employee Benefit Plan (including, without limitation, liabilities or obligations

arising from or related to the rejection, withdrawal from or other termination of any such plan

program agreement or benefit); (c) the Purchaser shall in no way be deemed a party to or

assignee of any such Employee Benefit Plan or any similar agreement or program; and (d) all

parties to any such Employee Benefit Agreement, plan or similar program are enjoined from

asserting against Purchaser any Claims arising from or relating to such Employee Benefit Plan or

similar agreement or program.

   13. The Purchaser, its affiliates, partners, principals, shareholders and their

respective advisors have proceeded in good faith and without collusion in all respects and

therefore are entitled to the benefits and protections of Section 363(m) of the Bankruptcy Code.

   14. Pursuant to Sections 105 and 363 of the Bankruptcy Code, the Debtor and

the Purchaser are each hereby authorized and directed to take any and all actions necessary or

appropriate to: (a) consummate the Sale of the Purchased Assets on the terms and subject to the

conditions set forth in the Purchase Agreement and the other Transactions contemplated thereby;

(b) assume and assign the Assumed Contracts and any Additional Assumed Contract to

Purchaser; and (c) perform, consummate, implement and fully close the Transactions and deliver

any additional instruments and documents that reasonably may be necessary or desirable to

implement the Purchase Agreement or any Transactions relating thereto.

   15. Neither Article 6 of the Uniform Commercial Code (as enacted in

applicable state or jurisdiction), nor any other bulk sales law or similar law of any state or other

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 17)

Debtor:                    BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.                   09-28689 (MBK)
Caption of Order:          ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                           PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                           BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                           REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

---

jurisdiction shall apply in any way to the Sale of the Purchased Assets on the terms set forth in

this Approval Order and in the Purchase Agreement.  Except to the extent, if any, as expressly

provided in the Purchase Agreement, no brokers were involved in consummation of the Sale and

no brokers' commissions are due to any person or entity in connection with the Sale of the

Purchased Assets to Purchaser.

16.    The consideration provided by the Purchaser for the Purchased Assets

under the Purchase Agreement shall be deemed for all purposes to constitute value and fair

consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be

avoided, or costs or damages imposed or awarded under Section 363(n) or any other provision of

the Bankruptcy Code.

17.    On the Closing Date, this Approval Order shall be construed and shall

constitute for any and all purposes a full and complete general assignment, conveyance and

transfer of all of the Purchased Assets or a bill of sale transferring good and marketable title in

such Purchased Assets to the Purchaser on the Closing Date pursuant to the terms of the

Purchase Agreement, free and clear of all Claims and Interests (other than Assumed Liabilities).

18.    This Approval Order is and shall be binding upon and shall authorize all

entities, including all filing agents, filing officers, title agents, title companies, recorders of

mortgages, recorders of deeds, registrars of deeds, administrative agencies or units,

governmental departments or units, secretaries of state, federal, state and local officials and all

other persons and entities who may be required by operation of law, the duties of their office, or

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 18)

Debtor:                 BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.              09-28689 (MBK)
Caption of Order:   ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                          PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                          BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                          REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

_____

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to the Purchased Assets

conveyed to the Purchaser.  All such persons and entities described above in this paragraph are

authorized and specifically directed to strike all recorded Interests against the Purchased Assets

from their records, official and otherwise.

19.    If any person or entity that has filed statements or other documents or

agreements evidencing Liens on, or Interests in, the Purchased Assets shall not have delivered to

the Debtor before the Closing, in proper form for filing and executed by the appropriate parties,

termination statements, instruments of satisfaction, releases of liens and easements, and any

other documents necessary for the purposes of document the release of all Liens that the person

or entity has or may assert with respect to any of the Purchased Assets, the Debtor and the

Purchaser are hereby authorized to execute and file such statements, instruments, releases an

other documents on behalf of such person or entity with respect to the Purchased Assets.

20.    All counterparties to the Assumed Contracts and Additional Assumed

Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of

the Purchaser, and shall not charge the Purchaser for, any instruments, applications, consents or

other documents which may be required or requested by any public or quasi-public authority or

other party or entity to effectuate the applicable transfers in connection with the Sale and related

Transactions.

46758/0001-6257465v5

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 19)
Debtor:            BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.           09-28689 (MBK)
Caption of Order:  ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                   PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                   BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                   REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

---

21.    Each and every federal, state and local governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale and other Transactions contemplated by the Purchase Agreement.

22.    Except only to the extent otherwise expressly agreed to by the Debtor and Purchaser in the Purchase Agreement, no governmental unit or regulatory authority may revoke or suspend any right, license, trademark or other permission relating to the use of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of the chapter 11 case or the consummation of the Sale.

23.    Except as otherwise provided in the Purchase Agreement, any and all Purchased Assets in the possession or control of any person or entity, including, without limitation, any vendor, supplier or employee of the Debtor shall be transferred to the Purchaser free and clear of all Claims and Interests (other than Assumed Liabilities) and shall be delivered at the time of Closing to the Purchaser.

24.    Upon the Closing, all creditors, employees and equity holders of the Debtor are permanently and forever barred, restrained and enjoined from asserting any Claims or Interests or enforcing remedies, or commencing or continuing in any manner any action or other proceeding of any kind, against the Purchaser or the Purchased Assets on account of any of the Liens, Claims, Interests, Excluded Liabilities or Excluded Assets (other than Assumed Liabilities).

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 20)
Debtor:                BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.               09-28689 (MBK)
Caption of Order:      ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                       PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                       BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                       REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

_____

25.     The Sale does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtor and/or the Debtor's estate, there is not substantial continuity between the Purchaser and the Debtor, there is no continuity of enterprise between the Debtor and the Purchaser, the Purchaser is not a mere continuation of the Debtor or the Debtor's estates, and the Purchaser does not constitute a successor to the Debtor or its estate.  Upon the Closing, the Purchaser shall be deemed to have assumed only the Assumed Liabilities.  Except for the Assumed Liabilities, the Purchaser's acquisition of the Purchased Assets shall be free and clear of any "successor liability" Claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the time of the Closing.  The Purchaser's operations shall not be deemed a continuation of the Debtor's business as a result of the acquisition of the Purchased Assets.

26.     To the extent this Approval Order is inconsistent with any prior order or pleading with respect to the Motion in this chapter 11 case, the terms of this Approval Order shall govern. To the extent there is any inconsistency between the terms of this Approval Order and the terms of the Purchase Agreement (including all ancillary documents executed in connection therewith) the terms of this Approval Order shall govern.

27.     Any amounts that become payable by the Debtor to the Purchaser pursuant to the Bid Procedures Order, Purchase Agreement or any of the documents delivered by the Debtor pursuant to or in connection therewith or any of the other Transactions contemplated thereby, including without limitation, the Expense Reimbursement, shall: (a) constitute

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 21)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

---

administrative expenses of the Debtor's estate within the meaning of Section 503(b) of the

Bankruptcy Code; and (b) be paid by the Debtor in the time and manner as provided in the

Purchase Agreement and Bid Procedures Order without further order of this Court being

necessary.

28.    This Approval Order shall not be modified by any chapter 11 plan

confirmed in this chapter 11 case or subsequent order of this Court unless expressly consented to

in writing by the Purchaser.

29.    This Approval Order and the Purchase Agreement shall be binding in all

respects upon all creditors and interest holders of the Debtor, all of the Debtor's employees, all

counterparties to the Assumed Contracts and Additional Assumed Contracts, any statutory

committee appointed in this chapter 11 case, all successors and assigns of the Debtor and each of

their affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other

fiduciaries appointed in this chapter 11 case or upon a conversion of this proceeding to chapter 7

case under the Bankruptcy Code, and the Purchase Agreement shall not be subject to rejection or

avoidance under any circumstances.

30.    The failure specifically to include or make reference to any particular

provisions of the Purchase Agreement or any agreement or document relating thereto in this

Approval Order shall not diminish or impair the effective of such provision, it being the intent of

the Court that the Purchase Agreement and any document or agreement to be executed in

connection therewith be authorized and approved in their entirety.

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 22)
Debtor:                BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS
Case No.               09-28689 (MBK)
Caption of Order:      ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS
                       PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE
                       BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE
                       REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D)

_____

31.    The Debtor is hereby authorized and directed to perform each of its covenants and undertakings as provided in the Purchase Agreement, the Assumed Contracts, Additional Assumed Contracts and any other document or agreement to be executed in connection with the Sale prior to or after Closing, without further order of the Court being necessary.

32.    Notwithstanding any provision in the Bankruptcy Rules to the contrary: (a) the terms of this Approval Order shall be self-executing and immediately effective and enforceable upon its entry; (b) the Debtor is not subject to any stay in the implementation, enforcement or realization of the relief granted in this Approval Order; and (c) the Debtor, in its discretion and without further delay, may take any action and perform any act authorized under this Approval Order.

33.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Approval Order, including, without limitation, the authority to: (a) interpret, implement and enforce the terms and provisions of either this Approval Order (including any of the injunctive relief provided herein) or of the Purchase Agreement including any amendments thereto and any waivers and consents provided in respect thereof; (b) protect the Purchaser and/or the Purchased Assets from and against any Claims or Interests; (c) compel the delivery of all of the Purchased Assets to Purchaser; and (d) resolve any disputes arising under or related to the Purchase Agreement or related Transactions.

46758/0001-6257465v5

*Approved by Judge Michael Kaplan January  22, 2010*

(Page 23)

| | |
|---|---|
| Debtor: | BAMBOO ABBOTT, INC. t/a PRESTIGE WINDOW FASHIONS |
| Case No. | 09-28689 (MBK) |
| Caption of Order: | ORDER AUTHORIZING DEBTOR TO SELL ITS ASSETS PURSUANT TO SECTIONS 105(A), 363, 365 AND 1113 OF THE BANKRUPTCY CODE AND WAIVING ANY STAY OTHERWISE REQUIRED BY BANKRUPTCY RULES 6004(H) AND 6006(D) |

_____

34.    The provisions of this Approval Order are final, non-severable and mutually dependent.

*Approved by Judge Michael Kaplan January  22, 2010*

# EXHIBIT A

*Approved by Judge Michael Kaplan January  22, 2010*

EXECUTION VERSION

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of the 14th day of January, 2010 (the "Agreement Date"), by and between Bamboo Abbott, Inc., a New Jersey corporation d/b/a Prestige Window Fashions and a debtor-in-possession ("Seller"), and Ventanas Acquisition Corporation, a Delaware corporation ("Purchaser").

## RECITALS

WHEREAS, Seller is engaged in the design, manufacture, distribution, marketing and sale of window coverings and other window treatment products, including aluminum blinds, cellular shades, pleated shades, natural woven shades, roller shades, Roman shades and soft treatments, sliding panels, vertical blinds, window shading, wood blinds, shutters and other window coverings, as well as related fixtures and fittings (including curtain and drapery rods, poles, rollers and clasps) and other related accessories (collectively, the "Business");

WHEREAS, on July 19, 2009, Seller commenced a case, Case No. 09-28689 (MBK) (the "Bankruptcy Case"), under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court");

WHEREAS, Seller is currently operating the Business and managing its properties and assets as a debtor-in-possession; and

WHEREAS, on the terms and conditions contained in this Agreement, and subject to the approval of the Bankruptcy Court, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, certain assets of Seller relating to the Business.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I

### Definitions And References

"Accounts Receivable" has the meaning set forth in Section 2.2(b).

"Accounts Receivable Amount" means the amount of accounts receivable of Seller as of the close of business on the date immediately preceding the Closing Date, as determined by Purchaser in its reasonable discretion, less any reserves established by Seller with respect thereto (which reserves shall not be less than $276,000) and excluding any accounts receivable that are subject to a payment plan or extended payment terms.

*Approved by Judge Michael Kaplan January  22, 2010*

For the avoidance of doubt, amounts outstanding under notes receivable, including those listed on Schedule 1.1(a), shall not be included in the Accounts Receivable Amount.

"Additional Assumed Contract" has the meaning set forth in Section 6.6(a).

"Additional Business Contract" has the meaning set forth in Section 6.6(b).

"Additional Business Contract Acceptance Notice" has the meaning set forth in Section 6.6(b).

"Affiliate" means a Person which controls, is in common control with or is controlled by another Person.  A Person will be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the introduction.

"Agreement Date" has the meaning set forth in the introduction.

"Allocation Schedule" has the meaning set forth in Section 4.5.

"Alternative Transaction" has the meaning set forth in Section 9.4.

"Apportioned Obligations" has the meaning set forth in Section 10.1.

"Approval Order" means the order of the Bankruptcy Court approving of this Agreement and the sale by Seller to Purchaser of the Purchased Assets, containing, among other things, provisions substantially the same as those set forth on Exhibit B.

"ARRA" means the American Recovery and Reinvestment Act of 2009.

"Assumed Contracts" has the meaning set forth in Section 2.2(d).

"Assumed Liabilities" has the meaning set forth in Section 3.1.

"Auction" has the meaning set forth in Section 6.2(a).

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Business" has the meaning set forth in the recitals.

"Business Contract Cure Amount" has the meaning set forth in Section 6.6(a).

2

*Approved by Judge Michael Kaplan January  22, 2010*

"Business Contracts" has the meaning set forth in Section 5.2(j)(i).

"Business Day" means any day that is not a Saturday, Sunday or a day on which the commercial banks in New York, New York are required or permitted to be closed.

"Business Employees" has the meaning set forth in Section 8.4(a).

"Cash Amount" means the amount of cash delivered by Seller to Purchaser at the Closing.

"Claims" means all claims (as claim is defined in Section 101(5) of the Bankruptcy Code) and Encumbrances of whatever kind or nature, including suits, licenses, rights of recovery, judgments, orders and decrees of any Governmental Authority, and any other interests, taxes, indentures, instruments, leases, contracts, agreements, offsets and recoupments, and any claims for reimbursement, contribution, indemnity or exoneration.

"Closing" has the meaning set forth in Section 4.2.

"Closing Date" has the meaning set forth in Section 4.2.

"Closing Date Payee(s)" has the meaning set forth in Section 4.3.

"Closing Date Payment" has the meaning set forth in Section 4.1.

"COBRA" means the requirements of Part 6 of Subtitle B of Title I of ERISA and section 4980B of the Internal Revenue Code.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and any other employee benefit plan, program or arrangement in which any Business Employee participates, including any bonus or other incentive plan, plan for deferred compensation, profit-sharing, options to acquire stock, stock appreciation rights, stock purchases, employee health, life or other welfare benefit plan, employment agreement, severance arrangement or policy, any change in control agreement or arrangement, any tax gross-up agreement or arrangement, any plan, arrangement, agreement, program or commitment to provide for insurance coverage (including any self-insured arrangements), disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, leave of absence, life or accident benefits (including any voluntary employee benefits association (as defined in Section 501(c)(9) of the Internal Revenue Code) providing for the same or other benefits) or other arrangement, whether or not terminated, whether or not in writing or oral and whether or not subject to ERISA.

"Encumbrances" means any liability, mortgage, pledge, lien (statutory, tax (other than not yet due and payable) or otherwise), security interest, easement, right of way,

3

1499386.10

covenant, claim, assessment, restriction, right (including any right of first refusal), option (including any purchase option), conditional sale or other title retention agreement, charge or encumbrance of any kind of nature.

"Environmental Laws" means all federal, state and local laws, policies, guidance, rules, permits, restrictions and licenses, which (a) regulate or relate to the protection or clean up of the environment, the use, treatment, storage, transportation, handling, disposal or release of Hazardous Materials, the preservation or protection of waterways, groundwater, drinking water, air, wildlife, plants or other natural resources or (b) impose liability or responsibility with respect to any of the foregoing, or any other law of similar effect.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any Person, any corporation, trade or business which, together with such Person, is a member of a controlled group of corporations or a group of trades or businesses under common control within the meaning of Section 414 of the Internal Revenue Code.

"Excluded Assets" has the meaning set forth in Section 2.3.

"Excluded Liabilities" has the meaning set forth in Section 3.2.

"Expense Reimbursement" has the meaning set forth in Section 9.4.

"Final Order" means an order or judgment of the Bankruptcy Court or other court having jurisdiction as entered on the docket (a) that has not been reversed, stayed, modified or amended, (b) as to which the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for certiorari, review or rehearing is pending and (c) that has become final and nonappealable in accordance with applicable law.

"Financial Statements" has the meaning set forth in Section 5.2(h).

"Governmental Authority" means any federal, state, local, foreign or similar government, governmental, quasi-governmental, regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body with competent jurisdiction.

"Hazardous Materials" means (a) petroleum and petroleum products, radioactive materials, asbestos-containing materials, urea formaldehyde foam insulation, transformers or other equipment that contain polychlorinated biphenyls and radon gas, (b) any other chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely

4

1499386.10

hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "contaminants" or "pollutants", or words of similar import, under any applicable Environmental Laws and (c) any other chemical, material or substance which is regulated by any Environmental Laws.

"Intellectual Property" means United States and foreign trademarks, service marks, trade names, trade dress, domain names, logos, business and product names and slogans, including registrations and applications to register or renew the registration of any of the foregoing; copyrights and registrations or renewals thereof; United States and foreign letters patent and patent applications, including all reissues, continuations, divisions, continuations-in-part or renewals or extensions thereof; inventions, processes, designs, formulae, trade secrets, know-how and confidential business and technical information; software and computer programs of any kind whatsoever (including all modeling software in both source code and object code versions) and all documentation relating thereto; Internet websites; and all other intellectual property and proprietary rights, tangible embodiments of any of the foregoing (in any form or medium including electronic media) and licenses of any of the foregoing.

"Inventory" has the meaning set forth in Section 2.2(a).

"Inventory Value Amount" means the book value of the Inventory of Seller as of the close of business on the date immediately preceding the Closing Date, as reasonably determined by Purchaser based on a count observed by Ernst & Young LLP or its Affiliate as of a specified date in the last week of December 2009 and on the purchase orders and other financial information provided by Seller with respect to the period thereafter, less any reserves established by Seller with respect thereto (which reserves shall not be less than $125,000).

"Person" means any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other entity or any Governmental Authority.

"Post-Closing Tax Period" has the meaning set forth in Section 10.1.

"Pre-Closing Tax Period" has the meaning set forth in Section 10.1.

"Purchased Assets" has the meaning set forth in Section 2.2.

"Purchase Price" has the meaning set forth in Section 4.1.

"Purchaser" has the meaning set forth in the introduction.

"Real Property Leases" has the meaning set forth in Section 5.2(j)(ii).

"Sale Motion" has the meaning set forth in Section 6.2(b).

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

"Sale Procedures" means the procedures for the submission of competing bids for the acquisition of the Purchased Assets as set forth on Exhibit A.

"Sale Procedures Order" means the order to be entered by the Bankruptcy Court that, among other things, approves the Expense Reimbursement on the terms set forth in this Agreement, approves the Sale Procedures for the auction process and approves related matters as set forth in Exhibit A.

"Seller" has the meaning set forth in the introduction.

"Seller Plan" has the meaning set forth in Section 5.2(q)(i).

"Seller's Ancillary Documents" has the meaning set forth in Section 5.2(a).

"Seller's Knowledge" means the actual knowledge (as of the date(s) of the relevant representation) of Joel Botwick, Gregory Libertiny, Phil Goldweitz, John Branyan, Ron Bruttell, Andy Pasarelli, Richard Verderese, Alfonso Lanza and Ruth Harenchar.

"Tangible Personal Property" means all furniture, fixtures, furnishings, equipment, machinery, motor vehicles, tools, computers, computer hardware, photocopiers, facsimile machines and other business equipment and devices (including data processing hardware and related telecommunications equipment, media and tools), tools, racking, molds, forms, dies and tooling and other similar items that are not Inventory.

"Transferred Employees" has the meaning set forth in Section 8.4(a).

"Turnils" has the meaning set forth in Section 7.1(f).

"WARN Act" means the U.S. Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar state or local law.

"Wells Fargo" has the meaning set forth in Section 4.3.

## ARTICLE II

### Purchase and Sale of Assets

Section 2.1.    Agreement to Purchase and Sell.  On the terms and subject to the conditions contained in this Agreement, Purchaser agrees to purchase from Seller, and Seller agrees to sell to Purchaser, all of Seller's right, title and interest in and to the Purchased Assets free and clear of all Claims.

Section 2.2.    Purchased Assets.  All assets, properties and rights of Seller related to, or used or held for use or otherwise usable in, the Business shall constitute the

6

*Approved by Judge Michael Kaplan January  22, 2010*

"Purchased Assets," other than the Excluded Assets.  The Purchased Assets shall include all of Seller's rights and interests in the following:

> (a)    all inventory (whether ordered or in transit, and wherever located), supplies, sample books, work-in-process, materials and stock in trade related to, or used or held for use or otherwise usable in, the Business (collectively, the "Inventory");

> (b)    all accounts receivable, trade receivables, notes receivable (other than the notes receivable listed on Schedule 1.1(a)) and other receivables of the Business and any security or collateral therefor, including recoverable customer deposits (collectively, the "Accounts Receivable");

> (c)    all books and records related to or used in the Business or otherwise related to the Purchased Assets, including (i) a customer list inclusive of all of the customers of the Business, and all customer records with respect to such customers and (ii) all financial, project-related and other records relating to the Business (including equipment records, project plans, marketing materials, catalogs and operating manuals);

> (d)    to the extent legally transferable (including pursuant to Section 365 of the Bankruptcy Code), (i) all of Seller's interest in those Business Contracts listed on Schedule 2.2(d)(i), (ii) all of Seller's interest in unfulfilled sales orders with customers of the Business (written or oral) and the payments or customer deposits therefor arising in the ordinary course of business consistent with past practice, in each case as listed on Schedule 2.2(d)(ii) or arising after the Agreement Date (other than any Business Contracts or Additional Business Contracts), (iii) any Additional Assumed Contracts and (iv) any Additional Business Contracts that are the subject of an Additional Business Contract Acceptance Notice as contemplated in Section 6.6(b) (collectively, the "Assumed Contracts");

> (e)    all Tangible Personal Property owned or leased by Seller;

> (f)    all Intellectual Property owned or licensed by Seller, including the Intellectual Property listed on Schedule 5.2(n);

> (g)    all deposits, rebates, prepaid insurance and other prepaid expenses of any kind related to the Business;

> (h)    all cash and cash equivalents of Seller;

> (i)    all "lock box" and other collections accounts of Seller (including the account where Seller's credit card receipts are deposited); and

> (j)    all goodwill appurtenant to the Business.

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

Section 2.3.    Excluded Assets.  Notwithstanding the generality of Section 2.2, the following assets, properties and rights of Seller (collectively, the "Excluded Assets") are not a part of the sale and purchase contemplated by this Agreement:

(a)    any contract of Seller (including the notes receivable listed on Schedule 1.1(a) and any Business Contract) other than the Assumed Contracts;

(b)    all causes of action belonging to Seller or its bankruptcy estate arising under Sections 544 through 550 and 553 of the Bankruptcy Code; provided, that no such causes of action shall be asserted, brought or otherwise prosecuted by Seller or by any Person on Seller's behalf against any customer of the Business or against any counterparty to any Assumed Contract;

(c)    any Tangible Personal Property subject to any Business Contract that is not an Assumed Contract; and

(d)    the rights of Seller under this Agreement and all cash and non-cash consideration payable or deliverable to Seller under this Agreement.

Section 2.4.    From time to time after the Agreement Date, but in no event later than the Closing Date, Purchaser may, in its sole discretion, notify Seller of any Business Contract not included on Schedule 2.2(d)(i) as of the Agreement Date that Purchaser elects to assume such Business Contract (such Business Contract, an "Additional Assumed Contract").  Purchaser shall be responsible for and shall pay to each applicable Person that is a party to such Additional Assumed Contract the respective Business Contract Cure Amount for such Additional Assumed Contract on the Closing Date.  In furtherance of the foregoing, the Approval Order shall provide that the assignment and assumption of each Business Contract is approved, subject only to (a) payment by Purchaser of the Business Contract Cure Amount for such Business Contract, (b) resolution of any assumption objection under Section 365(c)(1) or (c)(2) of the Bankruptcy Code and (c) Purchaser's election, in its sole and absolute discretion, to designate such Business Contract as an Additional Assumed Contract pursuant to this Section 2.4.  From the Agreement Date until the Closing Date, Seller shall not reject any Business Contract.

## ARTICLE III

### Liabilities

Section 3.1.    Assumed Liabilities.  Subject to the terms and conditions of this Agreement, at the Closing Seller shall assign and transfer to Purchaser, to the extent legally permissible, all of its rights and benefits under the Assumed Contracts, and Purchaser shall (a) assume and agree to discharge or perform the obligations of Seller arising under the Assumed Contracts after the Closing, (b) discharge or pay any amounts

8

necessary to cure defaults or that are otherwise payable in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Purchaser of the Assumed Contracts which shall be paid or otherwise discharged by Purchaser on or before the Closing, in each case in the amounts set forth on <u>Schedule 3.1(c)</u>, (c) discharge or pay those accounts payable of Seller set forth on <u>Schedule 3.1(c)</u>, but only to the extent of the amounts set forth therein, and (d) assume and be responsible for transfer taxes, as set forth in Section 4.6 (collectively, the "Assumed Liabilities").

Section 3.2.    <u>Excluded Liabilities</u>.    Except for the Assumed Liabilities, Purchaser shall not assume and shall not be deemed to have assumed any debt, Claim, obligation, tax or other liability of Seller whatsoever (the "Excluded Liabilities"), all of which shall remain the sole responsibility and obligation of Seller.    The Excluded Liabilities shall include the following:

(a)    all liabilities associated with any Excluded Assets;

(b)    all liabilities under the WARN Act, if any, arising out of or resulting from layoffs or termination of employees by Seller prior to the Closing Date;

(c)    all customer service and warranty claims arising after the Closing Date with respect to merchandise and finished goods sold by Seller prior to the Closing Date, and all obligations to perform warranty repair or replacement arising after the Closing Date with respect to merchandise or finished goods sold by Seller prior to the Closing Date;

(d)    all liabilities under and with respect to the Seller Plans;

(e)    all liabilities related to accounts payable of Seller other than those set forth on <u>Schedule 3.1(c)</u>, including any accounts payable to those parties identified on <u>Schedule 3.1(c)</u> in excess of the amounts set forth therein; and

(f)    all liabilities arising out of or in connection with Claims or other litigation and proceedings (whether instituted prior to or after the Closing) for acts or omissions that occurred, arise from, or otherwise directly or indirectly relate to events that occurred or circumstances existing prior to the Closing Date.

## ARTICLE IV

### Purchase Price; Manner of Payment and Closing

Section 4.1.    <u>Consideration</u>.    The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be (a) a cash purchase price in an amount equal to $7,100,000 (the "Closing Date Payment"), (b) the assumption by Purchaser of the Assumed Liabilities and (c) the undertaking by Purchaser of the obligations with respect to the payment of up to $1,200,000 (such amount representing a portion of the amount

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

currently owed by Seller in favor of Turnils), as set forth in the agreements between Seller and Turnils contemplated by Section 7.2(l). Purchaser agrees to pay the Closing Date Payment in the manner described in this ARTICLE IV. The Purchase Price shall be allocated among the Purchased Assets in the manner described in Section 4.5.

Section 4.2.    Time and Place of the Closing.  The closing of the transactions contemplated by this Agreement shall take place at 10:00 a.m., Eastern Standard Time, at the offices of Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey, (a) on the date that is one (1) Business Day after all of the conditions set forth in ARTICLE VII have been satisfied or waived (or such longer period after such conditions have been satisfied as may be required by the Approval Order under the provisions of Bankruptcy Code Rules 6004(g) or 6006(d)) or (b) on such other date as the parties mutually agree upon (the "Closing").  The date on which the Closing occurs in accordance with the foregoing is referred to in this Agreement as the "Closing Date."

Section 4.3.    Payment of Consideration.  Subject to the terms and conditions hereof, on the Closing Date, Purchaser shall pay to Wells Fargo Bank, National Association ("Wells Fargo") or such other Person(s) identified in the Sale Order as the Person(s) entitled to receive the Closing Date Payment (the "Closing Date Payee(s)"), by wire transfer of immediately available funds to an account or accounts specified in writing by the Closing Date Payee(s) to Purchaser not less than one (1) Business Day prior to the Closing (or as otherwise instructed in the Sale Procedures Order), an amount equal to the Closing Date Payment.  Seller hereby directs Purchaser to pay the Closing Date Payment in accordance with the immediately preceding sentence.

Section 4.4.    Closing Deliveries.  At the Closing:

(a)    Seller shall execute and deliver to Purchaser a bill of sale substantially in the form attached as Exhibit C, and such other bills of sale, endorsements, assignments and such other instruments of transfer and conveyance, in form and substance reasonably satisfactory to Purchaser, as shall be effective, together with the Approval Order, to vest in Purchaser as of the Closing Date good title to all of the Purchased Assets, free and clear, in accordance with the terms of the Approval Order, of all Claims;

(b)    Seller shall execute and deliver to Purchaser, and Purchaser shall execute and deliver to Seller, an assignment and assumption agreement substantially in the form attached as Exhibit D conveying Seller's interests in the Assumed Contracts;

(c)    in addition to the foregoing, there shall be executed and delivered at the Closing the following:

1499386.10

(i)      by Seller to Purchaser, a certificate, dated the Closing Date and signed by Seller's President and Chief Executive Officer, certifying that the representations and warranties of Seller contained in Section 5.2 were true and correct in all material respects when made and are true and correct in all material respects as if originally made on and as of the Closing Date (except for the representations and warranties that are qualified by materiality or material adverse effect, which were and are true and correct in all respects) and that all covenants required by the terms hereof to be performed by Seller on or before the Closing Date, to the extent not waived by Purchaser in writing, have been duly performed in all material respects;

(ii)      by Seller to Purchaser, a certificate, dated the Closing Date and signed by Seller's President and Chief Executive Officer, attaching (A) a certified copy of the resolutions of the board of directors of Seller authorizing the execution, delivery and performance of this Agreement and all documents associated herewith, (B) a certified copy of the resolutions or written consent of the stockholders of Seller authorizing the execution, delivery and performance of this Agreement and all documents associated herewith and (C) a certified copy of the articles of incorporation and bylaws of Seller and all amendments thereto;

(iii)      by Seller to Purchaser, a certificate of non-foreign status, in a form satisfactory to Purchaser, in the form provided in Treasury Regulation Section 1.1445-2(b), from Seller certifying that it is not a foreign person within the meaning of Treasury Regulation Section 1.1445-2(b); and

(iv)      by Purchaser to Seller, a certificate, dated the Closing Date and signed by a Person duly authorized by Purchaser, certifying that the representations and warranties of Purchaser contained in Section 5.1 were true and correct in all material respects when made and are true and correct in all material respects as if originally made on and as of the Closing Date (except for the representations and warranties that are qualified by materiality or material adverse effect, which were and are true and correct in all respects) and that all covenants required by the terms hereof to be performed by Purchaser on or before the Closing Date, to the extent not waived by Seller in writing, have been duly performed in all material respects.

Section 4.5.      Allocation of Consideration.    The Purchase Price shall be allocated among the Purchased Assets in the manner required by Section 1060 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder (and any similar provision of law, as appropriate), and within sixty (60) days after the Closing Date, Purchaser shall deliver to Seller a schedule with such allocation (the "Allocation Schedule"). If within thirty (30) days of receipt of the Allocation Schedule Seller notifies Purchaser in writing that Seller objects to one or more items reflected on the Allocation Schedule, Seller and Purchaser shall negotiate in good faith to resolve such dispute. If Seller and Purchaser fail to resolve such dispute within thirty (30) days of Purchaser's receipt of Seller's notice, the parties shall submit the dispute for resolution to an

11

*Approved by Judge Michael Kaplan January  22, 2010*

independent accounting firm mutually agreeable to the parties, which resolution shall be final and binding on Seller and Purchaser.  Any adjustment to the Purchase Price shall be allocated as provided by Treasury Regulation §1.1060-1(c).  The parties hereby agree not take any position inconsistent with the final Allocation Schedule for any tax reporting purposes.

Section 4.6.    Transfer Taxes.  Notwithstanding any other provision of this Agreement, all transfer, registration, stamp, documentary, sales, use and similar taxes (including all applicable real estate transfer taxes, but excluding any income or other gains taxes), and any penalties, interest and additions to such taxes, incurred in connection with this Agreement shall be the responsibility of and be timely paid by Purchaser.  Seller and Purchaser shall cooperate in the timely making of all filings, returns, reports and forms as may be required in connection therewith.

# ARTICLE V

## Representations and Warranties

Section 5.1.    Purchaser's Representations and Warranties.    Purchaser represents and warrants to Seller that:

(a)    Purchaser is a corporation validly existing and in good standing under the laws of the jurisdiction of its organization.  Purchaser has full power and authority to enter into and perform this Agreement and all documents, agreements and instruments to be executed by Purchaser pursuant to or in connection with this Agreement.  The execution and delivery of this Agreement by Purchaser, and the performance by Purchaser of all of its obligations hereunder, have been duly authorized and approved prior to the Agreement Date by all necessary corporate action.  This Agreement has been duly executed and delivered by Purchaser and constitutes its legal, valid and binding agreement, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and general principles of equity.

(b)    Except for the Bankruptcy Court's entry of the Approval Order, no consent, waiver, certificate, authorization, order or approval of, or filing or registration with, any Governmental Authority or other Person is required for the execution and delivery by Purchaser of this Agreement and the consummation by Purchaser of the transactions contemplated by this Agreement.

(c)    Neither the execution and delivery of this Agreement by Purchaser, nor the consummation by Purchaser of the transactions contemplated hereby, will conflict with or result in a breach of any of the terms, conditions or provisions of the articles of incorporation or bylaws of Purchaser, or of any agreement or instrument to which Purchaser is a party or any of its properties is subject or bound or any statute or

12

*Approved by Judge Michael Kaplan January  22, 2010*

administrative regulation, or of any order, writ, injunction, judgment or decree of any Governmental Authority or of any arbitration award, in each case to which Purchaser is subject or by which Purchaser or any of its assets is bound.

(d)     No agent, broker, investment banker, financial advisor or other Person is or shall be entitled to any broker's commission, finder's fee, investment banker's fee or similar payment in connection with the transactions contemplated by this Agreement as a result of any action taken by Purchaser.

(e)     At the Closing, subject to satisfaction of the condition set forth in Section 7.2(k), Purchaser shall have sufficient funds available to pay the Purchase Price in connection with the transactions contemplated by this Agreement. Purchaser and Seller acknowledge and agree that the obligation of Purchaser to complete the transactions contemplated by this Agreement shall be conditioned on and subject to Purchaser obtaining the financing contemplated by Section 7.2(k).

(f)     PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 5.2, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS, INCLUDING INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE OPERATION OF THE PURCHASED ASSETS, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF) OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLER HEREBY DISCLAIMS ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER HAS DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN SECTION 5.2, PURCHASER IS PURCHASING THE PURCHASED ASSETS AT THE CLOSING ON AN "AS-IS, WHERE-IS" BASIS AND "WITH ALL FAULTS."

Section 5.2.     Seller's Representations and Warranties.  Seller represents and warrants to Purchaser:

(a)     Seller is a New Jersey corporation validly existing and in good standing under the laws of the jurisdiction of its organization. Subject to the Bankruptcy Court's entry of the Approval Order, Seller has full power and authority to enter into and

1499386.10

perform this Agreement and all documents, agreements and instruments to be executed by Seller pursuant to or in connection with this Agreement (collectively, "Seller's Ancillary Documents").  The execution and delivery by Seller of this Agreement and Seller's Ancillary Documents, and the performance by Seller of all of its obligations hereunder and thereunder, have been duly authorized and approved prior to the Agreement Date by all necessary corporate action, including stockholder approval.  This Agreement has been, and Seller's Ancillary Documents will be, duly executed and delivered by Seller and, subject to the Bankruptcy Court's entry of the Approval Order, constitute the legal, valid and binding agreement of Seller, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and general principles of equity.

(b)     Except for the Bankruptcy Court's entry of the Approval Order and the consents listed on <u>Schedule 5.2(b)</u> which shall be obtained by Seller prior to the Closing, no consent, waiver, certificate, authorization, order or approval of, or filing or registration with, any Governmental Authority or other Person is required for the execution and delivery of this Agreement and Seller's Ancillary Documents and the consummation by Seller of the transactions contemplated by this Agreement and Seller's Ancillary Documents.  Except as noted above, neither the execution and delivery by Seller of this Agreement and Seller's Ancillary Documents, nor the consummation by Seller of the transactions contemplated hereby and thereby, will conflict with or result in a breach of any of the terms, conditions or provisions of the articles of incorporation or bylaws of Seller, or of any agreement or instrument to which Seller is a party or any of its properties is subject or bound or any statute or administrative regulation, or of any order, writ, injunction, judgment or decree of any Governmental Authority or of any arbitration award, in each case to which Seller is subject or by which Seller or any of the Purchased Assets is bound.

(c)     Seller has not received any written notice from any Person, which has not been dismissed or otherwise disposed of, that either Seller, the Business or the Purchased Assets has not complied with all applicable laws related to the ownership and operation of the Business and the Purchased Assets, including laws related to properties, sales practices, employment practices, terms and conditions of employment, wages and hours and occupational health and safety.  Seller has not been charged or threatened with, and, to Seller's Knowledge, is not under investigation with respect to, any violation of any law related to the ownership or operation of the Business or the Purchased Assets.

(d)     No Governmental Authority has given or, to Seller's Knowledge, threatened to give, notice of any action to revoke, terminate, cancel or restrict any material permit, license, certification, variation, exemption, order, franchise, registration, filing, approval, authorization or other required grant of operating authority required by any Governmental Authority necessary for the conduct of the Business.

14

*Approved by Judge Michael Kaplan January 22, 2010*

(e)    On the Closing Date, Seller shall have good and marketable title to and be the sole owner of (or have valid and enforceable leases for) the Purchased Assets. At the Closing, Purchaser shall acquire all of the Purchased Assets free and clear of all Claims.

(f)    Schedule 5.2(f) sets forth a true and complete list as of December 31, 2009 of all of the material fixed assets and Tangible Personal Property owned by Seller and included in the Purchased Assets.

(g)    Except as set forth on Schedule 5.2(g), there is no suit, action, litigation or proceeding, in law or in equity, before or by any Governmental Authority or before any arbitrator, pending against Seller with respect to the Business or the Purchased Assets and there are no proceedings or governmental investigations before any commission or other administrative authority pending against or, to Seller's Knowledge, threatened against Seller with respect to the Business or the Purchased Assets.  In addition, since January 1, 2005, there has been no (i) suit, action, litigation or proceeding, in law or in equity, before any Governmental Authority or before any arbitrator pending against Seller, (ii) proceedings or governmental investigations before any commission or other administrative authority pending against or, to Seller's Knowledge, threatened against Seller, or (iii) claims asserted by any Person against Seller, in each case (i), (ii) and (iii) involving product liability or otherwise relating to any product made, assembled or sold by Seller.

(h)    Schedule 5.2(h) sets forth the reviewed balance sheet of Seller as of December 31, 2008, the unaudited balance sheet of Seller as of October 31, 2009, the reviewed income statement of Seller for the twelve (12) months ended December 31, 2008 and the unaudited income statement of Seller for the ten (10) months ended October 31, 2009 (collectively, the "Financial Statements").  The Financial Statements have been prepared from, and are in accordance with, the books and records of Seller, on a consistent basis during the periods involved (except as may be indicated in the notes thereto).

(i)    Except for the commencement or pendency of the Bankruptcy Case, since January 1, 2009, there has been no event or condition that would reasonably be expected to, individually or in the aggregate, result in a material adverse effect on the Purchased Assets or on the Business or its operations, results of operations, cash flows or condition (financial or otherwise).

(j)

(i)    Schedule 5.2(j)(i) sets forth a true and complete list of all written or oral contracts, leases (including rental agreements, capital leases and other similar arrangements for Tangible Personal Property), sales orders, purchase orders, agreements, indentures, mortgages, notes, bonds, warrants, instruments, undertakings

15

*Approved by Judge Michael Kaplan January  22, 2010*

arrangements or commitments (including all amendments, supplements and modifications thereto) of the following types to which Seller (or any of the Purchased Assets) is bound (collectively, the "Business Contracts"): (A) contracts that require aggregate payments by or to Seller in excess of $50,000; (B) contracts involving a partnership, joint venture or other cooperative undertaking; (C) contracts that involve the lease or license of personal property with a book value in excess of $25,000 or with annual minimum lease payments in excess of $10,000; (D) contracts which require Seller to pay a contingent purchase price (such as an earn-out); (E) contracts that provide for change in control payments or any other payments or obligations which may be required as a result of the consummation of the transactions contemplated hereby (other than any such contract with any officer, employee or consultant); (F) contracts for any capital expenditure or leasehold improvements that involve an amount in excess of $25,000; (G) contracts with customers and suppliers listed in Schedule 5.2(m); (H) contracts with a sales representative, manufacturer's representative, distributor, dealer, brokers, sales agency, advertising agency or other Person engaged in sales, distributing or promotional activities with respect to the Business; (I) powers of attorney or agency agreements or arrangements with any Person (other than a Business Employee) pursuant to which such Person is granted the authority to act for or on behalf of Seller in connection with the Business; (J) contracts involving any restrictions with respect to the geographical area of operations or scope or type of business of Seller or that requires Seller to deal exclusively with any third party; (K) contracts not made in the ordinary course of business that are to be performed in whole or in part on or after the Closing Date; (L) contracts that involve the license of intellectual property to Seller; and (M) contracts not specified above the termination of which would result in a material adverse effect on the Purchased Assets or on the Business or its operations, results of operations, cash flows or condition (financial or otherwise). Seller has heretofore delivered to Purchaser true and complete copies of each Business Contract.

        (ii)    Schedule 5.2(j)(ii) sets forth a true and complete list of each lease for real property to which Seller is bound (collectively, the "Real Property Leases"), true and complete copies of which have heretofore been delivered to Purchaser, together with copies of all reports (if any) of any environmental consultants or other consultants in Seller's possession relating to any of the land subject to a Real Property Lease. Each Real Property Lease is in full force and effect and is a valid and binding obligation of Seller, enforceable against Seller in accordance with its terms. To Seller's Knowledge, there is no pending, proposed or threatened proceeding or other action by any Governmental Authority seeking to modify the zoning classification of, or to condemn or take by the power of eminent domain (or to purchase in lieu thereof), or to classify as a landmark, or to impose special assessments on, or otherwise to take or restrict in any way the right to use, develop or alter, all or any part of the land subject to the Real Property Leases.

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

(k)      To Seller's Knowledge, Seller is (and since January 1, 2005 has been) in compliance in all material respects with all Environmental Laws.  Seller has not received any written notice not subsequently resolved with respect to the business of, or any property owned or leased by, Seller from any Governmental Authority or other Person alleging that Seller or any aspect of the Business is not in compliance with any Environmental Laws, and to Seller's Knowledge, there has been no release of Hazardous Materials in excess of a reportable quantity on any real property that is used in the Business.

(l)      Except as set forth on Schedule 5.2(l), no stockholder or other Affiliate of Seller (or Affiliate of any such stockholder) performs any services for, or on behalf of, or provides any material benefits to, or with respect to, or is otherwise a party to any agreement or arrangement with, Seller or the Business.

(m)      Schedule 5.2(m) lists for the year ended December 31, 2008 and for the ten (10) months ended October 31, 2009 (i) the names of the customers that were the twenty (20) largest customers of the Business in terms of the sales price of products provided by Seller and (ii) the names of the suppliers that were the twenty (20) largest suppliers of the Business in terms of the cost of products or services, or both, used by the Business.  None of such customers or suppliers described in the previous sentence has given Seller written notice terminating, cancelling or threatening to terminate or cancel (or substantially reduce business under or alter material terms or conditions under (including with respect to pricing)) any contract, agreement or other arrangement, whether written or oral, with the Business.

(n)      Schedule 5.2(n) lists all Intellectual Property owned by Seller and related to, used in or usable in the Business.  Seller has not licensed (exclusively or otherwise) any such Intellectual Property to any other Person, Seller does not have any obligation to grant any license of any such Intellectual Property to any other Person and, to Seller's Knowledge, there is no unauthorized use, disclosure, infringement or misappropriation of any such Intellectual Property by any other Person.  In each case where Seller's ownership in a trademark application or registration included in such Intellectual Property has been acquired by assignment, the assignment has been duly recorded with the Governmental Authority from which the registration issued or before which the application or application for registration is pending.  To Seller's Knowledge, the products, services and operations of Seller do not infringe upon, violate or misappropriate the Intellectual Property of any other Person in any material respect.

(o)      With respect to each Business Employee, Schedule 5.2(o) lists, to the extent such information is permitted to be disclosed under applicable law: (i) each such person's name; (ii) each such person's title or job/position; (iii) each such person's job designation (i.e., salaried or hourly, exempt or non-exempt); (iv) each such person's location of employment; and (v) each such person's employment status (i.e., actively employed or not actively at work due to, e.g., illness, short-term disability, sick leave,

17

authorized leave or absence) and, if not actively at work, the date such person's absence commenced, the reason for the absence, and the anticipated date of return to active employment or active service.  Seller has provided Purchaser a true and complete list of each Business Employee's annual base rate of compensation as of the date hereof and, if applicable, target level of 2009 bonus amounts and bonuses received in 2008.

(p)     Except as set forth on Schedule 5.2(p), there are no (i) collective bargaining agreements, other labor agreements or employment agreements relating to any Business Employee, (ii) unfair labor practice complaints relating to any Business Employee that are pending (or, to Seller's Knowledge, threatened) before any Governmental Authority, (iii) ongoing or, to Seller's Knowledge, threatened labor strikes, work stoppages, slowdowns, walkouts, hand-billing, picketing or other concerted actions or labor disputes with respect to the Business Employees and no such actions with respect to the Business have occurred at any time in the past five (5) years or (iv) material labor grievances pending against Seller or any Affiliate of Seller by any Business Employee.

(q)     (i)     Schedule 5.2(q)(i) sets forth a true and complete list of each Employee Benefit Plan that Seller maintains, to which Seller contributes or has an obligation to contribute or with respect to which Seller otherwise has any liability or contingent liability (each, a "Seller Plan" and, collectively, the "Seller Plans").  Seller does not have, and has not at any time had, any ERISA Affiliates.

(ii)     To Seller's Knowledge, except as set forth in Schedule 5.2(q)(ii), all contributions and payments with respect to each Seller Plan have been timely made when due.

(iii)     Seller has complied in all respects with COBRA with respect to the Business Employees and, to Seller's Knowledge, all former employees of Seller with respect to the Business and each other COBRA qualified beneficiary with respect to such Business Employees and former employees of Seller.  Schedule 5.2(q)(iii) sets forth a true and complete list of each person who is a COBRA qualified beneficiary with respect to the Business under any Seller Plan that is a group health plan (within the meaning of Section 4980B(g)(2) of the Internal Revenue Code), including each person who is entitled to elect COBRA continuation coverage and whose election period has not yet expired, the nature of such person's COBRA qualifying event, the date such COBRA coverage commenced (or will commence if COBRA coverage is timely elected), the date the maximum COBRA coverage period will expire with respect to such person, whether such person is eligible for the COBRA subsidy pursuant to ARRA and the COBRA premium applicable to such person (taking into account any subsidy to which such person is entitled pursuant to ARRA).

(r)     All tax returns with respect to the Purchased Assets or income attributable therefrom that are required to be filed before the Closing Date have been or shall be filed, the information provided on such tax returns is or shall be complete and

18

accurate in all material respects, and all taxes shown to be due on such tax returns have been or shall be paid in full, to the extent that a failure to file such tax returns or pay such taxes, or an inaccuracy in such tax returns, could result in Purchaser being liable for such taxes or could give rise to an Encumbrance on the Purchased Assets.

(s)    All Accounts Receivable, whether reflected in the Financial Statements or arising thereafter in the ordinary course of business, (i) represent sales actually made or services actually performed and (ii) were incurred in the ordinary course of business.    Except as set forth on Schedule 5.2(s), Seller has not received any prepayments, prebilled invoices or deposits from customers for products to be delivered, or services to be performed, after the Closing.

(t)    The Inventory consists of supplies, sample books, work in process, materials and stock in trade of a quality useable or saleable consistent with standard industry practices.

(u)    All products produced, sold or delivered by Seller in connection with the Business or pursuant to any Assumed Contract has been in compliance with: (i) all promises or affirmations of fact made on the container or label for such product; (ii) all applicable laws; (iii) all commitments under applicable contracts; and (iv) all express and implied warranties.    Except as set forth on Schedule 5.2(u), Seller has no liability for replacement of any such products or other damages in connection therewith.

(v)    Except for SSG Capital Advisors, LLC, whose fees will be paid by Seller, no agent, broker, investment banker, financial advisor or other Person is or shall be entitled to any broker's commission, finder's fee, investment banker's fee or similar payment in connection with the transactions contemplated by this Agreement as a result of any action taken by Seller.

## ARTICLE VI

### Conduct Prior to the Closing

Section 6.1.    Access and Information.

(a)    Up to and including the Closing Date, upon reasonable prior notice to Seller, Seller shall afford to Purchaser and to Purchaser's financial advisors, legal counsel, accountants, consultants, financing sources and other authorized representatives access during normal business hours to its books, records, properties, plants and personnel relating to the Business and, during such period, shall furnish as promptly as practicable to Purchaser, at Purchaser's expense, copies of such books and records as Purchaser shall reasonably request.    In addition, during such period, Seller shall promptly furnish or make available to Purchaser each financial statement, report and notice sent or made available generally by Seller to its secured creditors or to the committee of

19

*Approved by Judge Michael Kaplan January  22, 2010*

unsecured creditors.  Seller acknowledges and agrees that no investigation pursuant to this Section 6.1 or otherwise by Purchaser shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the transactions contemplated by this Agreement.

(b)     Prior to the Closing, Seller, on the one hand, and Purchaser, on the other hand, shall each promptly notify the other in writing of all events, circumstances, facts and occurrences arising subsequent to the date hereof which have resulted in making any representation or warranty of such party contained in this Agreement untrue or incorrect in any material respect.

Section 6.2.     <u>Bankruptcy Action</u>.

(a)     This Agreement shall be subject to the consideration of higher or better offers submitted at an auction (the "Auction") to be conducted in accordance with the Sale Procedures as promptly as practicable and in no event later than January 21, 2010.  Seller may not deal with or otherwise communicate with any Person other than Purchaser in respect of any transaction involving the sale or disposition of all or a material portion of the Business until the Sale Procedures Order is entered by the Bankruptcy Court.   Thereafter, Seller may consider, solicit, engage in negotiations regarding or accept an Alternative Transaction only as permitted by the Sale Procedures Order.

(b)     Within one (1) Business Day after the Agreement Date, Seller shall file (or shall have filed before the Agreement Date) with the Bankruptcy Court a motion (the "Sale Motion") requesting the Bankruptcy Court's entry of the Approval Order approving Seller's execution and delivery of this Agreement and the performance of its obligations hereunder in accordance with the terms and conditions hereof pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code, including the sale of the Purchased Assets free and clear of all Claims.  Seller shall use commercially reasonable efforts to obtain entry of the Approval Order as promptly as practicable and in no event later than January 21, 2010, and Seller shall consult with Purchaser concerning all matters arising in the Bankruptcy Case that relate to or may have a material effect on this Agreement or the approval of the Sale Motion.

(c)     Seller shall provide Purchaser with copies of all motions, applications, and supporting papers prepared by Seller (including forms of orders and notices to interested parties) relating in any way to Purchaser or the transactions contemplated by this Agreement not less than two (2) Business Days prior to the filing thereof.

(d)     Seller shall give appropriate notice, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings or other proceedings relating to this Agreement or the transactions contemplated hereby.

20

*Approved by Judge Michael Kaplan January  22, 2010*

Without limiting the foregoing, the form, substance and manner of giving of such notice, and the related opportunity for a hearing, shall comply, to the extent applicable, with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, all applicable rules of the Bankruptcy Court and any order of the Bankruptcy Court and such notice shall be reasonably satisfactory to Purchaser. In addition, pursuant to an order of the Bankruptcy Court, such notice shall require that any objections to the assumption by Purchaser of the Assumed Contracts (together with a statement of any asserted defaults or the amounts necessary to cure such defaults or as a condition to assumption by Purchaser thereof) be filed on or before two (2) Business Days before the date of the hearing on the Sale Motion.

(e)    Seller acknowledges that Purchaser has made (and will make) a substantial investment of management time and incurred (and will incur) substantial out-of-pocket expenses in connection with the negotiation of this Agreement, its due diligence of the transaction and its efforts to consummate the transactions contemplated by this Agreement. Therefore, in consideration thereof, Seller has agreed to seek as part of the Sale Procedures Order the Bankruptcy Court's approval of the provisions of this Agreement relating to the Expense Reimbursement, including Section 9.4, and Seller's obligations in connection therewith shall have the status of an administrative expense pursuant to Section 503(b)(1)(A) of the Bankruptcy Code.

Section 6.3.    Prohibitions.    Prior to the Closing, without the prior written consent of Purchaser, Seller shall not:

(a)    sell, lease, transfer or otherwise dispose of any Purchased Assets, tangible or intangible, other than sales of Inventory in the ordinary course of business consistent with past practice;

(b)    amend in any material respect, or terminate, any Assumed Contract;

(c)    enter into any contract related to the Business, other than in the ordinary course of business consistent with past practice (in which case Seller shall provide a copy of such contract to Purchaser within two (2) Business Days);

(d)    impose or permit to be imposed any security interest upon any of the assets of the Business;

(e)    waive any material rights included in the Purchased Assets;

(f)    take any action that would materially adversely affect the Business or the Purchased Assets;

(g)    grant to any Business Employee any increase in compensation or benefits, grant to any Business Employee any increase in severance or termination pay or

21

*Approved by Judge Michael Kaplan January  22, 2010*

enter into or amend any employment, consulting, indemnification, severance or termination agreement with any Business Employee;

      (h)    enter into, adopt, amend or terminate any bonus, profit sharing, compensation, termination, stock option, stock appreciation right, restricted stock, performance unit, pension, retirement, deferred compensation, employment, severance or other employee benefit agreements, trusts, plans, funds or other arrangements for the benefit or welfare of any director, officer, consultant or employee of the Business, or increase in any manner the compensation or fringe benefits of any director, officer, consultant or employee of the Business or pay any benefit not required by any existing plan and arrangement; or

      (i)    agree, commit or otherwise arrange to take or permit the taking of any action described in this Section 6.3, regardless of whether such arrangement is oral, written or otherwise.

Section 6.4.    <u>Conduct of Business</u>.  From the Agreement Date until the Closing, except as expressly contemplated by this Agreement or as otherwise consented to by Purchaser in writing, Seller shall:

      (a)    carry on the Business only in the ordinary course in substantially the same manner in which it previously has been conducted;

      (b)    maintain the properties of the Business in good working repair, order and condition in accordance with its standard maintenance policies (ordinary wear and tear excepted);

      (c)    not merge with or into, consolidate with, or acquire all or substantially all of the stock or other ownership interests or assets of any Person; and

      (d)    maintain its books of account and records relating to the Business in their usual, regular and ordinary manner.

Section 6.5.    <u>Schedules</u>.  From time to time prior to the Closing, Seller shall promptly disclose in writing to Purchaser any matter hereafter arising which, if existing, occurring or known at the date of this Agreement would have been required to be disclosed to Purchaser or which would render inaccurate any of the representations, warranties or statements set forth in Section 5.2.  Except as set forth in Section 6.6, no information provided to Purchaser pursuant to this Section 6.5 shall be deemed to cure any breach of any representation, warranty or covenant made in this Agreement, and for all purposes of this Agreement, including for purposes of ARTICLE VII, the Schedules to this Agreement shall be deemed to contain only that information set forth on such Schedules as of the Agreement Date.

Section 6.6.    <u>Additional Assumed Contracts</u>.

1499386.10

(a)    As soon as practical after the Agreement Date but in no event later than January 14, 2010, Seller shall serve on each applicable Person that is a party to a Business Contract a notice (i) providing notice to such Person that the applicable Business Contract may be assigned to and assumed by Purchaser in connection with the transactions contemplated by this Agreement, (ii) setting forth Seller's proposed amount with respect to such Business Contract necessary to cure defaults or pay for amounts that are otherwise payable in order to effectuate, pursuant to the Bankruptcy Code, the assumption by Purchaser of such Business Contract and (iii) requiring such Person to assert any objections to such amount and submit such Person's proposed cure amount no later than January 20, 2010 (such cure amount as agreed to by Seller and such Person or otherwise determined by the Bankruptcy Court, the "Business Contract Cure Amount"). Seller shall obtain all relief necessary to implement the terms of this Section 6.6(a) in the Sale Procedures Order.

(b)    Until two (2) Business Days prior to the Closing Date, Seller shall, as promptly as practicable, identify to Purchaser and provide Purchaser with a true and complete copy of any contract entered into (or proposed to be entered into) by Seller on or after the Agreement Date that would, if entered into by Seller prior to the Agreement Date, be a Business Contract (each, an "Additional Business Contract"). Purchaser shall have two (2) Business Days after receipt by Purchaser of a true and complete copy of an Additional Business Contract to provide written notice to Seller that Purchaser has determined in its sole discretion to assume such Additional Business Contract at the Closing (such notice, an "Additional Business Contract Acceptance Notice"). If Purchaser sends to Seller a timely Additional Business Contract Acceptance Notice, such Additional Business Contract (i) shall be deemed to be a Purchased Asset, (ii) shall be listed on a revised Schedule 2.2(d)(i) and Schedule 5.2(j)(i) (and shall be deemed included on such Schedules for all purposes of this Agreement) and (iii) shall be assigned to Purchaser at the Closing. If Purchaser does not send to Seller a timely Additional Business Contract Acceptance Notice, such Additional Business Contract shall be deemed to be an Excluded Asset and all liabilities under such Additional Business Contract shall be deemed to be Excluded Liabilities.

## ARTICLE VII

### Conditions to Closing

Section 7.1.    Conditions to Seller's Obligations.  The obligation of Seller to consummate the transactions contemplated hereby is subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)    The representations and warranties made by Purchaser in Section 5.1 shall have been true and correct in all material respects when made and shall be true and correct in all material respects as if originally made on and as of the Closing Date, except for the representations and warranties that are qualified by materiality or material adverse

23

*Approved by Judge Michael Kaplan January  22, 2010*

effect, which shall be true and correct in all respects as of the Agreement Date and as of the Closing Date;

(b)     All obligations of Purchaser to be performed hereunder on or prior to the Closing Date shall have been duly performed in all material respects;

(c)     No statute, rule, regulation, executive order, decree, ruling, or preliminary or permanent injunction shall have been enacted, entered, promulgated or enforced by any Governmental Authority that prohibits, restrains, enjoins or restricts the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated;

(d)     No action or proceeding shall have been commenced or threatened before any Governmental Authority (by a party other than Seller, or any stockholder or other Affiliate of Seller) against Seller seeking to (i) prevent or restrain, or materially and adversely alter, the carrying out of this Agreement or any of the transactions contemplated hereby, (ii) declare unlawful any of the transactions contemplated by this Agreement or (iii) cause any of such transactions to be rescinded;

(e)     The Approval Order, containing, among other things, provisions substantially the same as those described in Exhibit B, shall have been entered by the Bankruptcy Court and the effectiveness of the Approval Order shall not have been modified, reversed, vacated, stayed, restrained or enjoined as of the Closing Date;

(f)     Seller shall have received a release from Turnils North America, Inc. ("Turnils"), dated and effective as of the Closing Date, with respect to Seller's payment obligation of up to $1,200,000 under that the documentation described in Section 7.2(l);

(g)     Seller's receipt of Purchaser's closing deliveries pursuant to Section 4.4; and

(h)     Seller's receipt of the Closing Date Payment pursuant to Section 4.3.

Each of the foregoing conditions is for the benefit of Seller, which may waive in writing any of such conditions at, or prior to, the Closing.

Section 7.2.     Conditions to Purchaser's Obligations.     The obligation of Purchaser to consummate the transaction contemplated hereby is subject to the satisfaction at or prior to the Closing Date of the following conditions:

(a)     The representations and warranties made by Seller in Section 5.2 shall have been true and correct in all material respects when made, and shall be true and correct in all material respects as if originally made on and as of the Closing Date, except for the representations and warranties that are qualified by materiality or material adverse

24

*Approved by Judge Michael Kaplan January  22, 2010*

effect, which shall be true and correct in all respects as of the Agreement Date and as of the Closing Date;

(b)     All obligations of Seller to be performed hereunder on or prior to the Closing Date shall have been duly performed in all material respects;

(c)     No statute, rule, regulation, executive order, decree, ruling, or preliminary or permanent injunction shall have been enacted, entered, promulgated or enforced by any Governmental Authority that prohibits, restrains, enjoins or restricts the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated;

(d)     No action or proceeding shall have been commenced or threatened before any Governmental Authority (by a party other than an Affiliate of Purchaser) against Purchaser seeking to (i) nullify, restrict or modify the rights and protections afforded Purchaser in this Agreement and the Approval Order, (ii) prevent or restrain, or materially and adversely alter, the carrying out of this Agreement or any of the transactions contemplated hereby, (iii) declare unlawful any of the transactions contemplated by this Agreement, (iv) cause any of such transactions to be rescinded or (v) materially affect the right of Purchaser to own, operate or control the Business or the Purchased Assets following the Closing;

(e)     The Sale Procedures Order and the Approval Order, each containing, among other things, provisions as described in Exhibits B and C, respectively, and each otherwise being in form and substance reasonably satisfactory to Purchaser, shall have been entered by the Bankruptcy Court and each shall have become a Final Order, and neither the effectiveness nor the terms of the Approval Order shall have been modified, reversed, vacated, stayed, restrained or enjoined as of the Closing Date;

(f)     No event, occurrence, fact, condition, change, development or effect shall have occurred since the Agreement Date that, individually or in the aggregate, has had or resulted in, or could reasonably be expected to become or result in, a material adverse effect on the Purchased Assets or on the Business or its operations, results of operations, cash flows or condition (financial or otherwise);

(g)     All consents, waivers, certificates, authorizations, orders or approvals of, or filings or registrations with, any Governmental Authority or other Person (including all such consents, waivers, certificates, authorizations, orders, approvals, filings and registrations set forth on Schedule 5.2(b)) that are required in order to consummate the transactions contemplated hereby shall have been obtained;

(h)     Purchaser shall have entered into (i) a lease agreement with an Affiliate of Joel Botwick with respect to the facility used by Seller located at 195 Raritan Center Parkway in Edison, New Jersey containing those terms and conditions set forth on

25

*Approved by Judge Michael Kaplan January 22, 2010*

Schedule 7.2(h) as well as such other terms and conditions as are mutually agreeable to the parties and (ii) a lease agreement with Matrix Development Group, Inc. with respect to the facility used by Seller located at 1000 Amboy Avenue in Perth Amboy, New Jersey containing those terms and conditions set forth on Schedule 7.2(h) as well as such other terms and conditions as are mutually agreeable to the parties;

(i)     Each of Joel Botwick and Phil Goldweitz shall have executed and delivered to Purchaser a non-compete agreement in the form attached hereto as Exhibit E;

(j)     The sum of the Inventory Value Amount, the Cash Amount and the Accounts Receivable Amount shall equal or exceed $13,400,000;

(k)     Purchaser shall have obtained in cash at least $5,600,000 of debt financing pursuant to a loan agreement providing aggregate available debt financing of at least $10,400,000 with Wells Fargo Bank, N.A. or its Affiliate on substantially the same terms and conditions as those set forth in the term sheet last circulated between Purchaser and Wells Fargo Bank, N.A. or its Affiliate prior to the execution of this Agreement and such other terms and conditions as are reasonably satisfactory to Purchaser;

(l)     Purchaser shall have entered into an agreement with Turnils, on terms and conditions mutually agreeable to Purchaser and Turnils, that provides for, among other things, a release by Turnils of Seller, effective as of the Closing Date, with respect to Seller's payment obligation of up to $1,200,000; and

(m)     Purchaser's receipt of Seller's closing deliveries pursuant to Section 4.4.

Each of the foregoing conditions is for the benefit of Purchaser, which may waive in writing any of such conditions at, or prior to, the Closing.

## ARTICLE VIII

### Other Agreements

Section 8.1.     Further Assurances.     The parties shall execute such further documents, and perform such further acts, as may be reasonably necessary to transfer and convey the Purchased Assets to Purchaser, on the terms herein contained, and to otherwise comply with the terms of this Agreement and consummate the transaction contemplated hereby.

Section 8.2.     Efforts and Actions to Cause Closings to Occur.     Upon the terms and subject to the conditions of this Agreement, each of Seller and Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done and cooperate with each other in order to do, all things necessary, proper or advisable (subject to any applicable laws) to consummate the

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

Closing as promptly as practicable, including the preparation and filing of all motions, forms, registrations and notices required to be filed to consummate the Closing and the taking of such actions as are reasonably necessary to obtain any requisite approvals, authorizations, consents, orders, licenses, permits, exemptions or waivers by any third party or governmental entity; <u>provided</u> that in no event shall Purchaser be required to pay any fees or other amounts to obtain any such approvals, authorizations, consents, orders, licenses, permits, exemptions or waivers.  In addition, no party hereto shall take any action after the Agreement Date that could reasonably be expected to materially delay the obtaining of, or result in not obtaining, any permission, approval or consent from any Governmental Authority or other Person required to be obtained prior to Closing.

Section 8.3.    Transition Services.  Commencing on the Closing Date, Seller agrees to provide Purchaser with up to thirty (30) days of assistance in the transition of the Business to Purchaser at times and locations agreeable to Seller.  Seller shall not be paid any fee or other remuneration for such services, but shall be reimbursed for all reasonable, documented costs and expenses incurred by Seller in rendering such transition services and approved in advance by Purchaser.

Section 8.4.    Employees.

(a)    Prior to the Closing Date, Purchaser shall offer employment to substantially all of the employees of Seller listed on Schedule 5.2(o) (other than Danielle Botwick, Cynthia Goldweitz, Paul Goldweitz and Greg Libertiny) (collectively, the "Business Employees") on such terms and conditions (including compensation and benefits) as Purchaser in its sole discretion determines; provided, that each such offer shall provide that it shall not become effective with respect to a Business Employee unless the applicable Business Employee is actively at work as of the Closing Date and, provided further, that Purchaser shall offer each such employee other than Joel Botwick and Phil Goldweitz substantially the same base rate of compensation as such employee is receiving as of the date of this Agreement (as set forth on the list contemplated by Section 5.2(o)).  Seller shall provide to Purchaser such information as reasonably requested by Purchaser to enable Purchaser to fulfill its obligations under this Section 8.4(a).  The new employment of each Business Employee who accepts Purchaser's offer of employment shall commence with effect from the later of the Closing or the date of acceptance.  Each Business Employee who accepts Purchaser's offer of employment and who becomes an employee of Purchaser as of the Closing (or as of the later date of acceptance) shall be a "Transferred Employee."  Purchaser shall have no liability whatsoever with respect to any Business Employee or other employee of Seller who does not become a Transferred Employee.  Purchaser shall not assume any Seller Plan or any liability of Seller under or with respect to any Seller Plan.  Nothing in this Agreement shall be construed to require, or prevent the termination of, employment of any individual, including any Transferred Employee, or require any minimum benefit or compensation levels or prevent any change in the employee benefits provided to any

27

Approved by Judge Michael Kaplan January  22, 2010

Transferred Employee, except as may be required under that certain Collective Bargaining Agreement between Bamboo Abbott, Inc. t/a Prestige Window Fashions and Amalgamated Industrial Union Local 76B and its divisions affiliated with the IUE-CWA, AFL-CIO, dated as of June 5, 2008.

(b)     Effective as of the Closing, Seller shall cause the employment of all of the Business Employees to terminate.  Seller shall be responsible for and pay any and all liabilities arising under the WARN Act, if any, arising out of or resulting from layoffs of employees, including Business Employees, at or prior to the Closing, and Seller shall remain liable for any and all costs and expenses relating to such employees (including Business Employees) associated with termination and severance, including any liability imposed on Seller to provide such employees with continued health, disability, life, retirement or other benefits (whether covered by insurance or not).  On the Closing Date, Purchaser shall credit each Transferred Employee with any accrued but unused vacation, sick and other paid time off.  Purchaser shall not assume or be responsible for any earned but unpaid bonus or other payments provided under Seller's applicable policies or in accordance with applicable law.

Section 8.5.     Name Change.  Seller acknowledges that, upon the Closing, all right, title and interest in the name "Prestige Window Fashions" shall be transferred to Purchaser.  As promptly as practicable, but in any event within thirty (30) days of the Closing Date, Seller shall file the necessary documentation in the applicable jurisdictions to remove any reference to "Prestige" or "Prestige Window Fashions" in connection with its name or operations (including with respect to any assumed or fictitious name).

Section 8.6.     Post-Closing Access to Books and Records.  For a period of six (6) years after the Closing Date, upon reasonable prior notice from Seller to Purchaser, Purchaser shall make available to Seller and the official committee of unsecured creditors appointed in the Bankruptcy Case and their respective successors and assigns (including any liquidating or similar trustee appointed under any chapter 11 plan) all books and records of Seller which Purchaser acquired pursuant to this Agreement during normal business hours for copy (at Seller's expense), examination and review for any tax related, regulatory or litigation purposes (other than any litigation involving Purchaser, on the one hand, and Seller or any of its Affiliates or the official committee of unsecured creditors or other liquidating or similar trustee, on the other hand, or with respect to this Agreement or the transactions contemplated hereby); provided, that the requesting party shall pay Purchaser for any costs incurred by Purchaser in connection therewith, and that such examination shall not unduly interfere with the operation of Purchaser's business; and, provided further, that all such books and records shall be used only for the purpose set forth in this Section 8.6.

Section 8.7.     Survival.  All representations, warranties and (except as set forth in the following sentence and Section 9.5) covenants set forth in this Agreement or in any certificate, document or other instrument delivered in connection herewith shall terminate

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

at the earlier of (a) the Closing and (b) termination of this Agreement in accordance with
ARTICLE IX.  Only those covenants that contemplate specific actions to be taken or
obligations in effect after the Closing or termination of this Agreement, as the case may
be, including as set forth in Section 9.5, shall survive in accordance with their terms and
to the extent so contemplated.

# ARTICLE IX

## Termination

Section 9.1.    Termination by Mutual Consent.    This Agreement may be
terminated at any time prior to the Closing Date by mutual written agreement of Seller
and Purchaser.

Section 9.2.    Termination by Seller.  Seller may terminate this Agreement at
any time prior to the Closing Date if:

(a)    there has been a material breach by Purchaser of any of its
representations or warranties contained in this Agreement, which breach is not curable or,
if curable, is not cured within five (5) days after written notice of such breach is given by
Seller to Purchaser;

(b)    there has been a material breach of any of the covenants or
agreements set forth in this Agreement on the part of Purchaser, which breach is not
curable or, if curable, is not cured within five (5) days after written notice of such breach
is given by Seller to Purchaser;

(c)    (i) the Bankruptcy Court has entered an order approving an
Alternative Transaction or (ii) the Bankruptcy Court has entered an order denying
approval of the Sale Motion; or

(d)    the Closing Date shall not have occurred on or prior to January 31,
2010; provided, that the right to terminate shall not be available under this Section 9.2(d)
if the Closing shall not have occurred by such date as a result of the failure of Seller to
fulfill any of its obligations under this Agreement.

Section 9.3.    Termination by Purchaser.    Purchaser may terminate this
Agreement at any time prior to the Closing Date if:

(a)    there has been a material breach by Seller of any of its
representations or warranties contained in this Agreement, which breach is not curable or,
if curable, is not cured within five (5) days after written notice of such breach is given by
Purchaser to Seller;

29

*Approved by Judge Michael Kaplan January  22, 2010*

(b)    there has been a material breach of any of the covenants or agreements set forth in this Agreement on the part of Seller, which breach is not curable or, if curable, is not cured within five (5) days after written notice of such breach is given by Purchaser to Seller;

(c)    if (i) Purchaser is not the Successful Bidder (as defined in the Sale Motion), (ii) the Bankruptcy Court has entered an order approving an Alternative Transaction, (iii) the Bankruptcy Court has entered an order denying approval of the Sale Motion or (iv) the Approval Order shall not have been entered by the Bankruptcy Court on or before January 21, 2010;

(d)    if the Sale Procedures Order shall not have been entered by the Bankruptcy Court on or before January 14, 2010, or if the Bankruptcy Court has entered an order modifying, reversing, vacating, staying, restraining or enjoining the Sale Procedures Order; or

(e)    the Closing Date shall not have occurred on or prior to January 31, 2010; provided, that the right to terminate shall not be available under this Section 9.3(e) if the Closing shall not have occurred by such date as a result of the failure of Purchaser to fulfill any of its obligations under this Agreement.

Section 9.4.    Expense Reimbursement.    If this Agreement is terminated pursuant to Section 9.2(c), Section 9.3(a), (b), (c)(i), (c)(ii) or (c)(iii), or Section 9.2(d) or 9.3(e) (other than in the case of Section 9.2(d) or 9.3(e) for failure of any condition set forth in Section 7.2(e), (h), (i), (j), (k) or (l) being met), then Seller shall pay to Purchaser the amount of $350,000 (the "Expense Reimbursement"), which the parties agree represents a portion of Purchaser's reasonable, actual out-of-pocket fees and expenses, including reasonable attorneys' fees, expenses of its financial advisors and expenses of other consultants, incurred in connection with the transactions contemplated by this Agreement, upon the consummation of (a) any transaction or series of transactions in which Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, all or substantially all of the Business or the Purchased Assets with one or more Persons other than Purchaser in any circumstance, including in accordance with the bidding procedures approved by the Bankruptcy Court (an "Alternative Disposition Transaction"), (b) any entry of an order confirming any plan of reorganization or liquidation in the Bankruptcy Case or (c) any entry of an order granting any stay relief to any secured creditor of Seller, including any entry or order allowing foreclosure or other similar action (any such event described in clauses (a), (b) or (c) being an "Alternative Transaction").  The Company shall cause the Sale Procedures Order to provide that the Expense Reimbursement shall be carved out of Wells Fargo's collateral and that the payment of the Expense Reimbursement shall be granted priority over amounts payable to Wells Fargo in connection with debt secured by such collateral or to any other administrative expense claimant in the event the Expense Reimbursement is payable upon an Alternative

30

Disposition Transaction or the entry of an order confirming any plan of reorganization in the Bankruptcy Case (as contemplated in clause (b) above). Notwithstanding the foregoing or any other provision hereof to the contrary, Purchaser and Seller acknowledge and agree that, regardless of any administrative expense priority granted to the Expense Reimbursement under the Bankruptcy Code, except in the event the Expense Reimbursement is payable upon consummation of an Alternative Disposition Transaction or the entry of an order confirming any plan of reorganization in the Bankruptcy Case (as contemplated in clause (b) above), Wells Fargo will have a first priority lien and security interest in and upon certain assets of Seller and the Expense Reimbursement shall not be paid out of the proceeds of Wells Fargo's collateral except to the extent those proceeds exceed the amount of debt held by Wells Fargo that is secured thereby.

Section 9.5.    Effect of Termination and Abandonment.    In the event of termination of this Agreement pursuant to this ARTICLE IX, written notice thereof shall as promptly as practicable be given to the other party to this Agreement and this Agreement shall terminate and the transactions contemplated hereby shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein all obligations of the parties shall terminate (except as set forth in this Section 9.5 and Section 9.4, Section 11.3, Section 11.5 and Section 11.12, each of which shall survive termination in its entirety). Notwithstanding the preceding sentence or any other provision set forth herein (including Section 8.7), nothing in this Section 9.5 shall relieve any party from liability for losses actually incurred as a result of a breach of any representation, warranty, covenant or agreement of such party contained in this Agreement prior to such termination.

## ARTICLE X

## Tax Matters

Section 10.1.    Proration.    Liability for all real and personal property taxes and similar ad valorem obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (the "Apportioned Obligations") shall be apportioned between Seller and Purchaser based on the number of days of such taxable period included in the period ending on the Closing Date (the "Pre-Closing Tax Period") and the number of days of such taxable period included in the period after the Pre-Closing Tax Period (the "Post-Closing Tax Period"). Seller shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Pre-Closing Tax Period. Purchaser shall be liable for the proportionate amount of such Apportioned Obligations that is attributable to the Post-Closing Tax Period.

Section 10.2.    Cooperation.

(a)    Seller and Purchaser agree to furnish, or cause to be furnished to the other, upon request and as promptly as practicable, such information (including access to

31

*Approved by Judge Michael Kaplan January  22, 2010*

books and records related to the Business or the Purchased Assets) and assistance related to the Purchased Assets as is reasonably necessary for the filing of any tax return, the preparation for any tax audit or the prosecution or defense of any proceeding related to any proposed tax adjustment related to the Purchased Assets.  Seller and Purchaser shall keep all such information and documents received by them confidential unless otherwise required by law.

(b)     Seller and Purchaser agree to retain, or cause to be retained, all books and records related to tax matters and pertinent to the Purchased Assets until the applicable period for assessment of taxes under applicable law (giving effect to any and all extensions or waivers) has expired and such additional period as necessary for any administrative or judicial proceedings related to any proposed assessment, and to abide with all record retention agreements entered into with any taxing authority.  Seller and Purchaser agree to give the other reasonable notice prior to transferring, discarding or destroying any such books and records related to tax matters and, if so requested, Seller and Purchaser shall allow the requesting party to take possession of such books and records.

(c)     Seller and Purchaser shall cooperate with each other in the conduct of any proceedings for any tax purposes related to the Purchased Assets and shall each execute and deliver such powers of attorney and other documents as are reasonably necessary to carry out the intent of this ARTICLE X.

(d)     For a period of three (3) years after the Closing Date, Seller shall provide Purchaser with ongoing reasonable access to books and records retained by Seller related to the Business that are related to taxes (which may be redacted with respect to information not relevant to the Business or which Seller is prohibited by applicable law from disclosing); provided, that Seller shall not be obligated to provide Purchaser with such access in connection with any litigation (i) involving Purchaser, on the one hand, and Seller or any of its Affiliates or the official committee of unsecured creditors or other liquidating or similar trustee, on the other hand, or (ii) with respect to this Agreement or the transactions contemplated hereby.

(e)     To the extent Purchaser hires any Business Employees, Seller shall cooperate with Purchaser and Purchaser's agents to provide Purchaser all of Seller's applicable payroll tax records.  In addition, (i) when required by state taxing agencies, Seller shall provide signatures (or notarized signatures) necessary to grant permission for Purchaser to file for transfers of experience of payroll tax accounts in states which require a signed release by the predecessor Seller, (ii) Seller shall provide Purchaser and its agents with the most recent Annual 940 Report (including Schedule A), and most recent years "tax rate notices" received from individual state agencies and (iii) Seller shall provide copies of all Seller's quarterly wage detail reports filed with individual state agencies in the calendar year through the Closing Date.  If Seller has utilized an outside payroll tax administrator, then Seller hereby grants Purchaser permission to have access

32

*Approved by Judge Michael Kaplan January  22, 2010*

to relevant successor-in-interest reports from the payroll tax administrator, such as state tax rate notices, state quarterly contribution reports, W2s and federal recap reports such as 940 and 941, and Seller shall provide Purchaser with a contact person at the payroll tax administrator.

**ARTICLE XI**

**Miscellaneous**

Section 11.1.   <u>Publicity</u>.  Except as may be required by applicable law or the Bankruptcy Court, Seller, on the one hand, and Purchaser, on the other hand, shall not issue any press release, respond to any press inquiry or make (or cause to be made) any public statement or otherwise make (or cause to be made) any disclosure with respect to this Agreement or the transactions contemplated hereby (or otherwise make any statement or disclosure to any third party regarding the foregoing) without the prior approval of the other party, which approval shall not be unreasonably withheld.

Section 11.2.   <u>Notices</u>.  All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile or by nationally recognized private courier.  Notices delivered by hand, by facsimile or by nationally recognized private carrier shall be deemed given on the date received or, if not a Business Day or after 5:00 p.m. EST on a Business Day, the next Business Day; <u>provided</u>, that a notice delivered by facsimile shall only be effective if such notice is also promptly (and in any event within one (1) Business Day) delivered by hand or sent by nationally recognized private courier.  All notices shall be addressed as follows:

| | |
|---|---|
| if to Purchaser: | Platinum Equity Advisors, LLC |
| | 360 North Crescent Drive, South Building |
| | Beverly Hills, California 90210 |
| | Telecopier:  (310) 712-1863 |
| | Attention: Eva M. Kalawski, Executive Vice |
| | President, General Counsel and Secretary |
| | |
| with a copy to: | Mayer Brown LLP |
| | 350 South Grand Avenue |
| | 25th Floor |
| | Los Angeles, California 90071-1503 |
| | Telecopier:  (213) 576-8177 |
| | Attention:  Brian T. May |
| | |
| if to Seller to: | Bamboo Abbott, Inc. |
| | 195 Raritan Center Parkway |
| | Edison, NJ 08836 |
| | Telecopier:  (732) 346-1182 |

33

*Approved by Judge Michael Kaplan January  22, 2010*

Attention:  Mr. Joel S. Botwick

with a copy to:          Cole, Schotz, Meisel, Forman & Leonard, P.A.
Court Plaza North
25 Main Street
Hackensack, New Jersey 07602
Telecopier:  (201) 678-6262
Attention:  Michael D. Sirota

or, in each case, at such other address as may be specified in writing to the other party.

Section 11.3.    Expenses.  Other than as set forth in this Agreement, each of Seller and Purchaser shall bear their respective costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

Section 11.4.    Entire Agreement.  This Agreement (including the Schedules, Exhibits and the other documents and instruments referred to herein) constitutes the entire agreement between the parties and supersedes all other prior agreements and understandings, both written and oral, between the parties, with respect to the subject matter hereof.

Section 11.5.    Applicable Law.    This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of New York applicable to contracts made therein, without regard to rules of conflicts of law.

Section 11.6.    Binding Effect; Benefit.    This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their successors and permitted assigns.  Nothing in this Agreement, express or implied, is intended to confer on any Person other than the parties hereto, and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 11.7.    Assignability.  This Agreement shall not be assignable by either party without the prior written consent of the other party, except that Purchaser may assign its rights and delegate its duties under this Agreement to one or more Affiliates; provided, that such assignment shall not discharge the obligations and liabilities of Purchaser hereunder.

Section 11.8.    Amendments.  This Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the parties hereto.

34

*Approved by Judge Michael Kaplan January  22, 2010*

Section 11.9.    Headings.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

Section 11.10.    Bulk Sales Laws.  The parties hereto hereby waive compliance with the provisions of any applicable bulk sales laws, including Article 6 of the Uniform Commercial Code as it may be in effect in any applicable jurisdiction.

Section 11.11.    Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same Agreement.

Section 11.12.    Venue and Exclusive Jurisdiction.  Purchaser and Seller agree that all actions brought, arising out of or related to this Agreement or the transactions contemplated hereby shall be brought in the Bankruptcy Court and that the Bankruptcy Court shall have exclusive jurisdiction over all disputes and other matters relating to the interpretation and enforcement of this Agreement or any ancillary document executed pursuant hereto.  Purchaser hereby expressly consents to and agrees not to contest such exclusive jurisdiction.

Section 11.13.    Waiver of Breach, Right or Remedy.  The waiver by any party of any breach or violation by the other party of any provision of this Agreement or of any right or remedy of the waiving party in this agreement (a) shall not waive or be construed to waive any subsequent breach or violation of the same provision, (b) shall not waive or be construed to waive a breach or violation of any other provision and (c) shall be in writing and may not be presumed or inferred from any party's conduct.  Except as expressly provided otherwise in this Agreement, no remedy conferred by this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be in addition to every other remedy granted in this Agreement or now or hereafter existing at law or in equity, by statute or otherwise.  The election of one or more remedies by a party shall not constitute a waiver of the right of such party to pursue other available remedies.  In addition to any other rights and remedies any party may have at law or in equity for breach of this Agreement, Purchaser shall be entitled to seek an injunction or other specific performance to enforce the provisions of this Agreement.  Seller acknowledges and agrees that Seller shall not be entitled to seek an injunction or other specific performance to enforce the provisions of this Agreement.  Notwithstanding the foregoing, Seller shall be entitled to seek damages in the event of a breach by Purchaser of its obligations under this Agreement prior to the Closing; provided, that in no event shall such damages exceed the Closing Date Payment or include special, indirect, consequential, punitive or exemplary damages.

Section 11.14.    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 11.15.    Construction.

(a)    The parties have participated jointly in the negotiation and drafting of this Agreement.    In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(b)    Any reference to any federal, state, local or foreign law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(c)    Unless the context otherwise requires, as used in this Agreement, (i) "including" and its variants mean "including, without limitation" and its variants, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (ii) words defined in the singular have the parallel meaning in the plural and vice versa; (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement and the Schedules and any Exhibits hereto; (iv) all Sections and the Schedules and Exhibits referred to herein are, respectively, Sections of, and the Schedules and Exhibits to, this Agreement; (v) words importing any gender shall include other genders; (vi) a dollar figure ($) used in this Agreement shall mean U.S. dollars; and (vii) any reference to "days" means calendar days, unless Business Days are expressly specified.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

BAMBOO ABBOTT, INC.

By: _____

      Joel S. Botwick, President
      and Chief Executive Officer

VENTANAS ACQUISITION
CORPORATION

By: _____

      Name:
      Title:

*Approved by Judge Michael Kaplan January  22, 2010*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

BAMBOO ABBOTT, INC.

By: _____
        Joel S. Botwick, President
        and Chief Executive Officer

VENTANAS ACQUISITION
CORPORATION

By: _____
        Name:  Eva M. Kalawski
        Title:    Vice President and Secretary

37

1499386.10

*Approved by Judge Michael Kaplan January 22, 2010*

**EXHIBIT A**

**SALE PROCEDURES MOTION; PROCEDURES ORDER**

See attached.

*Approved by Judge Michael Kaplan January  22, 2010*

## BAMBOO ABBOTT, INC. T/A PRESTIGE WINDOW FASHIONS
## BIDDING PROCEDURES

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the proposed sale (the "Sale") of substantially all of the assets of Bamboo Abbott, Inc. t/a Prestige Window Fashions (the "Debtor" or the "Seller"), Debtor and Debtor-in-possession in a Chapter 11 case pending in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). On or about January 13, 2010, the Seller executed that certain Asset Purchase Agreement (the "Asset Purchase Agreement") with Ventanas Acquisition Corporation (the "Purchaser"). The transaction contemplated by the Asset Purchase Agreement is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court pursuant to sections 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code").

On January 10, 2010, the Debtor filed a Motion (the "Motion") for an Order pursuant to 11 U.S.C. §§ 105(a), 363, 365 and 1113 and Fed. R. Bankr. P. 2002, 6004 and 6006: (1) Approving a "Stalking Horse" Asset Purchase Agreement for the Sale of Substantially All of the Debtor's Assets; (2) Approving Bidding Procedures and Form, Manner and Sufficiency of Notice Thereof; (3) Scheduling (a) an Auction Sale and (b) a Hearing to Consider Approving the Highest and Best Offer; (4) Authorizing the Debtor to Sell Substantially All of its Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and to Assume and Assign Related Executory Contracts, Unexpired Leases and its Collective Bargaining Agreement; and (5) Granting Other Related Relief (the "Sale Motion"). On January 13, 2010, the Bankruptcy Court entered an Order Under 11 U.S.C. §§363, And Fed. R. Bankr. P. 2002 And 9014 (I) Approving Bidding Procedures (II) Granting an Expense Reimbursement, (III) Approving Form And Manner Of Sale Notices, And (IV) Setting Approval Hearing Date In Connection With Sale Of Substantially All Of Debtor's Assets (the "Bidding Procedures Order"). The Bidding Procedures Order sets January 21, 2010, at 3:00 p.m. as the date when the Bankruptcy Court will conduct a hearing (the "Approval Hearing") to authorize the Seller to enter into the Asset Purchase Agreement. All capitalized terms used but not otherwise defined in these Bidding Procedures have the meanings ascribed to them in the Asset Purchase Agreement.

The Bidding Procedures set forth herein describe, among other things, the assets available for sale, the manner in which bidders and bids become Qualified Bidders and Qualified Bids (each as defined herein), respectively, the receipt and negotiation of bids received, the conduct of any subsequent Auction (as defined herein), the ultimate selection of the Successful Bidder(s) (as defined herein), and the Bankruptcy Court's approval thereof (collectively, the "Bidding Process"). The Debtor intends to consult with, among others, the official committee of unsecured creditors (the "Committee") and Wells Fargo Bank, National Association ("Wells Fargo") throughout the Bidding Process. In the event that the Debtor and any party disagree as to the interpretation or application of these Bidding Procedures, the Bankruptcy Court will have jurisdiction to hear and resolve such dispute.

## Assets To Be Sold

The assets proposed to be sold include substantially all of the assets of the Debtor (the "Purchased Assets").

46758/0001-6231165v3

*Approved by Judge Michael Kaplan January 14, 2010*

*Approved by Judge Michael Kaplan January 22, 2010*

## "As Is, Where Is"

The sale of the Purchased Assets, or any portion thereof, will be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Seller, its agents, or estate, except, with respect to the Purchaser, to the extent set forth in the Asset Purchase Agreement and, with respect to a Successful Bidder, to the extent set forth in the relevant purchase agreement of such Successful Bidder approved by the Bankruptcy Court.

## Free Of Any And All Claims And Interests

Except to the extent otherwise set forth in the relevant purchase agreement of such Successful Bidder or ordered by the Bankruptcy Court, all of the Seller's right, title, and interest in and to the Purchased Assets, or any portion thereof, to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests on and/or against the Purchased Assets (collectively, the "Claims and Interests"), such Claims and Interests to attach to the net proceeds of the sale of such Purchased Assets.

## Participation Requirements

Unless otherwise ordered by the Bankruptcy Court or as otherwise determined by Seller (in consultation with the Official Committee of Unsecured Creditors in connection with the Bankruptcy Case (the "Committee") and Wells Fargo), in order to participate in the Auction, each Person other than Purchaser who wishes to participate in the Auction (each, a "Potential Bidder") must deliver to Seller, Seller's counsel, Wells Fargo and its counsel, and the Committee's counsel (collectively, the "Notice Parties"):

(i)    an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by Seller to a Potential Bidder) that shall not be on terms that, in Seller's reasonable judgment, are more favorable to the Potential Bidder than the confidentiality agreement executed by Purchaser and which shall inure to the benefit of the purchaser of the Purchased Assets;

(ii)    current financial statements of the Potential Bidder (audited, if available), or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, such financial statements of the equity holder(s) of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow Seller and its financial advisors, in consultation with Wells Fargo and the Committee, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transactions contemplated by the Agreement; and

(iii)    a preliminary (non-binding) written proposal regarding (a) the purchase price range, (b) any Purchased Assets expected to be excluded or any additional assets desired to be included, (c) the structure of the financing of the transactions contemplated by the Agreement (including the sources of the financing for the purchase price and all requisite financial assurance), (d) any anticipated corporate, stockholder, internal or regulatory consents or approvals required to close the transactions contemplated by the Agreement, together with the anticipated time frame and any anticipated impediments for obtaining such consents or

46758/0001-6231165v3

*Approved by Judge Michael Kaplan January  14, 2010*

*Approved by Judge Michael Kaplan January  22, 2010*

approvals, (e) the proposed number of employees of Seller who will become employees of the Potential Bidder, and any proposed measures associated with their continued employment, and (f) any conditions to closing that the Potential Bidder may wish to impose in addition to those set forth in the Agreement.

A Potential Bidder that delivers the documents described above in substantial compliance with the form and manner described above as determined by Seller in its reasonable business judgment (including a reasonably competitive and realistic non-binding proposal) and whose financial information demonstrates to Seller's reasonable satisfaction (after consultation with Wells Fargo, the Committee and Seller's financial advisors) the financial capability of the Potential Bidder to consummate the transactions contemplated by the Agreement will be deemed a "Qualified Bidder." Notwithstanding the foregoing, Seller may request such additional information from a Potential Bidder as necessary in order to evaluate the Potential Bidder's ability to consummate a transaction and to fulfill its obligations in connection therewith and such Potential Bidder shall be obligated to provide such additional information as a precondition to becoming a Qualified Bidder and participating in the Auction.

Seller shall deliver to Purchaser copies of all such documents delivered by Potential Bidders (other than any financial statements or other financial disclosure documents described in clause (ii) above) promptly (and in any event no later than one (1) calendar day after receipt thereof).

### Due Diligence

No due diligence for any Person other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline. Seller will provide to Purchaser prompt access to all due diligence materials and other information provided to any Qualified Bidder that were not previously made available to Purchaser.

### Bid Deadline

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the Notice Parties in accordance with the notice provision set forth in the Agreement and so as to be received no later than January 20, 2010 at 1:00 p.m. (prevailing Eastern time) by Seller (the "Bid Deadline"). Seller, after consultation with Wells Fargo and the Committee, may extend the Bid Deadline once or successively; provided, that for any such extension beyond two (2) calendar days, Seller will have obtained the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Seller will promptly notify Purchaser and all Qualified Bidders of any extension of the Bid Deadline.

### Qualified Bid

A bid submitted will be considered a "Qualified Bid" only if the bid is submitted by a Qualified Bidder in accordance herewith and complies with all of the following:

(i)    it includes a letter stating that such Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder; provided, that if such Qualified Bidder is selected as

3

*Approved by Judge Michael Kaplan January 14, 2010*

*Approved by Judge Michael Kaplan January 22, 2010*

the Successful Bidder, its offer will remain irrevocable until the closing of the Sale to the Successful Bidder;

        (ii)     it includes a duly authorized and executed agreement proposed by such Qualified Bidder (the "Marked Agreement"), including the purchase price of the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, as well as copies of such materials marked to show those amendments and modifications to the Agreement, which amendments and modifications shall, in Seller's reasonable business judgment, be no less favorable than the terms and conditions set forth in the Agreement;

        (iii)    it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow Seller (in consultation with Wells Fargo and the Committee) to make a reasonable determination as to such Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Marked Agreement;

        (iv)    it is not conditioned on the outcome of unperformed due diligence by such Qualified Bidder;

        (v)     it has a value to Seller, in Seller's reasonable business judgment after consultation with its financial advisors, Wells Fargo and the Committee, that is greater than or equal to the sum of (a) the Purchase Price (as defined in the Agreement), plus (b) the amount of the Expense Reimbursement, plus (c) $250,000;

        (vi)    it includes evidence, in form and substance reasonably satisfactory to Seller, of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution and delivery of, and closing under, the Marked Agreement;

        (vii)   it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by Seller) in an amount equal to the Expense Reimbursement; and

        (viii)  it is received by the Bid Deadline.

Notwithstanding the foregoing, Purchaser will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Procedures, the Auction and the Sale.

## No Qualified Bids

If Seller does not receive any Qualified Bids other than the Agreement received from Purchaser by the Bid Deadline, the Auction will be cancelled and, subject to obtaining entry of the Approval Order by the Bankruptcy Court and satisfaction of the closing conditions set forth in the Agreement, Seller will promptly proceed to complete the transactions contemplated by the Agreement. In addition, if no other Qualified Bid is received by Seller, Purchaser reserves the right to request that the Bankruptcy Court move up the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof.

46758/0001-6231165v3

*Approved by Judge Michael Kaplan January  14, 2010*

*Approved by Judge Michael Kaplan January  22, 2010*

## Expense Reimbursement

Recognizing the value and benefits that Purchaser has provided to Seller by entering into the Agreement, as well as Purchaser's expenditure of time, energy and resources, Seller has agreed that if Purchaser is not the Successful Bidder, Seller will, in the circumstances set forth in the Agreement, pay to Purchaser an amount equal to $350,000 (the "Expense Reimbursement"), which shall constitute administrative expense claims against Seller under Section 503(b) of the Bankruptcy Code, payable in accordance with the terms of the Agreement and the Procedures Order.

## Auction

If Seller receives one or more Qualified Bids in addition to the Agreement, Seller will conduct the Auction. Copies of all Qualified Bids will be delivered to Purchaser at such time that such bid is deemed a Qualified Bid but no later than two (2) calendar days prior to the Auction. At least one (1) calendar day prior to the Auction, Seller will provide copies to Purchaser and all other Qualified Bidders of the Qualified Bid which Seller believes, in its reasonable business judgment after consultation with Wells Fargo and the Committee, is the highest or otherwise best offer (the "Starting Bid"). The Auction will run in accordance with the following procedures:

(i)      only Seller, Purchaser, the Committee, any secured creditor of Seller and any other Qualified Bidder that has timely submitted a Qualified Bid (and the advisors to each of the foregoing) will attend the Auction in person;

(ii)      only Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

(iii)      Wells Fargo shall be deemed a Qualified Bidder. Wells Fargo shall have the right, but not the obligation, to credit bid any or all of its secured claims for the Purchased Assets.

(iv)      Purchaser and each other Qualified Bidder will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale;

(v)      bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid, including at least an incremental value to the estate of at least $100,000 over the Starting Bid or the then leading bid (in each case net of the amount of any Expense Reimbursement that would be payable if such Qualified Bid was the Successful Bid);

(vi)      Purchaser shall be entitled to credit the amount of the Expense Reimbursement in connection with making any subsequent bids at the Auction (for example, if the Starting Bid was $10 million, Purchaser could bid $9.75 million as the next Qualified Bid (representing $10 million, plus the minimum subsequent bid increment of $100,000, less the amount of the Expense Reimbursement)); and

46758/0001-6231165v3

*Approved by Judge Michael Kaplan January  14, 2010*

*Approved by Judge Michael Kaplan January  22, 2010*

(vii)    in the event a Qualified Bid is submitted containing non-cash consideration, the assumption of any debt or liabilities of Seller (other than to the extent already expressly set forth in the Agreement from Purchaser), a proposal to pay any amounts to Seller based on future contingencies or otherwise provide Seller with any form of consideration other than cash at closing (collectively, "Alternative Consideration"), Seller, in consultation with Wells Fargo, the Committee and Seller's advisors, shall announce at the Auction what reasonable value Seller reasonably believes any such Alternative Consideration will have for purposes of determining the actual, present value of any such bid.

Notwithstanding any of the foregoing, Seller, after consultation with Seller's advisors, Wells Fargo and the Committee, may adopt such other rules for the Auction that it reasonably anticipates will result in the highest or otherwise best value for its estate and that are not inconsistent with any Bankruptcy Court order, provided that such other rules for the Auction are not inconsistent with these Bidding Procedures and are communicated to all participants at or prior to the Auction.

## Selection of Successful Bid

Prior to the conclusion of the Auction, Seller, in consultation with Wells Fargo and the Committee, will (a) review each Qualified Bid and evaluate each Qualified Bid and (b) identify the highest or otherwise best offer or offers for the Purchased Assets received at the Auction (the "Successful Bid" and the bidder(s) making such bid, the "Successful Bidder").  Such determination of the Successful Bid by Seller will be final subject to approval by the Bankruptcy Court.

Seller will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon approval of such Successful Bid by the Bankruptcy Court at the Approval Hearing.

46758/0001-6231165v3

*Approved by Judge Michael Kaplan January  14, 2010*

*Approved by Judge Michael Kaplan January  22, 2010*

**EXHIBIT B**

**SALE MOTION; APPROVAL ORDER**

The Sale Motion to be filed by Seller with the Bankruptcy Court, as provided in Section 6.2 of the Agreement, shall request entry of the Approval Order which, among other things, shall:

(i)      approve in all respects the Sale Motion and the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in the Agreement, authorize and approve Seller's execution, delivery and performance of the Agreement and the transactions contemplated thereby, and order that Seller is authorized to perform all acts necessary to consummate the transactions contemplated by this Agreement;

(ii)     include a specific finding that Purchaser is purchasing the Purchased Assets in good faith and is a good faith purchaser of the Purchased Assets pursuant to and within the meaning of the provisions of Bankruptcy Code Section 363(m) and is entitled to the protections provided thereby;

(iii)    provide that, pursuant to Sections 105 and 363 of the Bankruptcy Code, the sale of the Purchased Assets to Purchaser shall be free and clear of all Claims and other claims of any kind or nature whatsoever;

(iv)    determine that, except as expressly provided in the Agreement with respect to the Assumed Liabilities, neither the Purchaser nor any of the Purchased Assets shall have any obligation or liability for any of the indebtedness, liabilities or other obligations of Seller (including based on successor liability or similar theory) or be subject to any tax liability of Sellers except for such transfer tax liability as may be incurred as a result of the transfer of the Purchased Assets;

(v)     determine that all consent requirements for the assumption and assignment of the Assumed Contracts and Additional Assumed Contracts, if any, have been satisfied and that upon the Closing the Assumed Contracts and the Additional Assumed Contracts (as determined as of the Closing Date) shall have been assigned to Purchaser in accordance with Section 365 of the Bankruptcy Code and specifying that there are no defaults thereunder or amounts necessary to cure defaults or otherwise effectuate the assumption by Purchaser of the Assumed Contracts and such Additional Assumed Contracts, except for those defaults that are to be cured on the Closing Date as provided in the Agreement by Purchaser's payment of such cure and assumption amounts as are specified in the Agreement;

(vi)    find that sufficient and adequate prior notice to all parties in interest in the Bankruptcy Case was given;

*Approved by Judge Michael Kaplan January  22, 2010*

(vii)    provide that the Bankruptcy Court finds cause to permit closing under the Approval Order immediately following the entry of the Approval Order notwithstanding Bankruptcy Code Rules 6004(g) and 6006(d); and

(viii)    provide, to the extent applicable, that the Approval Order shall be binding on all creditors of Seller, all counterparties to the Assumed Contracts and all other parties in interest.

The Sale Motion shall otherwise be in form and substance reasonably satisfactory to the Purchaser, and the Approval Order shall contain such other findings of fact, conclusions of law and other provisions as Purchaser may reasonably require.

40

*Approved by Judge Michael Kaplan January  22, 2010*

**EXHIBIT C**

**BILL OF SALE**

This BILL OF SALE is made as of this ___ day of January, 2010, by the undersigned, Bamboo Abbott, Inc. d/b/a Prestige Window Fashions, a New Jersey corporation and debtor-in-possession ("Seller"), pursuant to the terms of that certain Asset Purchase Agreement by and between Seller and Ventanas Acquisition Corporation, a Delaware corporation ("Purchaser") dated January __, 2010 (the "Asset Purchase Agreement").

In consideration for the purchase price set forth in the Asset Purchase Agreement and other good and valuable consideration all as more particularly set forth in the Asset Purchase Agreement, receipt whereof is hereby acknowledged, Seller does hereby irrevocably sell, assign, transfer, convey and deliver unto Purchaser all of Seller's right, title, and interest in and to the Purchased Assets (as such term is defined in Section 2.2 of the Asset Purchase Agreement), to have and to hold same unto Purchaser, its successors and assigns, forever.

Seller does hereby agree to execute and deliver such further instruments of conveyance, transfer and assignment and to take such other and further action as Purchaser reasonably may request more effectively to convey, transfer and assign any of the Purchased Assets and properties conveyed hereunder and to confirm title thereto.

This Bill of Sale is delivered pursuant to the entry of a Sale Order dated January __, 2010 by the U.S. Bankruptcy Court for the District of New Jersey in the chapter 11 bankruptcy of Seller, Case No. 09-28689, approving and authorizing the parties to enter into the Asset Purchase Agreement and in connection with the Asset Purchase Agreement and is subject to and shall be governed by the terms and conditions thereof.

This Bill of Sale shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of New York applicable to contracts made therein, without regard to rules of conflicts of law.

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

**IN WITNESS WHEREOF**, Seller has executed this Bill of Sale on the date set forth above.

BAMBOO ABBOTT, INC.


By: _____
　　　　　Joel S. Botwick, President and
　　　　　Chief Executive Officer

1499386.10

*Approved by Judge Michael Kaplan January 22, 2010*

# EXHIBIT D

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") made and entered into effective as of the __ day of January, 2010, by and between Bamboo Abbott, Inc., a New Jersey corporation ("Assignor"), and Ventanas Acquisition Corporation, a Delaware Corporation ("Assignee").  Capitalized terms used herein but not otherwise defined have the meanings given to such terms in the Asset Purchase Agreement.

WHEREAS, Assignor and Assignee have entered into that certain Asset Purchase Agreement, dated as of January __, 2010 (the "Asset Purchase Agreement");

WHEREAS, subject to the terms and conditions contained in the Asset Purchase Agreement, Assignor desires to transfer to Assignee and Assignee desires to acquire from Assignor all of Assignor's interest in the Assumed Contracts; and

WHEREAS, subject to the terms and conditions contained in the Asset Purchase Agreement, Assignor desires that Assignee assume, and Assignee desires to assume, from Assignor the obligations of Assignor arising under the Assumed Contracts after the Closing.

NOW, THEREFORE, in furtherance of the premises and pursuant to the representations, warranties, covenants and agreements contained in the Asset Purchase Agreement, and intending to be legally bound hereby, the parties hereto agree as follows:

1.  <u>Conveyance, Assignment and Acceptance of the Assumed Contracts</u>.  Subject to the terms of this Agreement and in accordance with and subject to the provisions of the Asset Purchase Agreement, effective as of the Closing, Assignor hereby transfers, assigns, conveys and delivers unto Assignee any and all right, title and interest of Assignor in, to and under the Assumed Contracts, and Assignee hereby accepts such transfer, assignment, conveyance and delivery of the Assumed Contracts.

2.  <u>Assumption of Assumed Liabilities</u>.  Subject to the terms of this Agreement and in accordance with and subject to the provisions of the Asset Purchase Agreement, effective as of the Closing, Assignee hereby assumes the obligations of Assignor arising under the Assumed Contracts after the Closing.

3.  <u>Substitution and Subrogation</u>.  The conveyance of the Assumed Contracts unto the Assignee hereunder is with full rights of substitution and subrogation of the Assignee, to the extent possible, in and to all covenants and warranties by others heretofore given or made in respect of the Assumed Contracts or any part thereof.

4.  <u>Successor and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

43

*Approved by Judge Michael Kaplan January 22, 2010*

5.    <u>Further Assurances</u>.  From time to time after the Closing, at the request of the other party hereto, the parties shall execute and deliver such documents and take such other action as such requesting party may reasonably request in furtherance of the consummation of the transactions contemplated hereby.

6.    <u>Governing Law</u>.  This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of New York applicable to contracts made therein, without regard to rules of conflicts of law.

7.    <u>Miscellaneous</u>.  This Agreement may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same Agreement.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  This Agreement is subject to all of the terms, conditions and limitations contained in the Asset Purchase Agreement and, together with the Asset Purchase Agreement and the exhibits, schedules and agreements entered in connection therewith, constitutes the entire understanding of the parties with respect to the subject matter hereof.  This Agreement shall not confer any rights or remedies upon any Person other than the parties and their respective successors and permitted assigns.

8.    <u>Conflicts</u>.  Notwithstanding anything to the contrary contained in this Agreement, in the event of any conflict between the terms of this Agreement and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.  Nothing in this Agreement shall in any way supersede, modify, replace, amend, rescind, waive, narrow or broaden any provision set forth in the Asset Purchase Agreement (including, without limitation, all representations, warranties, covenants, conditions and agreements therein contained) or any of the rights, remedies or obligations arising therefrom.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

BAMBOO ABBOTT, INC.

By: _____

      Joel S. Botwick, President
      and Chief Executive Officer

VENTANAS ACQUISITION CORPORATION

By: _____

      Name:
      Title:

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

## EXHIBIT E

## FORM OF NONCOMPETE AGREEMENT

### NON-COMPETITION, NON-SOLICITATION AND CONFIDENTIALITY AGREEMENT

This **NON-COMPETITION, NON-SOLICITATION AND CONFIDENTIALITY AGREEMENT** (this "Agreement") is entered into as of _____, 2010, by and between Ventanas Acquisition Corporation, a Delaware corporation ("Purchaser") and _____ (the "Restricted Person" and together with Purchaser, the "parties").

WHEREAS, Purchaser and Bamboo Abbott, Inc., a New Jersey corporation d/b/a Prestige Window Fashions and a debtor-in-possession ("Bamboo"), are parties to that certain Asset Purchase Agreement, dated as of January __, 2010 (the "Asset Purchase Agreement"), pursuant to which Purchaser agreed to purchase certain assets and assume certain liabilities from Bamboo;

WHEREAS, the Restricted Person is a registered and beneficial owner of certain of the issued and outstanding shares of Bamboo's capital stock; and

WHEREAS, as a material condition and inducement to Purchaser's willingness to enter into the Asset Purchase Agreement, Purchaser has requested that the Restricted Person agree, and the Restricted Person has agreed, to enter into this Agreement.

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained herein and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement, each intending to be legally bound, hereby agree as follows:

### ARTICLE 1

### DEFINITIONS AND INTERPRETATION

Section 1.01.   Definitions.  All capitalized terms used in this Agreement but not defined herein shall have the meanings assigned to them in the Asset Purchase Agreement.

### ARTICLE 2

### REPRESENTATIONS AND WARRANTIES

The Restricted Person represents and warrants to Purchaser as follows

Section 2.01.   Due Authorization; Enforceability.  The Restricted Person has full power and authority (including legal capacity) to execute and deliver this Agreement and to perform the Restricted Person's obligations hereunder.  This Agreement has been duly and validly executed and delivered by the Restricted Person.  This Agreement constitutes a legal, valid and binding obligation of the Restricted Person, enforceable against the Restricted Person in accordance with

46

*Approved by Judge Michael Kaplan January  22, 2010*

its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies.

Section 2.02.   <u>Consents and Approvals; No Conflicts</u>.

(a)     No consent, authorization or approval of, filing or registration with any Governmental Authority or any other Person not a party to this Agreement is necessary in connection with the execution, delivery and performance by the Restricted Person of this Agreement.

(b)     The execution and delivery by the Restricted Person of this Agreement does not: (i) violate any applicable law or other restriction of any Governmental Authority applicable to the Restricted Person; (ii) violate or conflict with, result in a breach or termination of, constitute a default or give any Person any additional right (including a termination right) under, permit cancellation of, result in the creation of any Encumbrance upon any of the assets or properties of the Restricted Person under, or result in or constitute a circumstance which, with or without notice or lapse of time or both, would constitute any of the foregoing under, any Contract to which the Restricted Person is a party or by which the Restricted Person or any of the Restricted Person's assets or properties are bound; or (iii) result in the creation of any Encumbrance on any assets of the Restricted Person.

## ARTICLE 3

## COVENANTS AND AGREEMENTS

Section 3.01.   <u>Non-Competition</u>.

(a)     The Restricted Person agrees that, except on behalf of or as directed in writing by Purchaser or its Affiliates, during the period from the date hereof until the two (2) year anniversary of the date hereof (such period the "<u>Restricted Period</u>"), the Restricted Person shall not, and shall cause each of its Affiliates not to, directly or indirectly, carry on, engage in or be concerned or interested in any Restricted Business in any capacity, including rendering services to or having a financial interest in (other than ownership of two percent (2%) or less of any publicly traded company that conducts a Restricted Business) any Restricted Business or assisting any Person engaged in any Restricted Business.  For the avoidance of doubt, the parties agree that it would be a violation of this <u>Section 3.01</u> for the Restricted Person or any of its Affiliates to act as consultant, advisor, independent contractor, officer, manager, employee, principal, agent, lender or trustee of any Person that is engaged in any Restricted Business during the Restricted Period.  For purposes hereof, "<u>Restricted Business</u>" means any business or venture that competes, directly or indirectly, with the Business within the United States.

Section 3.02.   <u>Non-Solicitation</u>.  The Restricted Person agrees that, except on behalf of or as directed in writing by Purchaser or its Affiliates, during the Restricted Period, the Restricted Person shall not, and shall cause each of its Affiliates not to, directly or indirectly, solicit for employment, employ or retain as an employee, consultant, independent contractor or agent any Transferred Employee; <u>provided</u>, that nothing in this <u>Section 3.02</u> shall prohibit the

47

*Approved by Judge Michael Kaplan January  22, 2010*

Restricted Person or any of its Affiliates from making general solicitation advertisements that are not targeted at any such Transferred Employee, or hiring any Transferred Employee who responds to such general solicitation.

Section 3.03.  Confidentiality.  After the Closing, the Restricted Person shall (and shall cause its Affiliates to) hold, and shall use commercially reasonable efforts to cause its representatives to hold, in strict confidence from any Person (other than any such representative) all non-public documents and information concerning the Business, the Purchased Assets and Purchaser or any of its Affiliates, either furnished to the Restricted Person by Purchaser or its Affiliates or representatives, or to which the Restricted Person otherwise had access to at any time (including prior to the Closing Date) in connection with the Asset Purchase Agreement or the transactions contemplated thereby or the conduct of the Business prior to the Closing (collectively, the "Confidential Information"), except to the extent that such documents or information can be shown by the Restricted Person to have been: (a) previously known by the Person receiving such documents or information (excluding information related to the Business or Purchased Assets); (b) in the public domain (either prior to or after the furnishing of such documents or information hereunder) through no fault of the receiving Person; or (c) later lawfully acquired by the receiving Person from another source that is not under an obligation to either Purchaser or another Person to keep such documents and information confidential.  In the event that the Restricted Person (or any of its Affiliates) is requested or required by oral question, interrogatory, request for information or documents, subpoena, civil investigative demand or similar process to disclose any Confidential Information, such Person shall (i) provide Purchaser with prompt notice so that Purchaser may seek a protective order or other appropriate remedy or, in Purchaser's sole discretion, waive compliance with the provisions of this Section 3.03 and (ii) cooperate with Purchaser, at Purchaser's expense, in any effort Purchaser undertakes to obtain a protective order or other remedy.  In the event that such protective order or other remedy is not obtained or Purchaser waives compliance with the provisions of this Section 3.03, the disclosing Person shall disclose to the Person compelling disclosure only that portion of the Confidential Information that the disclosing Person is advised, by its counsel, is legally required and shall use commercially reasonable efforts to obtain reliable assurance that confidential treatment is accorded the Confidential Information so disclosed (to the extent available).

Section 3.04.  Remedies.

(a)    The Restricted Person acknowledges that (a) any violation of the provisions of this Article 3 would cause irreparable harm to Purchaser and that money damages would not be an adequate remedy for any such violation and (b) accordingly, Purchaser and its Affiliates shall be entitled to obtain injunctive or other equitable relief to prevent any actual or threatened breach of any of such provisions and to enforce such provisions specifically, without the necessity of posting a bond or other security or of proving actual damages, by an appropriate court in the appropriate jurisdiction.  The remedies provided in this Article 3 are cumulative and shall not exclude any other remedies to which Purchaser may be entitled under this Agreement or applicable law, and the exercise of a remedy under this Article 3 shall not be deemed an election excluding any other remedy or any waiver thereof.

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

(b)    If any Governmental Authority determines that the restrictions contained in Section 3.01, Section 3.02 or Section 3.03 are too broad or otherwise unreasonable under applicable law, including with respect to time or geographical scope, such Governmental Authority is hereby requested and authorized by the parties to revise the foregoing restriction to include the maximum restrictions allowable under applicable law.  The Restricted Person acknowledges, however, that this Agreement has been negotiated by the Restricted Person and that the geographical scope and time limitations, as well as the limitation on activities, contained in Section 3.01, Section 3.02 and Section 3.03 are reasonable in light of the circumstances pertaining to the Business and the transactions contemplated by the Asset Purchase Agreement.

## ARTICLE 4

## GENERAL PROVISIONS

Section 4.01.  Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes all other prior agreements and understandings, both written and oral, between the parties, with respect to the subject matter hereof.

Section 4.02.  Expenses.  Each party shall bear its respective costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

Section 4.03.  Assignability.  This Agreement shall not be assignable by either party without the prior written consent of the other party, except that Purchaser may assign its rights and delegate its duties under this Agreement to one or more Affiliates.  Any purported assignment in contravention of this provision shall be null and void.  Subject to the provisions of this Section 4.03, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 4.04.  Applicable Law.  This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of New York applicable to contracts made therein, without regard to rules of conflicts of law.

Section 4.05.  Binding Effect; Benefit.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their successors and permitted assigns.  Nothing in this Agreement, express or implied, is intended to confer on any Person other than the parties hereto, and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 4.06.  Notices.  All notices required or permitted to be given hereunder shall be in writing and may be delivered by hand, by facsimile or by nationally recognized private courier.  Notices delivered by hand, by facsimile or by nationally recognized private carrier shall be deemed given on the first (1st) Business Day following receipt; provided, that a notice delivered by facsimile shall only be effective if such notice is also delivered by hand, or deposited in the United States mail, postage prepaid, registered or certified mail on or before two (2) Business Days after its delivery by facsimile.  All notices shall be addressed as follows:

1499386.10

| | |
|---|---|
| If to the Restricted Person: | Copy to: |
| If to Purchaser: | Copy to: |
| Platinum Equity Advisors, LLC | Mayer Brown LLP |
| 360 North Crescent Drive, South Building | 350 South Grand Avenue |
| Beverly Hills, California 90210 | 25th Floor |
| Telecopier: (310) 712-1848 | Los Angeles, California 90071-1503 |
| Attention: Eva M. Kalawski, Executive | Telecopier: (213) 576-8177 |
| Vice President, General Counsel and | Attention: Brian T. May |
| Secretary | |

or, in each case, at such other address as may be specified in writing to the other party..

Section 4.07.  Amendments.  This Agreement shall not be modified or amended except pursuant to an instrument in writing executed and delivered on behalf of each of the parties hereto.

Section 4.08.  Headings.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement.

Section 4.09.  Counterparts.  This Agreement may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same Agreement.

Section 4.10.  Waiver of Breach, Right or Remedy.  The waiver by any party of any breach or violation by the other party of any provision of this Agreement or of any right or remedy of the waiving party in this agreement (a) shall not waive or be construed to waive any subsequent breach or violation of the same provision, (b) shall not waive or be construed to waive a breach or violation of any other provision and (c) shall be in writing and may not be presumed or inferred from any party's conduct.  Except as expressly provided otherwise in this Agreement, no remedy conferred by this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be in addition to every other remedy granted in this Agreement or now or hereafter existing at law or in equity, by statute or otherwise.  The election of one or more remedies by a party shall not constitute a waiver of the right of such party to pursue other available remedies.  In addition to any other rights and remedies any party may have at law or in equity for breach of this Agreement, Purchaser shall be entitled to seek an injunction or other specific performance to enforce the provisions of this Agreement.

Section 4.11.  Waiver of Jury Trial.  Each party hereto acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury in respect of any litigation directly or indirectly arising out of or related to this Agreement or the transactions contemplated hereby. Each party certifies and acknowledges that it: (a) understands and has considered the implications of this waiver; (b)

1499386.10

*Approved by Judge Michael Kaplan January 22, 2010*

makes this waiver voluntarily; and (c) has been induced to enter into this Agreement by, among other things, the mutual waiver in this Section 4.11.

Section 4.12.  Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 4.13.  Construction.

(a)    The parties have participated jointly in the negotiation and drafting of this Agreement.   In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(b)    Any reference to any federal, state, local or foreign law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

(c)    Unless the context otherwise requires, as used in this Agreement, (i) "including" and its variants mean "including, without limitation" and its variants, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it; (ii) words defined in the singular have the parallel meaning in the plural and vice versa; (iii) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement and the Schedules and any Exhibits hereto; (iv) all Sections referred to herein are, respectively, Sections of, this Agreement; (v) words importing any gender shall include other genders; (vi) a dollar figure ($) used in this Agreement shall mean U.S. dollars; and (vii) any reference to "days" means calendar days, unless Business Days are expressly specified.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

1499386.10

*Approved by Judge Michael Kaplan January  22, 2010*

IN WITNESS WHEREOF, the parties hereto have executed this Non-Competition, Non-Solicitation and Confidentiality Agreement on the date first above written.

**PURCHASER:**

VENTANAS ACQUISITION
CORPORATION

By:_____

Name:_____

Title:_____

**RESTRICTED PERSON:**

_____

[name]

1499386.10

# INDEX OF SCHEDULES

| Schedule | Description |
| --- | --- |
| 1.1(a) | Excluded Notes Receivable |
| 2.2(d)(i) | Assumed Business Contracts |
| 2.2(d)(ii) | Assumed Customer Orders |
| 3.1(c) | Purchaser Cure Amounts and Assumed Accounts Payable |
| 5.2(b) | Required Consents |
| 5.2(f) | Tangible Personal Property |
| 5.2(g) | Litigation and Proceedings |
| 5.2(h) | Financial Statements |
| 5.2(j)(i) | Business Contracts |
| 5.2(j)(ii) | Real Property Leases |
| 5.2(l) | Affiliate Transactions |
| 5.2(m) | Material Customers and Suppliers |
| 5.2(n) | Seller Owned Intellectual Property |
| 5.2(o) | Business Employees |
| 5.2(p) | Labor and Employment Matters |
| 5.2(q)(i) | Seller Plans |
| 5.2(q)(ii) | Seller Plan Contributions |
| 5.2(q)(iii) | COBRA Qualified Beneficiaries |
| 5.2(s) | Customer Prepayments and Deposits |
| 5.2(u) | Warranty Obligations |
| 7.2(h) | Lease Terms |

*Approved by Judge Michael Kaplan January  22, 2010*

# DISCLOSURE SCHEDULES

### ASSET PURCHASE AGREEMENT

### BY AND BETWEEN

## BAMBOO ABBOTT, INC. D/B/A PRESTIGE WINDOW FASHIONS ("SELLER")

### AND

## VENTANAS ACQUISITION CORPORATION ("PURCHASER")

### DATED: JANUARY 14, 2010

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 1.1(a)

### Excluded Notes Receivable

1.      Note by GKSS Internet, Inc. in favor of Seller, as holder, dated _____, 2008, in the original principal amount of $133,860.73.  As of the Agreement Date $10,681.64 remains due and outstanding, and such amount will be the amount due and outstanding as of the Closing Date, assuming the Closing occurs on or before January 31, 2010.

2.      Agreement and Note by GKSS Internet, Inc. t/a Islandblinds.com in favor of Seller, as holder, dated February 27, 2009, in the original principal amount of $160,000. As of the Agreement Date $160,000 remains due and outstanding, and such amount will be the amount due and outstanding as of the Closing Date, assuming the Closing occurs on or before January 31, 2010.

3.      Note and Guaranty by Islandblinds.com, Inc. dba Islandblinds.com and Joseph A. Mehm and Sherry L. Mehm, as Guarantors, in favor of Seller, as holder, dated _____, 2008, in the original principal amount of $100,000.  As of the Agreement Date $100,000 remains due and outstanding, and such amount will be the amount due and outstanding as of the Closing Date, assuming the Closing occurs on or before January 31, 2010.

4.      Customer Note and Guaranty by Moushey Enterprises, Inc. and David P. Moushey and Melissa Moushey, as Guarantors, in favor of Seller, as holder, dated _____, in the original principal amount of $60,264.56.  As of the Agreement Date $42,568.89 remains due and outstanding, and such amount will be the amount due and outstanding as of the Closing Date, assuming the Closing occurs on or before January 31, 2010.

*Approved by Judge Michael Kaplan January  22, 2010*

## <u>Schedule 2.2(d)(i)</u>

### Assumed Business Contracts

1.      Collective Bargaining Agreement by and between Bamboo Abbott, Inc. t/a Prestige Window Fashions and Amalgamated Industrial Union Local 76B and its divisions affiliated with the IUE-CWA, AFL-CIO, dated as of June 5, 2008.

2.      License Agreement by and between Seller and Microsoft Corporation dated _____ for Microsoft XP Pro and Microsoft Office 2003.

3.      REDACTED

4.      REDACTED

5.      REDACTED

6.      REDACTED

7.      REDACTED

8.      REDACTED

9.      REDACTED

46758/0001-6250835v1

*Approved by Judge Michael Kaplan January  22, 2010*

## <u>Schedule 2.2(d)(ii)</u>

### Assumed Customer Orders

See attached list of assumed customer orders (all open customer orders of Seller).

**REDACTED**

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 3.1(c)

### Purchaser Cure Amounts and Assumed Accounts Payable

Assumed Accounts Payable:

| Vendors/Suppliers | Accounts Payable Amount |
|---|---|
| Phase II | $50,000 |
| Total: | $50,000 |

Purchaser Cure Amounts under Assumed Contracts

None.

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 5.2(b)

## Required Consents

1.      Loan Agreement by and between Seller and Turnils North America, Inc. dated June 3, 2009.

2.      Promissory Note by Seller in favor of Turnils North America, Inc. dated June 3, 2009 in the principal amount of $600,000.

3.      Supply Agreement by and between Seller and Turnils North America, Inc. dated June 3, 2009.

4.      Note by Seller in favor of Phase II Products, Inc. dated December 1, 2008 in the principal amount of $1,600,000.

5.      Supply Agreement by and between Seller and Phase II Products, Inc. dated December 1, 2008.

6.      Credit and Security Agreement, by and between Seller and Wells Fargo Bank, National Association dated January 25, 2008, and the related Revolving Note, Equipment Term Note, CAPEX Note, Structural Overadvance Note, Trademark Security Agreement and Guaranty Agreements.

*Approved by Judge Michael Kaplan January  22, 2010*

## <u>Schedule 5.2(f)</u>

### Tangible Personal Property

See attached.

*Approved by Judge Michael Kaplan January  22, 2010*

**REDACTED**

### Schedule 5.2(g)

### Litigation and Proceedings

1.      Pending wrongful discharge arbitration by and between Seller and Leticia Hernandez, such hearing was scheduled for December 9, 2009 at the New Jersey Board of Mediation.  Seller and Ms. Hernandez settled the claim at the hearing before testimony was heard (Seller reinstated Ms. Hernandez in a different job category).

2.      Juana Santiago and Luis Salguero each filed for arbitration through the union to review their respective wage loss claims and Seller's settlement proposal and stipulation with respect thereto.  Seller, without prejudice and with no precedential effect, offered to pay Ms. Santiago $160 and Mr. Salguero $200 in settlement of their claims.  Seller settled both claims before the hearing for $297.60 and $262.08 respectively, and such payments were made on November 25, 2009.

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 5.2(h)

**Financial Statements**

Please see attached the following financial statements:

1.      Unaudited balance sheet as of October 31, 2009

2.      Unaudited income statements for the ten months ended October 31, 2009

3.      Reviewed balance sheet as of December 31, 2008

4.      Reviewed income statement for the twelve months ended December 31, 2008

*Approved by Judge Michael Kaplan January  22, 2010*

**REDACTED**

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 5.2(j)(i)

### Business Contracts

1.      Loan Agreement by and between Seller and Turnils North America, Inc. dated June 3, 2009.

2.      Promissory Note by Seller in favor of Turnils North America, Inc. dated June 3, 2009 in the principal amount of $600,000.

3.      Supply Agreement by and between Seller and Turnils North America, Inc. dated June 3, 2009.

3.      Note by Seller in favor of Phase II Products, Inc. dated December 1, 2008 in the principal amount of $1,600,000.

4.      Supply Agreement by and between Seller and Phase II Products, Inc. dated December 1, 2008.

5.      Credit and Security Agreement, by and between Seller and Wells Fargo Bank, National Association dated January 25, 2008, and the related Revolving Note, Equipment Term Note, CAPEX Note, Structural Overadvance Note, Trademark Security Agreement and Guaranty Agreements.

6.      Collective Bargaining Agreement by and between Bamboo Abbott, Inc. t/a Prestige Window Fashions and Amalgamated Industrial Union Local 76B and its divisions affiliated with the IUE-CWA, AFL-CIO, dated as of June 5, 2008.

7.      REDACTED

8.      REDACTED

9.      Carrier Agreement by and between Seller and United Parcel Service, Inc. dated November 1, 2005, as amended on March 6, 2007, including Service Schedule No. 1 Trade Direct Cross Border Service for Mexico and the United States by and between Seller and UPS Supply Chain Solutions, Inc. dated March 13, 2007, as amended.

10      Software License Agreement by and between Seller and PIC Business Systems, Inc. dated January 1, 1997.

11.     Note by and between Seller and Bank of America dated June 27, 2006 for 2007 Lexus ES350.

12.     Note by and between Seller and Ford Credit dated November 29, 2006 for 2006 Ford Explorer.

*Approved by Judge Michael Kaplan January  22, 2010*

13.    Note by and between Seller and Ford Credit dated June 26, 2006 for 2006 E350 Van.

14.    Note by and between Seller and Ford Credit dated _____ for 2006 E350 Van.

15.    Note by and between Seller and Ford Credit dated June 26, 2006 for 2006 Ford Explorer.

16.    Lease Agreement by and between Seller and Image Systems Leasing dated _____.

17.    Lease by and between Seller and Dell Financial dated _____.

18.    Note by GKSS Internet, Inc. in favor of Seller, as holder, dated _____, 2008, in the original principal amount of $133,860.73.

19.    Agreement and Note by GKSS Internet, Inc. t/a Islandblinds.com in favor of Seller, as holder, dated February 27, 2009, in the original principal amount of $160,000.

20.    Note and Guaranty by Islandblinds.com, Inc. dba Islandblinds.com and Joseph A. Mehm and Sherry L. Mehm, as Guarantors, in favor of Seller, as holder, dated _____, 2008, in the original principal amount of $100,000.

21.    Customer Note and Guaranty by Moushey Enterprises, Inc. and David P. Moushey and Melissa Moushey, as Guarantors, in favor of Seller, as holder, dated _____, in the original principal amount of $60,264.56.

22.    License Agreement by and between Seller and Microsoft Corporation dated _____ for Microsoft XP Pro and Microsoft Office 2003.

23.    Credit Card Agreement by and between Seller and American Express dated _____.

24.    Service Agreement by and between Seller and Image Systems dated March 1, 2009.

25.    Credit Agreement by and between Seller and Malouf Ford, Inc. dated _____.

26.    Card Services Agreement by and between Seller and National Card dated _____.

27.    Agreement and Step Lease Addendum to Agreement by and between Seller and Neopost Leasing, Inc. dated _____.

*Approved by Judge Michael Kaplan January  22, 2010*

28.     Verizon Business Services Agreement by and between Seller and Verizon
Business Network Services, Inc. dated _____.

29.     Direct TV agreement by and between Seller and Direct TV dated _____.

*Approved by Judge Michael Kaplan January  22, 2010*

## <u>Schedule 5.2(j)(ii)</u>

### Real Property Leases

1.      Lease by and between Seller and Matrix Development Corporation dated
September 20, 2005 for the premises located at 1000 Amboy Avenue, Perth Amboy, New
Jersey.

2.      Lease by and between Seller and B.F.G. Realty, L.L.C. dated October 31, 2006 for
the premises located at 195 Raritan Center Parkway, Edison, New Jersey.

3.      Oral lease by and between Seller and Our Kids Realty, L.L.C. for the premises
located at 5 Pheasant Brook, Bedminster, New Jersey.

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 5.2(l)

### Affiliate Transactions

1.      Joel Botwick is a stockholder, officer and director of Seller and is currently employed by Seller.

2.      Philip Goldweitz is a stockholder, officer and director of Seller and is currently employed by Seller.

3.      Seller currently leases real property located at 195 Raritan Center Parkway in Edison, New Jersey from B.F.G. Realty, L.L.C., which is owned by Joel Botwick and Philip Goldweitz.

4.      Seller currently leases real property located at 5 Pheasant Brook, Bedminster, New Jersey from Our Kids Realty, L.L.C., which is owned by Joel Botwick and Philip Goldweitz.

*Approved by Judge Michael Kaplan January  22, 2010*

## <u>Schedule 5.2(m)</u>

### Material Customers and Suppliers

Please find attached a list of the twenty (20) largest customers and the twenty (20) largest suppliers of Seller for both the year ended December 31, 2008 and for the ten months ended October 31, 2009.

*Approved by Judge Michael Kaplan January  22, 2010*

**REDACTED**

46758/0001-6250835v1

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 5.2(n)

## Seller Owned Intellectual Property

See attached.

46758/0001-6250835v1

**REDACTED**

*Approved by Judge Michael Kaplan January  22, 2010*

### Schedule 5.2(o)

**Business Employees**

Chart of key employees:

**REDACTED**

See attached chart for all other Business Employees.

*Approved by Judge Michael Kaplan January  22, 2010*

**REDACTED**

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 5.2(p)

### Labor and Employment Matters

1.      Collective Bargaining Agreement by and between Bamboo Abbott, Inc. t/a
Prestige Window Fashions and Amalgamated Industrial Union Local 76B and its
divisions affiliated with the IUE-CWA, AFL-CIO, dated as of June 5, 2008.

2.      Employment Agreement by and between [Redacted] and Seller dated 7/13/09.

3.      Employment Agreement by and between [Redacted] and Seller dated 2/1/05.

4.      Employment Agreement by and between [Redacted] and Seller dated 5/1/04.

5.      Employment Agreement by and between [Redacted] and Seller dated 11/1/06.

6.      Employment Agreement by and between [Redacted] and Seller dated 11/20/06.

7.      Employment Agreement by and between [Redacted] and Seller dated 5/5/03.

8.      Employment Agreement by and between [Redacted] and Seller dated 10/1/05.

9.      Employment Agreement by and between [Redacted] and Seller dated 12/1/08.

10.     Employment Agreement by and between [Redacted] and Seller dated 6/25/03.

11.     Employment Agreement by and between [Redacted] and Seller dated 9/7/04.

*Approved by Judge Michael Kaplan January  22, 2010*

## <u>Schedule 5.2(q)(i)</u>

### Seller Plans

1.     Bamboo Abbott, Inc. 401(k) Savings Plan, ID 7-08193

2.     Aetna Insurance Company (Medical Plan)

3.     Sun Life Disability Plan

4.     Sun Life Life Insurance Plan

5.     Lincoln Life & Annuity Co. of NY Disability Insurance (provided for the benefit of Joel Botwick and Philip Goldweitz only)

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 5.2(q)(ii)

### Seller Plan Contributions

None.

*Approved by Judge Michael Kaplan January  22, 2010*

## <u>Schedule 5.2(q)(iii)</u>

### COBRA Qualified Beneficiaries

See attached.

*Approved by Judge Michael Kaplan January  22, 2010*

**REDACTED**

46758/0001-6250835v1

*Approved by Judge Michael Kaplan January  22, 2010*

## Schedule 5.2(s)

### Customer Prepayments and Deposits

See attached.

*Approved by Judge Michael Kaplan January  22, 2010*

**REDACTED**

*Approved by Judge Michael Kaplan January  22, 2010*

## **Schedule 5.2(u)**

## **Warranty Obligations**

See attached.

46758/0001-6250835v1

## Schedule 7.2(h)

### Lease Terms

**REDACTED**

EXECUTION COPY

## AMENDMENT NO. 1 TO
## ASSET PURCHASE AGREEMENT

THIS AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT (this "Amendment") is made and entered into as of January 21, 2010 by and between Bamboo Abbott, Inc., a New Jersey corporation d/b/a Prestige Window Fashions and a debtor-in-possession ("Seller"), and Ventanas Acquisition Corporation, a Delaware corporation ("Purchaser").

## RECITALS

WHEREAS, Seller and Purchaser are parties to that certain Asset Purchase Agreement, dated as of January 14, 2010 (the "Purchase Agreement");

WHEREAS, the obligation of Purchaser to consummate the transactions contemplated by the Purchase Agreement is subject to the condition that the sum of the Inventory Value Amount, the Cash Amount and the Accounts Receivable Amount equals or exceeds $13,400,000 (the "Inventory Closing Condition");

WHEREAS, Seller and Purchaser have reasonably determined that the Inventory Closing Condition will not be met;

WHEREAS, in order to induce Purchaser to waive the Inventory Closing Condition and consummate the transactions contemplated by the Purchase Agreement, Seller and Purchaser desire to amend the Purchase Agreement to, among other things, waive the Inventory Closing Condition and adjust the Purchase Price;

WHEREAS, Seller and Purchaser have agreed that Purchaser shall not be required to undertake any obligation of Seller to make payment to Turnils; and

WHEREAS, pursuant to Section 11.8 of the Purchase Agreement, the Purchase Agreement may be modified or amended only in a writing executed by Seller and Purchaser.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I.

## DEFINITIONS

Capitalized terms not otherwise defined in this Amendment shall have the respective meanings ascribed to such terms in the Purchase Agreement.

*Approved by Judge Michael Kaplan January  22, 2010*

## ARTICLE II.

## PURCHASE AGREEMENT AMENDMENTS AND CLARIFICATIONS

2.1     Section 2.2(b).  Section 2.2(b) of the Purchase Agreement is hereby amended by deleting it in its entirety and inserting the following in lieu thereof:

> "all accounts receivable, trade receivables, notes receivable (including the notes receivable listed on Schedule 1.1(a)) and other receivables of the Business and any security or collateral therefor, including recoverable customer deposits (collectively, the "Accounts Receivable");"

2.2     Section 2.3(a).  Section 2.3(a) of the Purchase Agreement is hereby amended by deleting it in its entirety and inserting the following in lieu thereof:

> "any contract of Seller other than the Assumed Contracts;"

2.3     Section 4.1.   Section 4.1 of the Purchase Agreement is hereby amended by deleting it in its entirety and inserting the following in lieu thereof:

> "The aggregate consideration for the Purchased Assets (the "Purchase Price") shall be (a) a cash purchase price in an amount equal to $6,500,000 (the "Closing Date Payment") and (b) the assumption by Purchaser of the Assumed Liabilities and.  Purchaser agrees to pay the Closing Date Payment in the manner described in this ARTICLE IV.  The Purchase Price shall be allocated among the Purchased Assets in the manner described in Section 4.5."

2.4     Sections 7.1(f).  Seller hereby waives the condition set forth in Section 7.1(f) and acknowledges and agrees that the obligation of Seller to consummate the transactions contemplated by the Agreement shall not be subject to satisfaction at or prior to the Closing Date of the condition set forth in Section 7.1(f).

2.5     Sections 7.2(j) and (l).  Purchaser hereby waives the conditions set forth in Sections 7.2(j) and (l) and acknowledges and agrees that the obligation of Purchaser to consummate the transactions contemplated by the Agreement shall not be subject to satisfaction at or prior to the Closing Date of the conditions set forth in Sections 7.2(j) or (l).

## ARTICLE III.

## MISCELLANEOUS

3.1     Full Force and Effect.  Except as expressly modified by this Amendment, all of the terms, covenants, agreements, conditions and other provisions of the Purchase Agreement shall remain in full force and effect in accordance with their respective terms.  As used in the Purchase Agreement, the terms "this Agreement," herein, hereinafter, hereunder, hereto and words of similar import shall mean and refer to, from and after the date hereof, unless the context otherwise requires, the Purchase Agreement as amended by this Amendment.

1500826 09277963

*Approved by Judge Michael Kaplan January  22, 2010*

3.2    <u>Applicable Law</u>.  This Agreement shall be governed and controlled as to validity, enforcement, interpretation, construction, effect and in all other respects by the internal laws of the State of New York applicable to contracts made therein, without regard to rules of conflicts of law.

3.3    <u>Counterparts</u>.  This Amendment may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same Amendment.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

1500826 09277963

*Approved by Judge Michael Kaplan January  22, 2010*

IN WITNESS WHEREOF, the parties have executed this Amendment No. 1 to Asset
Purchase Agreement as of the date first above written.

BAMBOO ABBOTT, INC.

By: _____
        Joel S. Botwick, President
        and Chief Executive Officer

VENTANAS ACQUISITION
CORPORATION

By _____
        Name: Eva M. Kalawski
        Title:    Vice President and Secretary

:50p026-4927796}

IN WITNESS WHEREOF, the parties have executed this Amendment No. 1 to Asset Purchase Agreement as of the date first above written.

BAMBOO ABBOTT, INC.

By: _____

      Joel S. Botwick, President
      and Chief Executive Officer


VENTANAS ACQUISITION CORPORATION

By: _____

      Name:  Eva M. Kalawski
      Title:  Vice President and Secretary

1500826 09277963

*Approved by Judge Michael Kaplan January  22, 2010*